UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH FRAGALA, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>        vs.<br><br>500.COM LIMITED; MAN SAN LAW ZHENGMING PAN; DEUTSCHE BANK SECURITIES INC.; PIPER JAFFRAY & CO.; and OPPENHEIMER & CO. INC.,<br><br>           Defendants. | CASE NO. CV 15-01463 MMM (Ex)<br><br>ORDER APPOINTING LIU SHAOLIN AS LEAD PLAINTIFF AND APPROVING SELECTION OF LEAD COUNSEL |

On February 27, 2015, Joseph Fragala filed this putative securities class action on his own behalf and on behalf of similarly situated individuals against 500.com Limited ("500.com" or the "Company"), Man San Law ("Law"), Zhengming Pan ("Pan"), Deutshe Bank Securities Inc. ("DBS"), Piper Jaffray & Co. ("PJC"), and Oppenheimer & Co. ("Oppenheimer") (collectively, "defendants").[1]

On April 28, 2015, plaintiffs Liu Shaolin ("Liu"), LungHao Wei ("Wei"), and Min Joo ("Joo") each filed motions for appointment as lead plaintiff and approval of lead counsel pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a).[2]  On June 22, 2015, Joo filed a

---

[1]Complaint, Docket No. 1 (Feb. 27, 2015), ¶¶ 6-15.

[2]Motion for Appointment of Counsel and Appointment as Lead Plaintiff by LungHao Wei ("Wei Motion"), Docket No. 15 (Apr. 28, 2015); Memorandum in Support of Liu Shaolin's Motion for

notice of non-opposition to Liu's motion for appointment as lead plaintiff.[3]  Three days later, Wei also filed a notice of non-opposition to Liu's appointment as lead plaintiff.[4]  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds this matter appropriate for decision without oral argument; the hearing calendared for July 13, 2015, is therefore vacated, and the matter taken off calendar.

## I.  FACTUAL BACKGROUND

### A.    500.com's Business and Initial Public Offering

500.com is an online sports lottery service provider located in the People's Republic of China ("PRC").[5]  It allegedly contracts with lottery administration centers in PRC provinces to sell lottery products through its website, 500.com.[6]  Sports lottery products such as those sold on 500.com are purportedly regulated by the PRC Ministry of Finance, the China Sports Lottery Administration Center ("CSLAC"), and the PRC's province-based sports lottery administration centers.[7]  Fragala alleges that online lottery sales are illegal in the PRC without proper authorization from one of the governing

---

Appointment ("Liu Motion"), Docket No. 18 (Apr. 28, 2015); Motion for Appointment of Counsel and Appointment as Lead Plaintiff by Min Joo ("Joo Motion"), Docket No. 20 (Apr. 28, 2015); see Declaration of Ramzi Abadou in Support of LungHao Wei's Motion for Appointment ("Abadou Decl."), Docket No. 16 (Apr. 28, 2015); Declaration of Valerie Chang in Support of Liu Shaolin's Motion for Appointment ("Chang Decl."), Docket No. 19 (Apr. 28, 2015); Supplement to Motion for Appointment of Counsel by Liu Shaolin ("Shaolin Supplement"), Docket No. 27 (June 29, 2015); Memorandum in Support of Min Joo's Motion for Appointment ("Joo Memo"), Docket No. 21 (Apr. 28, 2015); Declaration of Laurence Rosen in Support of Min Joo's Motion for Appointment ("Rosen Decl."), Docket No. 22 (Apr. 28, 2015).

[3]Notice of Non-Opposition filed by Min Joo ("Joo Non-Opposition"), Docket No. 24 (June 22, 2015).

[4]LungHao Wei's Notice of Non-Opposition ("Wei Non-Opposition"), Docket No. 26 (June 22, 2015).

[5]Complaint, ¶¶ 25, 29.

[6]*Id.*

[7]*Id.*, ¶¶ 26, 27.

agencies.[8]

On October 22, 2013, 500.com purportedly filed a Registration Statement on Form F-1 with the Securities and Exchange Commission ("SEC").[9]  Thereafter, it purportedly amended the Registration Statement on Form F-1/A; the amended Registration Statement was allegedly declared valid by the SEC on November 21, 2013.[10]  It purportedly states:

> "All of our net revenues come from service fees paid to us by provincial lottery administration centers for purchase orders of national and provincial lottery products we direct to them.  We have entered into service agreements with a number of provincial lottery administration centers.  Pursuant to these service agreements, each provincial lottery administration center generally pays us a fixed percentage of the total purchase amount received from us as a service fee."[11]

On November 22, 2013, 500.com allegedly filed its final prospectus with the SEC.[12]  The share price listed in the initial public offering prospectus was $13.00 per share.  The day the prospectus was filed, the Company's 5,786,000 American Depository Shares ("shares") opened on the New York Stock Exchange at $20.00 per share.[13]  Between November 22, 2013, and February 25, 2015 (the "class period"), Fragala and members of the class purchased or acquired 500.com shares.[14]

**B.  500.com's Purportedly False and Misleading Statements**

Fragala alleges that, on multiple occasions prior to and during the class period, the Company made false and misleading statements regarding the fact that it had received approval from the Ministry

---

[8]*Id.*, ¶ 27.

[9]*Id.*, ¶ 22.

[10]*Id.*

[11]*Id.*, ¶ 29.

[12]*Id.*, ¶ 24.

[13]*Id.*

[14]*Id.*, ¶¶ 6, 17.

3

of Finance, the CSLAC, and provincial sports lottery administration centers to sell sports lottery products online. In its Registration Statement, for example, 500.com allegedly stated that "[i]n the nine months ended September 30, 2013, we increased our sales and marketing efforts following the receipt of the approval for online sales services for sports lottery products in order to recover and grow our user base and activity level."[15] In separate filings with the SEC on March 26 and April 2, 2014, the Company again purportedly stated that it had "obtained . . . approval for online sales services for sports lottery products."[16]

On May 8, 2014, the Company allegedly issued a press release that was filed with its Form 6-K the same day.[17] In the press release, 500.com allegedly stated that "it ha[d] obtained all relevant approvals to legitimately operate an online sports lottery service in China."[18] Approximately four months later, on September 10, 2014, the Company issued another press release, which purportedly stated that "[the Company] has obtained all relevant and necessary licenses and approvals to legally provide online sports lottery services in China[ ] and [ ] it has made accurate and full disclosures on its business operations."[19]

Fragala also alleges that the Company made false statements regarding the alleged suspension of 500.com's licenses. In an email purportedly sent to investors on February 23, 2015, the Company stated:

> "The rumors that you have heard regarding the Chinese government's revocation of 500.com's license and that Mr. Man San Law has been detained by authorities are false and have conveniently been spread during China's seven-day new year's holiday. Mr. Law has not been detained and the Company's business continues to operate normally. As mandated by the government, lottery sales are suspended during Chinese New Year

---

[15]*Id.*, ¶ 30.

[16]*Id.*, ¶¶ 31-32.

[17]*Id.*, ¶ 33.

[18]*Id.*

[19]*Id.*, ¶ 34.

holidays nationwide.  Sales will resume after the Chinese New Year holiday ends on Wednesday, February 25, 2015."[20]

Fragala claims that the preceding statements were materially false and failed to disclose certain facts allegedly known to defendants, including: (a) the Company did not have the necessary approvals to conduct online operations; (b) the Company faced the risk of voluntary suspension of the acceptance of online purchase orders for lottery products by provincial sports lottery administration centers; and (c) the Company knew that it would not be operated as usual after the end of the Chinese New Year holiday.[21]

### C.       The Discovery of 500.com's False Statements

On May 7, 2014, *Jinghua Daily* allegedly published an article that was circulated throughout Chinese media.  The article reported that the China Welfare Lottery Administration Center ("CWLAC") and CSLAC had both stated that they had not authorized any website or agency to conduct online lottery sales.[22]  The CWLAC and CSLAC also allegedly stated that all online lottery sales in the PRC were illegal.[23]  The same day, *GeoInvesting* purportedly published an article titled "500.com (WBAI) – On-Line Sports Lottery Business Facing Legal Controversy."[24]  The article purportedly compared statements made by the CWLAC and CSLAC in *Jinghua Daily* with statements made by the Company in its SEC filings, and concluded that they were contradictory.[25]  The *GeoInvesting* article stated, in relevant part:

"On May 7, 2014, a news article published by *Jinghua Daily* brings to light a situation that may materially impact WBAI's daily business.  We have found no related press release in the U.S.

The China Sports Lottery Administration Center ('the Center') said that, to date, it has

---

[20]*Id.*, ¶ 35.

[21]*Id.*, ¶ 36.

[22]*Id.*, ¶ 37.

[23]*Id.*

[24]*Id.*, ¶ 38.

[25]*Id.*

5

not yet authorized any sports lottery websites.  The news article further states that, based on the '*Implementing Rules of Regulation on Administration of Lottery*,' online lottery sales are illegal without prior authorization.

The major business that 500.com (NYSE: WBAI) conducts is that of online sports lottery sales.  If the Center forbids and/does not authorize the online sports lottery sales in China, WBAI's business may be subject to suspension.

That's why we find it interesting that in its April 2, 2014 F-1, WBAI states:

> 'In October 2012, we were notified by China Sports Lottery Administration Center that we were one of the two entities that had been approved by the MOF to conduct online sales of sports lottery products in China on behalf of China Sports Lottery Administration Center. However, since the operation of online sports lottery sales services by China Sports Lottery Administration Center itself is in a pilot phase and is subject to further approval by the MOF, our operation of online sales of sports lottery products may be subject to suspension if China Sports Lottery Administration Center fails to obtain such further approval from the MOF.  We are currently awaiting approval from the MOF to provide sales services for welfare lottery products.'

Apparently, the claim in the newspaper contradicts the statement in WBAI's SEC files. Now we need to wait to see how the company would respond to this information from China Sports Lottery Administration Center.  We will also keep tracking the progress on this issue."[26]

Following the publication of these articles, 500.com's stock purportedly fell $5.07 per share – or more than 15% in value – from its previous closing price of $28.61 per share on May 7, 2014.[27]

On January 17, 2015, Sina.com, the website for a Chinese online media company, allegedly

---

[26]*Id.*

[27]*Id.*, ¶ 39.

reported that, on January 15, 2015, the Ministry of Finance, the Ministry of Civil Affairs, and the General Administration of Sports of the People's Republic of China issued a notice requiring that provincial agencies conduct self-inspections to detect unauthorized online lottery sales and prepare a written report of their findings no later than March 1, 2015.[28]  Fragala alleges that, following the dissemination of this notice, the Company's stock purportedly fell $0.60 per share – or more than 3% – from its previous closing price of $17.52 per share on January 20, 2015.[29]

Online media outlet *TheStreet.com* allegedly published an article on February 23, 2015, which stated that 500.com's license to operate as an online sports lottery operator had been revoked by the CSLAC and that its Chief Executive Officer ("CEO"), Man Saw Law, had been detained.[30]  Following the publication of this news, 500.com stock allegedly fell $2.85 per share – or approximately 18% – from its previous closing price of $15.66 per share on February 20, 2015.[31]

Two days later, on February 25, 2015, the Company purportedly issued a press release captioned "500.com Limited Announces Suspension of Sales by Certain Provincial Sports Lottery Administration Centers."  The article stated, in relevant part:

> "500.com Limited (WBAI) ('500.com' or the 'Company'), a leading online sports lottery service provider in China, today announced that it had recently come to the Company's attention that certain provincial sports lottery administration centers to which the Company provides sport lottery sales services plan to temporarily suspend accepting online purchase orders for lottery products, in response to the Notice on Issues Related to Self-Inspection and Self-Remedy of Unauthorized Online Lottery Sales (the 'Notice'), which was jointly promulgated by the Ministry of Finance, the Ministry of Civil Affairs, and the General Administration of Sports of the People's Republic of China on January 15, 2015.

---

[28]*Id.*, ¶ 40.

[29]*Id.*, ¶ 41.

[30]*Id.*, ¶ 42.

[31]*Id.*, ¶ 43.

The Notice requires provincial and municipal government branches, including financial, civil affairs, and sports bureaus, to conduct inspection and take remedial measures for unauthorized online lottery sales within their respective jurisdictions.  The scope of inspection includes, among other things, commercial contract arrangements, online lottery products, lottery sales data exchange, online lottery sales channels, and sales commission fees in connection with unauthorized engagements of online sales agents by lottery administration centers.  The Notice further requires a formal report on the result of the self-inspection and self-remedy be submitted by each provincial or municipal government to the Ministry of Finance, the Ministry of Civil Affairs, and the General Administration of Sports of the People's Republic of China by March 1, 2015.

The Company was informed by certain provincial sports lottery administration centers that as part of their respective self-inspection processes, such provincial sports lottery administration centers that as part of their respective self-inspection processes, such provincial sports lottery administration centers plan to temporarily suspend accepting online purchase orders for lottery products starting from February 25, 2015.  Four high frequency lottery products for which the Company currently provides online services are affected as a result and the Company will not be able to accept online purchase orders for such suspended lottery products.  Aggregate revenue generated from the four suspended lottery products accounted for approximately 10.6% and 9.6% of the Company's total revenue in 2013 and 2014, respectively.  The Company is closely monitoring the development of the matter and will disclose relevant information in a timely manner once available.

The Company notes that, as stated in the preamble of the Notice, the promulgation of the Notice is an important step by the competent government authorities to sanction unauthorized online lottery sales and to ensure healthy development of the lottery market in China.  Although there is uncertainty involved in the implementation of the Notice, the Company believes such measures would have long-term beneficial effects on the lottery market in China.  In addition, the Company wishes to reiterate that the Company

has obtained the approval from the Ministry of Finance to provide online sports lottery services on behalf of China Sports Lottery Administration Center."

As a result of the Company's February 25, 2015 disclosure, 500.com stock purportedly fell $2.87 per share – more than 22% – from its previous closing price of $12.83 per share on February 24, 2015.[32]

### D.  Fragala's Claims

Fragala alleges that, as a result of defendants' material misrepresentations and omissions during the class period, 500.com stock was overvalued, and that Fragala and members of the class lost money when its inflated price decreased dramatically in 2015.[33]  Fragala pleads claims for (1) violation of § 10(b) of the Exchange Act and Rule 10b-5;[34] (2) violation of § 20(a) of the Exchange Act;[35] (3) violation of § 11 of the Securities Act;[36] (4) violation of § 12(a)(2) of the Securities Act;[37] and (5) violation of § 15 of the Securities Act.[38]

## II.  DISCUSSION

### A.  Legal Standard Governing Appointment of Lead Plaintiff

The Private Securities Litigation Reform Act ("PSLRA") provides that within twenty days after the date on which a securities class action complaint is filed,

> "the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class – (i) of the pendency of the action, the claims asserted

[32]*Id.*, ¶ 45.

[33] *Id.*, ¶ 54.

[34]*Id.*, ¶¶ 55-58.

[35]*Id.*, ¶¶ 59-60.

[36]*Id.*, ¶¶ 61-68.

[37]*Id.*, ¶¶ 69-77.

[38]*Id.*, ¶¶ 78-84.

therein, and the purported class period; and (ii) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class." 15 U.S.C. § 78u-4(a)(3)(A).

If more than one action is filed, only the plaintiff or plaintiffs in the first-filed action must publish notice. See 15 U.S.C. § 78u(4)(a)(3)(A)(ii). The Act requires that within ninety days after publication of the notice,

"the court . . . shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter . . . referred to as the 'most adequate plaintiff'). . . ." 15 U.S.C. § 78u-4(a)(3)(B)(i).

In selecting a lead plaintiff,

"the court shall adopt a presumption that the most adequate plaintiff in any private action . . . is the person or group of persons that – (aa) has either filed the complaint or made a motion [for designation as lead plaintiff]; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

This presumption may be rebutted

"only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff – (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)((iii))(II).

Interpreting these statutes, the Ninth Circuit has held that the Act "provides a simple three-step process for identifying the lead plaintiff" in a securities fraud case. *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002). "The first step consists of publicizing the pendency of the action, the claims made and the purported class period." *Id.* At the second step, "the district court must consider the losses allegedly suffered by the various plaintiffs," and select as the "presumptively most adequate

plaintiff . . . the one who has the largest financial interest in the relief sought by the class and [who] otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* at 729-30 (internal citations omitted). As a third and final step, the court must "give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." *Id.* at 730.[39]

The *Cavanaugh* court cautioned that "a straightforward application of the statutory scheme . . . provides no occasion for comparing plaintiffs with each other on any basis other than their financial stake in the case. . . . So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job." *Id.* at 732. With these principles in mind, the court turns to the competing motions for appointment as lead plaintiff that have been filed.

[39]See also *Miami Police Relief & Pension Fund v. Fusion-io, Inc.*, Nos. 13-CV-05368 LHK, 13-CV-05474 LHK, 14-CV-00242 LHK, 2014 WL 2604991, *3 (N.D. Cal. June 10, 2014) ("Under the PSLRA, a three step process determines the lead plaintiff. First, the first plaintiff to file an action governed by the PSLRA must publicize the pendency of the action, the claims made, and the purported class period 'in a widely circulated national business-oriented publication or wire service.' This notice must also alert the public that 'any member of the purported class may move the court to serve as lead plaintiff.' Second, the court must select the presumptive lead plaintiff. In order to determine the presumptive lead plaintiff, 'the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit.' Once the court identifies the plaintiff with the most to gain, the court must determine whether that plaintiff, based on the information he provides, 'satisfies the requirements of Rule 23(a), in particular those of typicality and adequacy.' If he does, that plaintiff becomes the presumptive lead plaintiff. If not, the court selects the plaintiff with the next-largest financial stake and determines whether that plaintiff satisfies the requirements of Rule 23. The court repeats this process until it selects a presumptive lead plaintiff. Third, those plaintiffs not selected as the presumptive lead plaintiff may 'rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements.' This is done by showing that the presumptive lead plaintiff either 'will not fairly and adequately protect the interests of the class' or 'is subject to unique defenses that render such plaintiff incapable of adequately representing the class.' If the court determines that the presumptive lead plaintiff does not meet the typicality or adequacy requirement, then it must return to step two, select a new presumptive lead plaintiff, and again allow the other plaintiffs to rebut the new presumptive lead plaintiff's showing. The court repeats this process 'until all challenges have been exhausted'" (citations omitted)).

## B.      Publication of Notice

Fragala filed this action against defendants on February 27, 2015.[40] The same day, his attorney caused notice to be published via *BusinessWire*, a widely-circulated, business-oriented wire service.[41] The notice stated that a putative securities class action had been filed against 500.com and certain of its officers and underwriters, described Fragala's claims and allegations, and identified the class period involved.[42] It advised class members wishing to serve as lead plaintiff of their obligation to file a motion for appointment within sixty days of the date of the notice.[43] On April 28, 2015, Liu, Wei, and Joo each filed a motion for appointment as lead plaintiff.[44]

Because class notice was published within twenty days of the commencement of the action and advised the putative class of its pendency, Fragala's claims, the purported class period, and the fact that they could seek appointment as lead plaintiff within sixty days, the court finds that the notice requirements under § 78u-4(a)(3)(A)(i) have been satisfied. See 15 U.S.C. § 78u-4(a)(3)(A)(i) ("Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class: (I) of the pendency of the action, the claims asserted therein, and the purported class period; and  (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class"). Similarly, the pending motions for appointment as lead plaintiff were timely filed on April 28, 2015 – fifty-nine days after the publication of class notice. See 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). As a result, the court finds that Liu, Wei, and Joo have each satisfied the first statutory

[40]Complaint at 1.

[41]See Liu Motion at 6.  See also Declaration of Valerie Chang in Support of Motion for Appointment of Counsel and for Appointment of Liu Shaolin as Lead Plaintiff ("Chang Decl."), Docket No. 19 (Apr. 28, 2015), Exh. C.

[42]Chang Decl., Exh. C. at 1.

[43]*Id.* ("A class action lawsuit has already been filed.  If you wish to serve as lead plaintiff, you must move the Court no later than April 28, 2015").

[44]Liu Motion at 1; Wei Motion at 1; Joo Motion at 1.

12

requirement for appointment as lead plaintiff.[45]  See, e.g., *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 12-CV-06039-LHK, 2013 WL 2368059, *3 (N.D. Cal. May 29, 2013) ("On November 28, 2012, the same day as the filing of the complaint, the Retirement System's counsel published a notice in *Business Wire*.  This notice was timely because it was published within 20 days after the filing of the complaint, and it listed the claims, the class period, and advised putative class members that they had 60 days from the date of the notice to file a motion to seek appointment as lead plaintiff in the lawsuit.  The Retirement System then filed the instant motion within the statutory period specified in 15 U.S.C. § 78u–4(a)(3)(A).  The Retirement System has therefore met the statutory procedural requirements"); *City of Royal Oak Retirement System v. Juniper Networks, Inc.*, No. 5:11-CV-04003-LHK, 2012 WL 78780, *3 (N.D. Cal. Jan. 9, 2012) ("In accordance with the requirements under the PSLRA, Plaintiff City of Royal Oak Retirement System timely published a notice in *Business Wire* on August 16, 2011, one day after filing this action, informing the class of the pendency of the action, the claims made, and the purported class period.  Public Retirement Systems, IUOE Local 39, and Pension Funds all filed their respective motions for appointment as lead plaintiff and approval of lead counsel on October 17, 2011, which is within 60 days of publication of the notice.  Therefore, all three motions are timely and shall be considered by the Court" (citations omitted)); *Squyres v. Union Texas Petroleum Holdings, Inc.*, No. CV 98-6085-LGB (AIJx), 1998 WL 1144586, *2 (C.D. Cal. Nov. 2, 1998) ("Here, the Squyres have complied with the provisions of the PSLRA regarding appointment

---

[45]Each of Liu, Wei, and Joo has also complied with the certification mandated by 15 U.S.C. § 78u-4(a)(2), which requires that "[e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that – (i) states that the plaintiff has reviewed the complaint and authorized its filing; (ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter; (iii) states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary; (iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint; (v) identifies any other action under this chapter, filed during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and (vi) states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)."

of a lead plaintiff.  First, they published a notice on the *Business Wire* on August 3, 1998, which was within twenty days of the filing of the complaint on July 28, 1998.  The notice described the case, the Squyres' allegations, and the purported class.  The *Business Wire* has been recognized as a suitable vehicle for meeting the PSLRA's requirement that notice be published in a widely circulated national business-oriented publication or wire service.  Second, other potential plaintiffs had until October 3, 1998 to move this court to serve as lead plaintiffs.  No other potential plaintiffs made such a motion," citing *Greebel v. FTP Software, Inc*., 939 F.Supp. 57, 62-63 (D. Mass. 1996)).

### C.    Determination of the Presumptively Most Adequate Plaintiff

At the second step in identifying the presumptively most adequate plaintiff, the *Cavanaugh* court directed that district courts first determine the plaintiff who has the greatest financial stake in the litigation and examine whether that plaintiff satisfies the typicality and adequacy requirements of Rule 23 of the Federal Rules of Civil Procedure.  *Cavanaugh*, 306 F.3d at 729-30.  Specifically, once the court determines the plaintiff with the greatest financial stake, it "must . . . focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" *Id*. at 730 (emphasis in original).  See *In re Diamond Foods, Inc., Sec. Litig.*, 281 F.R.D. 405, 408 (N.D. Cal. 2012) ("The inquiry focuses on the 'typicality' and 'adequacy' requirements, as the other requirements in FRCP 23 of numerosity and commonality would preclude class certification by themselves"); *Gluck v. CellStar Corp*., 976 F.Supp. 542, 546 (N.D. Tex. 1997) (stating that the inquiry should "focus[ ] on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4), that is typicality and adequacy"); see also *In re Flight Safety Technologies, Inc. Securities Litig.*, 231 F.R.D. 124, 130 (D. Conn. 2005) ("[w]hile the PSLRA requires that the lead plaintiff satisfy all of Rule 23's requirements, the third and fourth requirements of Rule 23 – typicality and adequacy – are the key factors for a court's lead plaintiff determination" (internal quotation marks omitted)).

In doing so, the court "must rely on the presumptive lead plaintiff's complaint and sworn certification; there is no adversary process to test the substance of [his] claims." *Cavanaugh*, 306 F.3d at 730; see also *In re Cendant Corp. Litig.*, 264 F.3d 201, 264 (3d Cir. 2001) (stating that at this stage the "court may and should consider the pleadings that have been filed, the movant's application, and any

14

other information that the court requires to be submitted.  In keeping with the statutory text, however, the court generally will not consider at this stage any arguments by other members of the putative class").  "A wide ranging analysis is not appropriate" to determine whether the movant has made a prima facie showing that he satisfies the requirements of Rule 23, and "should be left for consideration on a motion for class certification."  *Fischler v. AMSouth Bancorp.*, No. 96-1567-Civ-7-17A, 1997 WL 118429, * 2 (M.D. Fla. Feb. 6, 1997); see also *In re Cendant Corp. Litig.*, 264 F.3d at 263 (stating that "[t]he initial inquiry (i.e., the determination of whether the movant with the largest interest in the case 'otherwise satisfies' Rule 23) should be confined to determining whether the movant has made a prima facie showing of typicality and adequacy"); *Gluck*, 976 F.Supp. at 546 ("Evidence regarding the requirements of Rule 23 will, of course, be heard in full at the class certification hearing.  There is no need to require anything more than a preliminary showing at this stage").

### 1. Financial Stake

As noted, the Act provides "that the *only* basis on which a court may compare plaintiffs competing to serve as lead [plaintiff] is the size of their financial stake in the controversy."  See *Cavanaugh*, 306 F.3d at 732.  As respects Liu's financial stake in this action, he states that he purchased a total of 40,000 shares of 500.com securities during the class period at a cost of $1,588,001.68.[46]  The value of his shares at the end of the class period was $535,200.00, reflecting a loss of $1,052,801.68.[47]  Joo purchased a total of 3,200 shares at a cost of $124,600.00.[48]  Joo's financial spreadsheet reflects that the current approximate value of his stock is $19,700.84; he thus suffered a loss during the class period of $104,899.16.[49]  Finally, Wei purchased a total of 960 shares of 500.com stock at a cost of $38,931.00.[50]  The value of Wei's shares at the end of the class period

---

[46]Liu Motion at 7.  See also Chang Decl., Exh. B at 1.

[47]*Id.*

[48]Joo Motion at 4.  See also Rosen Decl., Exh. 3 at 1.

[49]Rosen Decl., Exh. 3 at 1.

[50]Wei Motion at 6.  See also Abadou Decl., Exh. B at 1.

was $12,844.13, for a loss of $26,086.87.[51]

Of the movants, Liu suffered the largest financial loss as a result of defendants' purported violations of the federal securities laws. Indeed, Joo and Wei concede that Liu has the largest financial stake, and do not challenge the calculation of his purported losses.[52] Because Liu is the class member with the largest financial stake in the litigation – the most important factor in choosing a lead plaintiff – the court must consider whether he satisfies the remaining requirements for designation as the presumptively most adequate plaintiff. See *In re Advanced Tissue Sciences Securities Litig.*, 184 F.R.D. 346, 350 (S.D. Cal. 1998) ("All else equal the PSRLA requires that a court appoint as lead plaintiff the 'person or group of persons that . . . in the determination of the court has the *largest* financial interest in the relief sought by the class" (emphasis original)); see also *Miami Police Relief & Pension Fund*, 2014 WL 2604991 at *4 ("Here, FIG holds the largest financial stake in this litigation. FIG submitted a declaration establishing that its losses as a result of Defendants' conduct are approximately $1,235,967.62. There is no dispute that FIG suffered the greatest financial loss during the Class Period. Indeed, both Institutional Investor Group and Fusion-io Investor Group have conceded they do not have the largest financial stake in the action and that FIG has the largest financial interest. Further, Hassani, who filed a notice of non-opposition to FIG's motion and does not challenge FIG's calculation of FIG's losses, alleged a loss of only $590,674 during the Class Period in Hassani's original motion for appointment as lead plaintiff. Thus, the Court finds that FIG is the plaintiff with the greatest financial interest in the litigation"); *Puente v. Chinacast Educ. Corp.*, No. CV 12-4621-JFW (PLAx), 2012 WL 3731822, *2 (C.D. Cal. Aug. 22, 2012) ("A review of the declarations and briefs submitted by the Costa Brava Plaintiffs demonstrate that they are the presumptive lead plaintiffs because they have suffered an estimated loss of $3,837,086, and have the largest financial stake in this litigation").

### 2. Typicality and Adequacy Under Rule 23

As noted, "[a] wide-ranging analysis under Rule 23 is not appropriate [at the initial stages of the litigation] and should be left for consideration on a motion for class certification." *Takeda v. Turbodyne*

---

[51]Abadou Decl., Exh. B at 1.

[52]Joo Non-Opposition at 1; Wei Non-Opposition at 1.

*Technologies, Inc.*, 67 F.Supp.2d 1129, 1136 (C.D. Cal. 1999) (citing *Fischler*, 1997 WL 118429 at *2); see *Ravens v. Iftikar*, 174 F.R.D. 651, 665 (N.D. Cal. 1997), on reconsideration (July 16, 1997) (also citing *Fishcler*, 1997 WL 118429 at *2); see also *Gluck*, 976 F.Supp. at 546 ("Evidence regarding the requirements of Rule 23 will, of course, be heard in full at the class certification hearing.  There is no need to require anything more than a preliminary showing at this stage"); *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 587 (N.D. Cal. 1999) (stating that, at this stage of the litigation, nothing more than a preliminary showing is required).

Some inquiry as to whether the presumptively most adequate plaintiff is adequate and has claims that are typical is nonetheless necessary under Rule 23 to determine whether there is reason to believe that he has interests at odds with the remainder of the class.  See *Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398, 408-09 (D. Minn. 1998).  Accordingly, the court must consider whether Liu satisfies the requirements of Rule 23(a), and in particular, the requirements of "typicality" and "adequacy."  See *Cavanaugh*, 306 F.3d at 730 (stating that the "district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit.  It must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy'").

### a.    Typicality

"The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the [Lead Plaintiff] ha[s] incentives that align with those of absent class members so . . . that the absentees' interests will be fairly represented." *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994) (citation omitted).  The Ninth Circuit has stated that "[u]nder [Rule 23's] permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  "Typicality entails an inquiry whether the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which [his] claims are based differs from that upon which the claims of other class members will perforce be based." *Baby Neal*, 43 F.3d at 57-58 (citations and internal quotation marks omitted); *In re Cree, Inc., Securities Litigation*, 219

17

F.R.D. 369, 372 (M.D.N.C. 2003) ("The typicality requirement of the rule requires that a lead plaintiff suffer the same injuries as the class as a result of the defendant's conduct and ha[ve] claims based on the same legal issues"); *Patrykus v. Gomilla*, 121 F.R.D. 357, 362 (N.D. Ill. 1988) (holding that a "representative's claim is typical if it arises from the same . . . practice or course of conduct that gives rise to the claims of the other class members and . . . is based on the same legal theory" (citations and internal quotation marks omitted).

Like other class members, Liu acquired 500.com stock during the class period, at prices that were allegedly inflated artificially by defendants' material misrepresentations and omissions.[53]  Like them, he suffered losses when reports emerged that 500.com's license had been suspended and that the Company had not received all required authorizations from PRC authorities to provide sports lottery services and products online.  Based on the complaint and information supporting Liu's motion, there appear to be questions of law and fact common to all class members, including Liu: (1) whether 500.com violated the securities laws by misrepresenting or failing to disclose material facts during the class period; (2) whether defendants acted knowingly or with deliberate recklessness; (3) whether 500.com's stock price was artificially inflated as a result; and (4) whether, and to what extent, plaintiffs suffered damages.  See, e.g., *Tanne v. Autobytel, Inc*., 226 F.R.D. 659, 667 (C.D. Cal. 2005) ("Here, Kurtz's claims are typical because, just like other class members, he: (1) purchased or acquired Autobytel securities during the Class period, (2) at prices alleged to be artificially inflated by defendants' materially false and misleading statements and/or omissions, and (3) suffered damage as a result"); *Armour v. Network Assocs., Inc.*, 171 F.Supp.2d 1044, 1052 (N.D. Cal. 2001) (identifying the common questions presented in making a preliminary evaluation of typicality for purposes of a lead plaintiff motion, and finding that the proposed plaintiff satisfied the typicality requirement based on a "well-defined community of interests").

Here, after conducting a preliminary analysis, the court is satisfied that Liu's claims arise "from the same event[s] or course of conduct that gives rise to the claims of other class members" and that they are "based on the same legal theory."  See *Baby Neal*, 43 F.3d at 58.  It thus finds that Liu satisfies the

---

[53]Liu Motion at 9.

typicality requirement for purposes of appointment as lead plaintiff. See, e.g., *City of Royal Oak Retirement System*, 2012 WL 78780 at \*5 ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct. Here, the Court finds that the claims asserted by Public Retirement Systems are based on the same conduct giving rise to the other class members' claims, namely Defendants' alleged misrepresentations during the Class Period. The Court also finds that Public Retirement Systems has suffered the same injury as other plaintiffs, namely the purchase of Juniper stock during the Class Period at prices artificially inflated by Defendants' materially false and misleading statements and omissions. Accordingly, the Court finds that Public Retirement Systems satisfies the typicality requirement of Rule 23(a)" (citation omitted)); *Ferrari v. Gisch*, 225 F.R.D. 599, 607 (C.D. Cal. 2004) ("Because a 'preliminary showing' is all that is necessary, and because the Poppe Group has submitted sworn certifications and declarations indicating that they purchased securities during the relevant class period and suffered losses as a result, the court concludes that it has satisfied the burden of establishing typicality"); *Squyres*, 1998 WL 1144586 at \*3 ("The test of typicality 'is whether other members have the same or similar injury [as the named plaintiffs], whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' Here, by virtue of their ownership of Union Texas shares and their sale of those shares to ARCO, the Squyres allegedly suffered the same financial injury as the other class members. The Squyres' claims are based on the same conduct: whether Union Texas and the other defendants violated the '34 Act" (citations omitted)).

### b.    Adequacy of Class Representation

Rule 23(a) requires that the person representing a class be able "fairly and adequately to protect the interests" of all members in the class. FED.R.CIV.PROC. 23(a)(4). Whether the class representative can do so depends on the circumstances of each case. *McGowan v. Faulkner Concrete Pipe Co.*, 659 F.2d 554, 559 (5th Cir. 1981). The Ninth Circuit has held that representation is "adequate" when counsel for the class is qualified and competent, the representative's interests are not antagonistic to the interests of absent class members, and it is unlikely that the action is collusive. *In re Northern Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig.*, 693 F.2d 847, 855 (9th Cir. 1982). In addition, the class

19

representative must have a sufficient interest in the outcome of the case to ensure vigorous advocacy. See *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986). "Adequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action." *In re Milestone Scientific Securities Litigation*, 183 F.R.D. 404, 416 (D.N.J. 1998).

Because one relevant factor in assessing adequacy is whether the plaintiff has a sufficient financial incentive to monitor the litigation vigorously, the court's finding that Liu suffered the largest single loss of any plaintiff indicates that he will be an adequate class representative. Liu also states in a sworn declaration that he is willing "to serve as a representative party on behalf of [the] Class," and is not aware of any unique defenses to his individual claims.[54] He has also provided a list of his purchases and sales of 500.com stock during the class period.[55] This evidence suggests that Liu will adequately represent the proposed class. See *Tanne*, 226 F.R.D. at 668 ("Kurtz is an 'adequate' plaintiff because he has suffered the greatest financial loss, ensuring vigorous advocacy, and represented that he is 'committed to prosecution of the action.' Kurtz submitted both a certification detailing his purchases of Autobytel securities during the class period, and a declaration stating that he is willing to accept the responsibilities of serving as a representative party on behalf of the class"); see also *City of Royal Oak Retirement System*, 2012 WL 78780 at *5 ("The test for adequacy is whether the class representative and his counsel 'have any conflicts of interest with other class members' and whether the class representative and his counsel will 'prosecute the action vigorously on behalf of the class.' The Court finds that the claims of Public Retirement Systems are typical of the class and that Public Retirement Systems' interests are aligned with the interests of the absent class members. The Court further finds, upon review of the[ ] submitted declarations, that the Public Retirement Systems . . . [has] amply demonstrated [it] will vigorously prosecute the action on behalf of the class. Accordingly, the Court finds that Public Retirement Systems has shown it will fairly and adequately protects the interests of the

---

[54]Chang Decl., Exh. A.

[55]Chang Decl., Exh. B.

20

class, satisfying the adequacy requirement of Rule 23(a)"); *City of Harper Woods Employee Retirement System v. AXT, Inc.*, No. C 04-04362 MJJ, 2005 WL 318813, *4 (N.D. Cal. Feb. 7, 2005) ("[T]here is no evidence of antagonism between Morgan's interests and those of the class. [Moreover], Plaintiff Morgan's interests do not appear to differ from the other class members, as all plaintiffs claim to have suffered financial losses as a result of AXT's alleged misconduct. Finally, there is no evidence that this suit is collusive. Thus, Plaintiff Morgan satisfies the adequacy requirement of Rule 23").

Because Liu has suffered the greatest financial loss and has demonstrated that he meets the requirements, at this preliminary stage, of typicality and adequacy under Rule 23, the court finds that he is presumptively the most adequate lead plaintiff.

### 3.    Rebuttal of Presumption of Most Adequate Plaintiff

Under the Act, the statutory presumption that a party is the most adequate plaintiff can be rebutted by showing that "the presumptively most adequate plaintiff (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); see also *In re Advanced Tissue Sciences Securities Litig.*, 184 F.R.D. at 350-51. As noted in *In re Cendant Corp.Litig.*, "once the presumption is triggered, the question is not whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a fair and adequate job." 264 F.3d at 267. This inquiry "is not a relative one." *Id.*; see also *Cavanaugh*, 306 F.3d at 730 ("[a]t the third stage, the process turns adversarial and other plaintiffs may present evidence *that disputes the lead plaintiff's prima facie showing of typicality and adequacy*" (emphasis added)).

None of the putative class members has come forward with evidence that rebuts the presumption in favor of Liu. Indeed, Wei and Joo do not oppose Liu's appointment as lead plaintiff.[56] Accordingly, the presumption that Liu is the most adequate lead plaintiff has not been rebutted, and the court need not consider the motion of the class member with the next largest financial stake. *In re Cavanaugh*, 306

---

[56]Wei Non-Opposition at 1; Joo Non-Opposition at 1.

21

F.3d at 730-31.  The court thus finds that Liu is entitled to serve as lead plaintiff in this action.  See, e.g., *Miami Police Relief & Pension Fund*, 2014 WL 2604991 at *6 ("Having established that FIG has the greatest financial stake and satisfies the requirements of Rule 23(a), FIG is presumptively the most adequate plaintiff to represent the class.  This presumption may be rebutted only upon proof by a member of the purported plaintiff class that FIG either (1) 'will not fairly and adequately protect the interests of the class,' or (2) 'is subject to unique defenses that render [it] incapable of adequately representing the class.'  No purported class member has come forward with such rebuttal evidence to rebut the presumption in favor of FIG.  Indeed, no party opposes FIG's motion for appointment as lead plaintiff.  Accordingly, the presumption that FIG is the most adequate lead plaintiff has not been rebutted, and the Court therefore need not proceed to consider the motion of the movant with the next largest financial stake.  Absent proof that the lead plaintiff candidate with the largest financial interest does not satisfy the requirements of FRCP 23, said candidate is 'entitled to lead plaintiff status.'  Thus, FIG is entitled to be the lead plaintiff in this action" (citations omitted)); *City of Harper Woods Employees Retirement System*, 2005 WL 318813 at *4 ("Since no other member of the purported class has offered any evidence to rebut the presumption in favor of appointment, and since Behm has withdrawn its Motion for Appointment as Lead Plaintiff, Plaintiff Morgan's motion for appointment as lead plaintiff is GRANTED"); *Squyres*, 1998 WL 1144586 at *3 ("No other member of the purported class has offered any evidence to rebut this presumption.  The court GRANTS the Squyres' motion to be appointed lead plaintiffs").

### 4.    Conclusion as to Lead Plaintiff

Because Liu has sufficiently demonstrated that he has the largest financial interest in the litigation and that he satisfies the typicality and adequacy requirements under Rule 23(a), and because no class member has rebutted the presumption that Liu should be named lead plaintiff, the court grants Liu's motion and appoints him lead plaintiff in this action.

### D.    Appointment of Lead Counsel

The PSLRA directs that once the court has designated a lead plaintiff, that plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v); see *Cohen v. U.S. Dist. Court for Northern Dist. of California*, 586 F.3d 703, 709

22

(9th Cir. 2009) ("Here we address only the PSLRA's mandate that '[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.' 15 U.S.C. § 78u-4(a)(3)(B)(v). This provision clearly identifies the most adequate plaintiff as the actor that 'select[s] and retain[s]' class counsel. Although this power is subject to court approval and is therefore not absolute, it plainly belongs to the lead plaintiff"). In *Cohen*, the Ninth Circuit advised district courts that they "should not reject a lead plaintiff's proposed counsel merely because [they] would have chosen differently." *Id.* at 711 (citing *In re Cavanaugh*, 306 F.3d at 732, 734 & n. 14 ("[T]his is not a beauty contest; the district court has no authority to select for the class what it considers to be the best possible lawyer or the lawyer offering the best possible fee schedule. Indeed, the district court does not select class counsel at all. . . . While the appointment of counsel is made subject to the approval of the court, the Reform Act clearly leaves the choice of class counsel in the hands of the lead plaintiff")). Instead, courts "should generally defer" to the lead plaintiff's reasonable choice of lead counsel. *Id.* at 712 (citing *In re Cendant Corp. Litig.*, 264 F.3d at 276 (in approving designations of lead counsel, "courts should consider: (1) the quantum of legal experience and sophistication possessed by the lead plaintiff; (2) the manner in which the lead plaintiff chose what law firms to consider; (3) the process by which the lead plaintiff selected its final choice; (4) the qualifications and experience of counsel selected by the lead plaintiff; and (5) the evidence that the retainer agreement negotiated by the lead plaintiff was (or was not) the product of serious negotiations between the lead plaintiff and the prospective lead counsel")).

Liu seeks approval of Levi & Korsinksy as lead counsel and Shepherd, Finkelman, Miller, & Shah LLP as liaison counsel.[57] The court has reviewed each firm's resume and is satisfied that counsel will capably and competently serve in these roles. Levi & Korsinksy has extensive experience litigating complex securities fraud class actions as lead counsel on behalf of individual investors throughout the United States.[58] Moreover, no class member has voiced any reservation about the firm's appointment. Accordingly, Liu's request for appointment of Levi & Korsinksy as lead counsel in this action is

---

[57]Liu Motion at 1.

[58]Chang Decl., Exhs. D & E.

23

granted. See, e.g., *In re Versata, Inc. Securities Litigation*, Nos. C 01-1439 SI, C 01-1559 SI, C 01-1703 SI, C 01-1731 SI, C 01-1786 SI, 2001 WL 34012374, *7 (N.D. Cal. Aug. 20, 2001) ("No challenge has been made to the Wang group's selection of co-class counsel, Milberg Weiss Bershad Hynes & Lerach LLP and Scott & Scott LLC. Consequently, no grounds exist to disturb the choice that these law firms serve as co-class counsel. The Court hereby designates Milberg Weiss Bershad Hynes & Lerach LLP and Scott & Scott LLC as class counsel").

The court also concludes that Shepherd, Finkelman, Miller, & Shah LLP ("SFMS") is qualified to serve as liaison counsel. Shepherd has experience in complex civil and commercial litigation and securities matters.[59] As with Liu's designated lead counsel, no class member has objected to the appointment of SMFS as liaison counsel. Accordingly, the court approves the appointment of liaison counsel on the understanding that its role will be limited to procedural advice and services related to litigating in this district. Compensation will be awarded only for such services, and the court will not award fees to lead and liaison counsel for duplicative services. See *Bell v. Ascendant Solutions, Inc*., No. Civ.A. 3:01-CV-0166, 2002 WL 638571, * 7 (N.D. Tex. Apr. 17, 2002) ("Should Lead Plaintiff select . . . a firm that is based outside of the Northern District of Texas (and does not have a local office capable of handling the work), the Court hereby appoints Claxton & Hill, P.L.L.C., local counsel in this case. The Court expects that the firm will advise lead counsel on local procedural matters, create and maintain a master list of all parties and their respective counsel, distribute communications between the Court and counsel, apprise counsel of developments and scheduling matters in the case, and generally assist in the coordination of the case. On these conditions, the Court approves the appointment of Claxton & Hill as liaison counsel . . . with the further proviso that Claxton & Hill's role be limited to the procedural advice and services specified above. Compensation will be awarded according to only those duties listed above, strictly construed. The Court will not permit both Claxton & Hill and the lead counsel to be compensated for any duplication of services among the law firms"); see also *de la Fuente v. DCI Telecomms., Inc.*, 269 F.Supp.2d 229, 232-33 (S.D.N.Y. 2003) ("This court has demonstrated a strong preference for local liaison counsel when securities fraud class actions are filed by out-of-state

---

[59]Chang Decl., Exhs. D & E.

24

lawyers. It facilitates communication and ensures that out-of-state lawyers are familiarized with local rules and practices. It also ensures that if a court appearance is necessary on short notice or for a minor matter, a legal representative of the litigant can be available quickly, and without the expense of out-of-state travel"); but see *In re Nice Systems Securities Litigation*, 188 F.R.D. 206, 224 (D.N.J. 1999) ("As stated, Proposed Lead Plaintiffs also seek approval of Cohn Lifland to serve as liaison counsel, but do not set forth the role Cohn Lifland will play if approved to serve in that capacity. . . . Proposed Lead Plaintiffs have not offered any explanation as to what duties would be assumed by Cohn Lifland and why such duties could not be adequately performed by lead counsel. Further, it has not been demonstrated how the duties of the liaison counsel would not be coextensive with those of the lead counsel").

## III.  CONCLUSION

For the reasons stated, the court grants Liu Shaolin's motion for appointment as lead plaintiff and approves his selection of Levi & Krosinksy as lead counsel and Sheherd, Finkelman, Miller, & Shah LLP as liaison counsel. The court denies the motions of LungHao Wei and Min Joo for appointment as lead plaintiff and for approval of their selection of lead counsel.

DATED: July 7, 2015

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

25