VALERIE L. CHANG (SBN 295147)
Email: vchang@sfmslaw.com
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
11755 Wilshire Blvd.
Los Angeles, CA 90025
Tel: (323) 510-4060
Fax: (866) 300-7367

SHANNON L. HOPKINS
Email: shopkins@zlk.com
NANCY A. KULESA
Email: nkulesa@zlk.com
**LEVI & KORSINSKY LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (212) 363-7500
Fax: (212) 363-7171
*pro hac vice to be submitted*

*Attorneys for Lead Plaintiff Liu Shaolin*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH FRAGALA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>500.COM LIMITED, MAN SAN LAW, ZHENGMING PAN, DEUTSCHE BANK SECURITIES INC., PIPER JAFFRAY & CO., AND OPPENHEIMER & CO. INC.,<br><br>Defendants. | No. 2:15-CV-01463-MMM (Ex)<br><br>Hon. Margaret M. Morrow<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

SUMMARY OF THE ACTION ..... 1
JURISDICTION AND VENUE ..... 4
THE PARTIES ..... 5
I. LEAD PLAINTIFF ..... 5
II. DEFENDANTS ..... 5
A. 500.com Limited ..... 5
B. The Management Defendants ..... 6
C. The Underwriter Defendants ..... 8
STATEMENT OF FACTS ..... 10
I. Company Background ..... 10
A. 500.com's Questionable Corporate Structure ..... 10
B. 500.com's Lottery Operations ..... 13
1. Lottery Sales Services ..... 13
2. Information Platform ..... 15
3. Mobile Applications ..... 16
II. The Highly-Regulated Chinese Gambling Industry ..... 16
III. 500.com's Operations are Suspended in 2012 for Failure to Obtain Regulatory Approval ..... 21
IV. Defendant Law Obtains Temporary Lottery License in Exchange for Bribing Chinese Governmental Officials With Illegal Kickbacks ..... 22
V. 500.com Launches a Strategically Timed Initial Public Offering to Raise Capital Before Imminent Government Crackdown ..... 27
VI. The Chinese Government Cracks Down on Illegal Online Gambling ..... 31
VII. With Knowledge of Imminent Government Crackdown, 500.com Insiders Make Self-Serving Stock Sales Before Suspension Announcement ..... 39
DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS ..... 40
I. Materially False and Misleading Statements in 500.com's Initial Offering Prospectus ..... 41
A. Materially False and Misleading Statements Concerning 500.com's License to Operate an Online Lottery and Gaming Website ..... 42
B. Materially False and Misleading Statements Concerning Market Risk ..... 44
C. Materially False and Misleading Statements Concerning 500.com's

Compliance with Chinese Laws and Regulations ....... 46

1. Bribery and Illegal Kickbacks ....... 46

2. Cross-Border Ticket Sales ....... 47

D. Materially False & Misleading Statements Concerning 500.com's Financial Performance ....... 49

II. Materially False and Misleading Statements in 500.com's Initial Offering Registration Statement ....... 50

A. Materially False and Misleading Statements Concerning 500.com's License to Operate an Online Lottery and Gaming Website ....... 51

B. Materially False and Misleading Statements Concerning Market Risk ....... 53

C. Materially False and Misleading Statements Concerning 500.com's Compliance with Chinese Laws and Regulations ....... 54

1. Bribery and Illegal Kickbacks ....... 55

2. Cross-Border Ticket Sales ....... 56

D. Materially False & Misleading Statements Concerning 500.com's Financial Performance ....... 58

III. Materially False and Misleading Statements In 500.com's February 21, 2014 Press Release ....... 58

IV. Materially False and Misleading Statements in 500.com's 2013 Annual Report ....... 60

A. Materially False and Misleading Statements Concerning 500.com's License to Operate an Online Lottery and Gaming Website and Market Risk ....... 60

B. Materially False and Misleading Statements Concerning 500.com's Market Risk ....... 62

C. Materially False and Misleading Statements Concerning 500.com's Compliance with Chinese Laws and Regulations ....... 63

1. Bribery and Illegal Kickbacks ....... 63

2. Cross-Border Ticket Sales ....... 65

D. Material False and Misleading Statements Concerning 500.com's Internal Controls ....... 66

E. Materially False & Misleading Statements Concerning 500.com's Financial Performance ....... 70

V. Materially False and Misleading Statements In 500.com's May 7, 2014 Press Release ....... 71

VI. Materially False and Misleading Statements in 500.com's May 8, 2014 Press Release ....... 72

VII. Materially False and Misleading Statements In 500.com's August 11, 2014 Press Release .......... 74

VIII. Materially False and Misleading Statements in 500.com's September 10, 2014 Press Release .......... 75

IX. Materially False and Misleading Statements In 500.com's November 20, 2014 Press Release .......... 77

X. Materially False and Misleading Statements In 500.com's February 11, 2015 Press Release .......... 78

THE TRUTH BEGINS TO EMERGE .......... 80

I. The 500.com Defendants Reveal in the February 25, 2015 Press Release that the Sale of Certain Lottery Products Have Been Suspended Pursuant to a National Audit Investigation .......... 80

II. Continuing Materially False and Misleading Statements in the February 25, 2015 Press Release .......... 81

III. The March 2, 2015 Press Release Discloses Further Suspensions by the Remaining Provincial Sports Lottery Administration Centers .......... 82

IV. POST-CLASS PERIOD EVENTS .......... 84

500.COM'S INTERNAL CONTROL VIOLATIONS .......... 89

ADDITIONAL SCIENTER ALLEGATIONS .......... 95

I. The 500.com Defendants' Knowledge Of, And/Or Reckless Disregard for 500.com's Failure to Obtain a Valid Lottery License and Comply with Lottery Regulations .......... 95

A. Defendant Law Bribed Government Officials to Sell Lottery Products Without a Valid License in Exchange for Illegal Kickbacks .......... 96

B. Defendant Pan Admits that the Management Defendants Were Aware that 500.com Had Not Satisfied the Requirements for Obtaining a Valid Online License .......... 98

C. The Management Defendants, Through Their Control of the 500.com Entities, Were Aware that 500.com Lacked a License to Operate an Online Lottery Service and a Government Crackdown was Imminent .......... 99

D. The Management Defendants' History of Non-Compliance with License and Regulatory Requirements .......... 100

E. The Management Defendants Were Aware that 500.com Lacked a License to Operate an Online Lottery Service and a Government Crackdown Was Imminent Because it was 500.com's "Core" Business .......... 101

F. The Management Defendants Were Aware that 500.com Lacked a License to Operate an Online Lottery Service and a Government Crackdown Was

Imminent as a Result of Their Significant Industry Knowledge and Experience ....... 102

G. The Individual Defendants Closely Monitored 500.com's Online Lottery Business During the Class Period....... 103

II. THE 500.COM DEFENDANTS HAD MOTIVE TO MAKE FRAUDULENT REPRESENTATIONS ....... 105

A. The Management Defendants Had Motive to Commit the Alleged Fraud in Order to Reap Significant Profits From Lucrative Bonuses....... 105

B. Insider Selling ....... 106

C. The Management Defendants Had Motive to Commit the Alleged Fraud in Order to Complete the IPO ....... 107

LOSS CAUSATION ....... 108

CLASS ACTION ALLEGATIONS....... 110

NO STATUTORY SAFE HARBOR ....... 111

APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE....... 112

COUNT I ....... 113

COUNT II....... 115

COUNT III ....... 117

COUNT IV ....... 119

COUNT V ....... 121

PRAYER FOR RELIEF ....... 122

JURY DEMAND....... 123

Lead Plaintiff Liu Shaolin ("Lead Plaintiff"), brings this action pursuant to §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), on behalf of: (1) all persons or entities other than Defendants who purchased or otherwise acquired 500.com Limited's ("500.com" or the "Company") American Depository Shares ("ADSs") pursuant to or traceable to Initial Public Offering ("IPO") commenced on or about November 22, 2013; and (2) all purchasers of 500.com ADSs between November 22, 2013 and March 2, 2015, inclusive (the "Class Period").

Lead Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the investigation of his undersigned Lead Counsel, which included, among other things, review and analysis of (i) 500.com's public filings with the U.S. Securities and Exchange Commission ("SEC") and the Chinese Administration for Industry and Commerce (the "SAIC")[1]; (ii) interviews with confidential sources in the lottery industry in the People's Republic of China ("China" or the "PRC"); (iii) 500.com's other public statements, including press releases; and (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning 500.com and the industry in which it operates. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiff believes that substantial additional evidentiary support will exists for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1. This securities fraud class action is based upon an extensive and

[1] The SAIC is a governmental authority in the People's Republic of China that is responsible for overseeing a variety of corporate and commercial matters. Chinese corporations must register with the SAIC upon formation and must timely disclose a variety of information to the SAIC, including but not limited to: periodic financial statements, changes in ownership, use of corporate stock as collateral for a debt contract, and the identities of corporate officers.

pervasive fraud, orchestrated by the 500.com Defendants (defined below), who embarked upon a fraudulent scheme to grow 500.com's business and become one of only two entities in China approved to sell online lottery products. The 500.com Defendants perpetuated their fraudulent scheme by bribing government officials to grant 500.com a license to sell online lottery products and turn a blind eye while the Company peddled them outside of the authorized province, in exchange for illegal kickbacks. According to Lead Plaintiff's confidential sources, defendant Man San Law ("Law"), 500.com's founder and former Chief Executive Officer ("CEO"), paid government officials an agreed upon amount of money as a percentage of online sports lottery sales in exchange for turning a blind eye to 500.com conducting unauthorized online lottery sales.

2. As a result of Law's bribery and kickback scheme, 500.com became one of only two companies to receive a temporary, exploratory license to sell online lottery products, allowing 500.com to report year-over-year sequential revenue growth in the double-digits throughout the Class Period, reaching as high as 135% in 2013, well ahead of its competitors.

3. Throughout the Class Period, Defendants made numerous materially false and misleading statements and omitted material facts concerning 500.com's: (a) license to operate an online lottery and gaming website; (b) market risk; (c) compliance with Chinese laws and regulations; (d) internal controls; and (e) financial results. Defendants' materially false and misleading statements included, among others, that 500.com:

- "[O]btained all relevant and necessary licenses and approvals to legally provide online sports lottery services in China";
- Was "approved by the Ministry of Finance ('MOF') to provide online sales services for sports lottery products";
- Was "the only MOF-approved online lottery sales service provider with an operational track record and expertise among the online lottery

sales service providers that currently operate in China";

- Would "continue our reputation as a reliable and trustworthy source for online lottery purchases in the future";
- Had "reliable and secured operations and excellent customer services, as evidenced by our large customer base and good market reputation, and [the MOF] issued approval for us to be one of the two authorized entities to provide online lottery sales services under the new regulations so that we can act as an example for the developing online lottery market in China;" and
- That 500.com had a "solid foundation [that the Company has] created as China's leading online sports lottery service."

4. As set forth herein, Defendants' statements were each materially false and misleading when made because, among other reasons, 500.com (i) did not have a formal license granted by the Ministry of Finance ("MOF"), as represented, and rather, had, at most, a provisionary or exploratory permit; (ii) only had the temporary license as a result of illegal bribes and kickback arrangements with government officials; (iii) was using its temporary license to operate illegally outside of the permitted province; (iv) as a result of (i) – (iii), was not in compliance with applicable regulations; (v) would be subjected to stiff fines and penalties, a likely shutdown of the Company's operations and costly litigation; (vi) could not sustain the reported levels of revenue and profit from illegal lottery sales; (vii) financial performance and operations were much worse than represented; and (viii) maintained inadequate internal controls.

5. Investors would ultimately learn the truth about 500.com's invalid licenses when the results of a National Audit in early 2015 required the Company's lottery operations to be suspended indefinitely and defendant Law was detained and interrogated relating to issues of bribery, among others, in connection with the Company's online lottery sales. Such news would send the Company's stock

careening downwards. Meanwhile, 500.com's lottery operations are currently still suspended.

6. The 500.com Defendants acted with knowledge and/or with reckless disregard for the fact that their Class Period statements were materially false and misleading when made. Most egregiously, they were aware as early as November 2012 that defendant Law was bribing government officials to allow 500.com to engage in the sale of online lottery products outside of Guangdong province, ultimately resulting in the indefinite suspension of the Company's business, while telling investors otherwise. The 500.com Defendants were also aware that the Company was operating an online lottery business illegally without a valid license by: (1) the Company's prior history of suspension of its operations for not complying with regulatory licensing requirements; (2) the fact that the explicit requirements for obtaining a valid lottery license has not been satisfied, as admitted by defendant Zhengming Pan ("Pan"); (3) that the sale of lottery products was not just 500.com's "core" business- it was the Company's entire business; (4) their active monitoring of 500.com's operations and financial reporting pursuant to their duties as members of executive management; and (5) their significant industry and financial experience.

7. Moreover, the Management Defendants were motivated to commit the alleged fraud to reap substantial financial benefits from large ADS grants and raise money in the Company's November 2013 Initial Public Offering ("IPO").

8. When 500.com finally began to reveal the truth that the Company's license was only "temporary" and, as a result of unauthorized lottery sales, its license and operations had been suspended indefinitely, the price of the Company's ADSs dropped from $12.83 per ADS on February 24, 2015 to $9.96 per ADS on February 25, 2015, causing investors to sustain substantial losses.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of

the Securities Act, 15 U.S.C. §§77k, 77(o), Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

10. This Court has subject matter jurisdiction over this action under §27 of the Exchange Act (15 U.S.C. §78aa), Section 22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

11. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), Section 22 of the Securities Act (15 U.S.C. §77v), and 28 U.S.C. §1391(b) because the false and misleading statements at issue took place and had an effect in this District.

## THE PARTIES

### I. LEAD PLAINTIFF

12. Lead Plaintiff Liu Shaolin, as previously set forth in his certification supporting his motion for appointment of Lead Plaintiff, incorporated by reference herein, purchased 500.com ADSs at artificially inflated prices during the Class Period and has been damaged thereby.

### II. DEFENDANTS

#### A. 500.com Limited

13. Defendant 500.com is a corporation organized under the laws of the Cayman Islands with its principal executive offices located at 500.COM Building, Shenxianling Sports Center Longgang, Shenzhen, PRC, 518115. The Company maintains an agent for service in the United States at Law Debenture Corporate Services Inc., 400 Madison Avenue, 4th Floor, New York, New York 10017. The Company describes itself as an online sports lottery service provider in China with

the largest market share as of June 30, 2013 in terms of purchased amount of sports lottery products. For the full year 2014, 500.com reported net revenue of RMB579.7 million (or US $93.4 million), an increase of 123.4% over the full year 2013. The Company's current operations of providing online lottery services were indefinitely suspended on April 3, 2015 in response to a crackdown on illegal online gambling by Chinese regulators.

14. Prior to suspension, the Company had continually marketed itself as among the first companies to provide online lottery services in China, and one of only two entities authorized by the MOF to provide online lottery sales services. The MOF is the regulatory authority in charge of the issuance and sale of sports lottery products in China. In particular, prior to suspension, the Company's operations consisted of aggregating and processing lottery purchase orders from its registered user accounts. During all times relevant hereto, the Company's ADSs were listed on the NYSE, an efficient market, under the ticker symbol "WBAI."

**B. The Management Defendants**

15. Defendant Law is believed to be a resident of the PRC. Law is 500.com's founder, former CEO, and current Chairman of the Board. Law served as the CEO of 500.com from 1999 until May 15, 2015. On May 15, 2015, the Board accepted Law's resignation from his role as CEO and simultaneously approved the appointment of Zhengming Pan, the then-President of the Company, to take Law's place. Law remains the Chairman of the Company's Board of Directors (the "Board"). According to 500.com's website, Law is responsible for overseeing the strategic direction of the Company and has transformed it "from a small start-up to an established and leading online lottery service provider in China." Moreover, in the Company's SEC filings, Law is repeatedly touted as the lynchpin of 500.com's success:

> Our success is dependent upon the expertise and continued service of our senior management and other key personnel. Our founder, Chairman and Chief Executive Officer, Mr. Man San Law, has 12 years of experience in the lottery service industry. Mr. Law is a pioneer

> of the online lottery service market who has been at the forefront of developing innovative online products and solutions and has established relations with market participants in China.

16. Defendant Law directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning 500.com and its business, operations, growth, financial statements, and financial condition. According to the Initial Offering Prospectus filed with the SEC on FORM 424B4 on November 22, 2013 (the "Initial Offering Prospectus"), Law was primarily responsible for the proliferation of the Company's online operations:

> Our founder, chairman and CEO, Mr. Man San Law, was the key person behind the establishment of our company, which was among the earliest online lottery service providers in China. Mr. Law has been at the forefront of developing innovative online products and solutions and establishing strategic partnerships with market participants. Our long-term track record as a leader in the market under Mr. Law's leadership has strengthened our market position and enhanced our brand name.

17. Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to 500.com's course of conduct, and his access to material inside information about 500.com during the Class Period, at all material times, Defendant Law was a controlling person of 500.com within the meaning of §20(a) of the 1934 Act.

18. As alleged herein, during the Class Period, Defendant Law made materially false and misleading statements concerning 500.com and its financial well-being.

19. Defendant Zhengming Pan is believed to be a resident of the PRC. Pan has been the President of 500.com since September 1, 2014 and was recently appointed CEO on May 15, 2015, following the resignation of Defendant Law. Pan previously served as the Company's Chief Financial Officer from April 2011 until August 2014. Prior to joining 500.com, Pan served as a vice president at Deutsche Bank AG, Hong Kong Branch from 2007 to April 2011. Defendant Pan directly

participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning 500.com and its business, operations, growth, financial statements, and financial condition. Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to 500.com's course of conduct, and his access to material inside information about 500.com during the Class Period, at all material times, Defendant Pan was a controlling person of 500.com within the meaning of §20(a) of the 1934 Act. As alleged herein, during the Class Period, Pan made materially false and misleading statements concerning 500.com and its financial well-being.

20. Defendants Law and Pan are collectively referred to hereinafter as the "Management Defendants." The Management Defendants, because of their positions within the Company, possessed the power and authority to control the contents of 500.com's reports filed with the SEC. Each Management Defendant had the ability and opportunity to prevent their issuances or cause them to be corrected. The Management Defendants are liable for the misstatements pleaded herein.

21. The Management Defendants and 500.com are referred to herein as the "500.com Defendants".

**C. The Underwriter Defendants**

22. Defendant Deutsche Bank Securities Inc. ("Deutsche"), operates as a subsidiary of Deutsche Bank AG, headquartered at 60 Wall Street, New York, NY 10005. Deutsche is a registered securities broker-dealer and investment advisor with the SEC, futures commission merchant ("FCM") and the Commodities Futures Trading Commission ("CFTC"). In its capacity as a broker-dealer and FCM, Deutsche clears securities and derivatives products for its customers, affiliates, or itself, on various exchanges of which Deutsche is a member. Deutsche provides trade execution services for a broad range of domestic and international clients and

provides securities brokerage and investment advisory services to private clients and institutions. Deutsche also provides a variety of capital raising, market making and brokerage services for the government, financial institutions, and corporate clients, including fixed income and equity sales and trading, emerging markets activities, equity market research and investment banking.

23. Deutsche entered into an underwriting agreement with 500.com dated November 21, 2013 and acted as the representative of the underwriters and lead underwriter in the Company's IPO of 500.com ADSs on November 22, 2014. Pursuant to the underwriting agreement, Deutsche agreed to purchase 4,628,800 of 500.com ADSs in the IPO.

24. Defendant Piper Jaffray & Co. ("Piper Jaffray") is a leading full-service investment bank and asset management firm serving clients in the U.S. and internationally, with a principal place of business at 800 Nicolle Hall, Suite 1000, Minneapolis, Minnesota 55402. Piper Jaffray was an underwriter in the IPO. Pursuant to the underwriting agreement, Piper Jaffray agreed to purchase 867,900 of 500.com ADSs in the IPO.

25. Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is a leading investment bank and full-service investment firm that provides financial services and advice to high net worth investors, businesses and institutions, with a principal place of business at 85 Broad Street, New York, New York 10005. Oppenheimer is also a registered broker-dealer and investment advisory firm, offering securities. Oppenheimer was an underwriter in the IPO. Pursuant to the underwriting agreement, Oppenheimer agreed to purchase 298,300 of 500.com ADSs in the IPO.

26. Deutsche, Piper Jaffray and Oppenheimer are collectively referred to herein as the "Underwriter Defendants."

27. The Underwriter Defendants negotiated the Initial Offering price of 500.com ADSs and, in addition, solicited and sold ADSs to investors. According to the Initial Public Offering Prospectus, filed with the SEC in connection with the

IPO, the Underwriter Defendants "propose initially to offer the ADSs to the public at the public offering set forth on the cover of this prospectus [$13.00 per share] and to dealers at that price less a concession not in excess of $0.55 per ADS." In addition, the Underwriter Defendants were each granted an additional option, exercisable within 30 days from the date of the final prospectus, to purchase up to 867,900 additional ADSs at $13.00 per ADS.

## STATEMENT OF FACTS

### I. Company Background

#### A. 500.com's Questionable Corporate Structure

28. Defendant Law founded 500.com in 2001 to capitalize on China's lucrative gaming industry, with little regard for regulatory compliance.

29. 500.com is the holding company for E-Sun Sky Network, an entity that operates an online lottery service in China. 500.com itself does not conduct any business and was created for the purpose of executing the IPO in 2013.

30. 500.com is structured as a Variable Interest Entity ("VIE"), a convoluted and potentially illegal corporate structure under Chinese law, designed for the express purpose of circumventing Chinese regulatory constraints on foreign investment. Chinese law currently restricts foreign investors from owning businesses in strategically important sectors, such as finance, telecommunications, and the internet. To get around this and access U.S. markets and investors, Chinese companies such as 500.com, use the VIE structure to offer investors only a piece of the contractual rights to its profits and control over management, rather than an equity share of the underlying business.

31. More practically, many Chinese companies utilize the VIE structure by setting up two entities, an operating company based in China and a holding company based abroad.[2] Foreigners invest in the overseas company and have no

---

[2] Gillian Wong and Juro Osawa, *How China's Foreign Investment Rules Might Play Out*, WALL STREET JOURNAL (Jan. 22, 2015) at http://blogs.wsj.com/digits/2015/01/22/how-chinas-new-vie-rules-might-play-out/.

direct stake in the Chinese entity, thus skirting the ban on foreign ownership.[3] Instead, the Chinese entity signs contracts that give the overseas company effective control.

32. In the case of 500.com, the business offered to United States investors in the IPO was actually a holding company based in the Cayman Islands, which controls the underlying assets through equity interests in a bewildering array of subsidiaries in the British Virgin Islands ("BVI") and Hong Kong. These subsidiaries in turn hold contracts with entities and executives on the ground in mainland China. The following diagram illustrates the Company's organizational structure as of April 27, 2015:




33. Thus, ultimately, 500.com came to sit atop a corporate structure which passes through the BVI and Hong Kong before making its way on shore to China. Fine Brand Limited ("Fine Brand BVI") is a company incorporated under the laws

[3] *Id.*

of the BVI and is wholly owned by 500.com. Fine Brand BVI, in turn, wholly owns 500wan HK Limited ("500wan HK"), a company incorporated under the laws of the Hong Kong S.A.R of China, and which wholly owns E-Sun Sky Computer, a Shenzhen, China incorporated entity. E-Sun Sky Computer then has Chinese-based "shareholders," which are 500.com directors, executives, family members of directors and executives, and employees. These shareholders are subject to contractual arrangements with 500.com which obligates them to distribute losses and profits up the corporate chain to 500.com and its shareholders.

34. The legal status of the VIE structure is questionable at best under the current Chinese regulatory regime, and both U.S. and Hong Kong market regulators have raised concerns that these contracts may not hold up in court.[4] As Echo He, a New York-based analyst with Maxim Group LLC explained, "[t]he risk associated with VIE is that if the operation contract defaults, what investors have invested in would be just a piece of paper."[5] Indeed, China's highest court ruled in October 2014 that VIEs used by a Hong Kong based firm to invest in a Chinese bank were void.[6] Moreover, as recently as January 2015, China's Ministry of Commerce proposed draft legislation targeting VIEs. The draft legislation takes a non-traditional approach in determining whether a company in a "sensitive" industry (finance, telecommunications, or the internet) is subject to foreign investment rules.[7] Instead of looking at ownership, the proposed legislation focuses on who has control of the company.[8] It appears to say that VIEs will be deemed to be foreign if foreign investors are in control, meaning they may be barred from operating in

---

[4] Leslie Picker and Elena Popina, *China Dot-Coms Rush to U.S. as Buyers Shrug Off Murky Structures*, BLOOMBERG (Apr. 2, 2014) at http://www.bloomberg.com/news/articles/2014-04-02/china-dot-coms-rush-to-u-s-as-buyers-shrug-off-murky-structures.

[5] *Id.*

[6] John McDuling, *The Mind-Bendingly Complex Ownership Structure Behind Chinese Internet IPOs*, QUARTZ (Dec. 9, 2013) at http://qz.com/155535/the-mind-bendingly-complex-ownership-structure-behind-chinese-internet-ipos/.

[7] Wong, *supra* note 2.

[8] *Id.*

restricted sectors.[9] The draft legislation is currently open for public comment.

**B. 500.com's Lottery Operations**

35. 500.com operates as an aggregator and processor of lottery purchase orders from registered user accounts. The Company derives substantially all of its revenues from service fees paid by provincial Sports Lottery administration centers for the purchase orders of Sports Lottery products that the Company directs to such centers.

36. Historically, 500.com provided online sales services for, and generated service fees from, The China Sports Lottery ("Sports Lottery") and The China Welfare Lottery ("Welfare Lottery"). The Sports lottery offers traditional number lotteries, scratch cards, sports betting lotteries, single match sports bets, and terminals for betting virtual sport. The Welfare lottery offers the exact same less sports betting and plus rapid draw games similar to slots. The distinguishing factor between the two lotteries is where the money goes- profit from the Sports lottery goes towards development of sport in the country, while profit from the Welfare lottery goes toward the public welfare. The Company ceased providing services for Welfare lottery products in late 2012 when it could not obtain the requisite license approval from the MOF.

37. 500.com's main competitors are the other online lottery service providers and traditional offline lottery agents.

38. As discussed below, through its subsidiaries, 500.com operates three primary business segments: (1) lottery sales services; (2) information platform; and (3) mobile applications.

**1. Lottery Sales Services**

39. 500.com provides users with online purchase services to Sports Lottery products. Lottery products may be purchased individually, in a pool, or via automatic tag-along or recurring purchases. For individual lottery purchases, the

[9] *Id.*

Company's users will place purchase orders for Sports Lottery products through the 500.com website after registering, opening, and funding an online account. As of December 31, 2014, 500.com had 54.7 million registered user accounts as compared to 13.8 million, 16.6 million, and 19.1 million registered user accounts as of December 31, 2011, 2012, and 2013, respectively.

40. For pooled lottery purchases, individual users will purchase a share in a pooled lottery outcome or group of outcomes with other users. According to the 2014 Annual Report (defined below) Lottery pool purchasing has become the purchase mode most favored by 500.com users, with total lottery pool purchases amounting to RMB169.8 million, RMB524.4 million and RMB922.5 million (or US$148.7 million in 2014), respectively, for the years 2012, 2013 and 2014, which accounted for 10.1%, 17.2% and 12.9% of the total purchase amount for the same periods, respectively. The popularity of these lottery sales services was similarly accretive to the Company's net revenues, which were RMB171.5 million, RMB259.5 million, and RMB579.7 million (or US $93.4 million in 2014), in 2012, 2013, and 2014, respectively, representing a 51.3% increase from 2012 to 2013, and a 123.4% increase from 2013 to 2014, respectively.

41. For automatic-tag along purchases, a user can choose to automatically and periodically join a lottery pool initiated by another user. A user can customize the automatic tag-along feature by specifying the pools he wishes to automatically join, the commitment to be put down for each automatic pool and other specifications. Finally, for recurring purchases, users may repeatedly purchase a particular number or a combination of numbers. The user sets the combination once, and specifies the type and number of rounds or dates of lotteries he wants to purchase with the selected combination.

42. To facilitate prize collection and delivery, every registered user has an online cash account which can be funded directly from the user's bank account or through other online payment methods. When an order is placed, the purchase price

is deducted from the user's online cash account. A user needs to have a sufficient balance in his online cash account before he can submit a purchase order.

43. When a user wins a prize, 500.com distributes the equivalent prize money to such user's account immediately after the prize announcement date, from 500.com's own reserves. The Company will then collect the actual prize money from the lottery administration center for itself.

44. Under the current prize payout scheme of national and provincial lottery products, prize money can only be claimed by natural persons who present the winning lottery tickets at the time of collection. Since the Company does not distribute physical tickets to individual users, it collects prizes on behalf of winning users by having 500.com employees maintain bank accounts opened in their individual names for the purpose of prize money collections. Upon collection, the prize money is immediately deposited into an employee's bank account and the Company's accounting department is notified. The bank also sends an automatic Short Message System ("SMS") notification generated by its system to the accounting manager immediately after the deposit has taken place. Upon receipt of the SMS notification, the accounting manager transfers the prize money online into a corporate account. The accounting department then verifies the transfer amount to ensure the entire prize money amount is transferred into the corporate account, thus replenishing the amount initially forwarded to winning users from the Company's own reserves.

45. The Company derives substantially all of its net revenues from service fees paid to it by provincial lottery administration centers for orders 500.com directs to such centers. Net revenues generated from the Company's Lottery sales services in this manner accounted for 92%, 95%, and 89% of 500.com's total net revenues in 2012, 2013, and 2014, respectively, before deductibles.

**2. Information Platform**

46. To further facilitate 500.com's online lottery sales, the Company also

operates a proprietary and in-house developed information platform that offers real-time and historical lottery related news and data to help users make purchase decisions and provides them with updated information regarding the lottery business. The Company's information services cover the latest news in the lottery business, including comprehensive information on all 13 national level lottery products and 56 provincial level lottery products as of December 31, 2014. For Sports match lottery products in particular, the Company has a dedicated information channel, which provides a variety of information, including analytical data purchased from a professional sports information agency, historical charts, and in-depth analysis of matches by experts in relation to official odds, as well as real-time scores and league standings for major global soccer and basketball matches.

### 3. Mobile Applications

47. In addition to online lottery sales, starting April 2011, 500.com began offering users mobile applications that provide a comprehensive set of lottery services, including purchase, result inquiry, and purchase account management. Users can purchase Sports Lottery products through such mobile applications. In addition, 500.com maintains a mobile website that offers a variety of general and mobile-specific functions including registration, payment, account management, and push messages. Net revenues generated from mobile applications accounted for 28.4%, 17.1% and 40.0% of the Company's total net revenue in 2012, 2013 and 2014, respectively.

## II. The Highly-Regulated Chinese Gambling Industry

48. Privatized gambling on China's mainland has been illegal under Chinese law since the Communist Party took power in 1949. However, the ban actually stems from the early 20th century when General Chiang Kai-shek, the country's nominal leader in the 1930s and 1940s, saw gambling as a threat to his army's morale and unsuccessfully tried to curtail it before fleeing China in the late 1940s. Chiang's successor in power and founding father of the People's Republic

of China, Mao Zedong, successfully outlawed gambling in 1949. Under current Chinese law, there is no legal privatized gambling permitted in China, either on or off-line. In fact, the Chinese government's official stance is that gambling is a serious social evil -- one that is inextricably tied to corruption and leads to pervasive addiction.[10]

49. Pursuant to Article 303 of the Criminal Law of the People's Republic of China, non-approved forms of gambling is a crime on China's mainland:

> Whoever, for the purpose of profit, gathers people to engage in gambling, runs a gambling house or makes gambling his profession shall be sentenced to fixed-term imprisonment of not more than three years, criminal detention or public surveillance and shall also be fined.

50. Chinese regulators published judicial interpretations of Article 303 in 2005 which clarified that the gambling ban extended to online operations:

> Whoever, for the purpose of reaping profits, sets up gambling websites on the internet or acts as an online gambling agent will be regarded as 'opening gambling houses' and will be punished according to article 303 of the criminal law.

51. There are only two very limited exceptions to China's strict gambling ban. First, casino gambling is permitted in the Taiwanese city of Macau, an area specially and exclusively zoned by the Chinese government for gambling. Taiwan is considered a Special Administrative Region of China which, similar to a United States Territory, has an entirely different set of laws and form of government than mainland China. Indeed, even Chinese citizens must obtain a visa passport in order to visit Macau. Since its establishment in 1999, Macau has become the world's capital of gambling, out-gambling Las Vegas every year since 2006.[11] The Chinese government has responded to the influx of mainland Chinese citizens to Macau by announcing a crackdown on Macau's gambling hub, including measures to curtail widespread corruption and make it more difficult for Chinese citizens to obtain

[10] Mary Kalenyuk, *The Bets Are On For Gambling in China*, THE WORLD OF CHINESE (Nov. 7, 2013) at http://www.theworldofchinese.com/2013/11/the-bets-are-on-for-gambling-in-china/.
[11] *Id.*

passports to the area.

52. The second exception to China's strict gambling ban are its two national lotteries, the Sports Lottery and the Welfare Lottery, both of which are supported and supervised by the Chinese government on China's mainland. The regulated lottery industry in China was launched in 1987 and has since grown rapidly to become one of the world's largest lottery markets by sales volume. The initial purpose behind China's lottery was to use funds to help the poor, vulnerable and elderly. According to MOF data, over the years, China's Welfare and Sports lotteries' cumulative sales have respectively led to the distribution of 310 billion RMB (USD $50 billion) and 212 billion RMB (USD $34 million) in public welfare funds. Additionally, lottery sales have increased at a compound annual growth rate of approximately 33% between 1987 and 2013;[12] 2013 was a record year for the Chinese lottery industry, with combined sales from Welfare and Sports of over 309 billion RMB (roughly USD $48.25 billion), implying an annual growth rate of approximately 18%. This exponential growth is depicted in the chart below:




[12] *An Overview of China Lottery Industry*, AGTECH at http://www.agtech.com/html/industry_lottery_overview_char.php.

53. At its inception, Welfare and Sports Lottery tickets were exclusively sold at brick and mortar outlets found in all of China's cities. However, as the lottery grew in popularity, the limited number of outlets served as a restraint on the number of potential customers. To expand access to China's lotteries, the Sports Lottery entered the online world in 2010 pursuant to a pilot program that allowed for the sale of online lottery products in certain designated provinces on a temporary basis. No formal licenses were issued.

54. The new pilot program for online lottery sales allowed licensed Sports Lottery vendors to partner with website providers to offer online lottery purchases on a temporary basis. Such websites were required to be approved by government regulators, such as the Ministry of Finance, the Ministry of Civil Affairs, and the General Administration of Sports of the PRC, and were subject to strict regulation. Specifically, such an entity would be required to file an application initially with the Ministry of Civil Affairs or the General Administration of Sports of China. If the application was approved, such application would be further submitted to the Ministry of Finance for that Ministry's examination and approval. If then approved, prior to implementation, the website, as a telecommunication service, would be required to obtain a separate value-added telecommunication business operating license (or "VAS license") from the State Council of China. The online sale of lottery products and the operation of a telecommunication service outside of the designated provinces pursuant to either license was illegal.[13]

55. In particular, under the current PRC regulations and provisions, the State Council is vested with the power to authorize the issuance of the Welfare and Sports Lotteries licenses, and is also the highest authority for granting the right to issue lotteries. The Ministry of Finance is responsible for administering, regulating, and supervising the national lottery industry. The Ministry of Civil Affairs and the General Administration of Sports of the PRC are responsible for administering and

[13] The Welfare lottery remains exclusively available at brick and mortar locations.

regulating the Welfare and Sports Lotteries, respectively, and have established the China Welfare Lottery Issuance and Administration Center and the China Sports Lottery Administration Center, respectively, pursuant to regulations for the issuance and sales of Welfare and Sports Lotteries.

56. Outside of the two limited regulatory exceptions for Macau and the state lottery, illicit gambling in China is a lucrative and nearly ubiquitous underground market on the mainland. Illegal gambling emerged as a major source of revenue for organized crime groups in China after 1978, when the "open door" policy and economic reform made profit and economic development a national movement.[14] For instance, Xinhua News Agency revealed that the revenue from illegal gambling markets in China is estimated to be ten times higher than China's two officially sanctioned lotteries.[15] By conservative estimates, one trillion Yuan (roughly USD 1 billion) is wagered illegally each year in China – equal to the entire economic output of Beijing.[16]

57. In recent years, China has witnessed considerable growth in the illicit *online* gambling industry, despite the country's attempts to block access through China's internet firewall. To clarify, online gaming in China is patently illegal, while the state lotteries have permitted limited mobile and online lottery ticket sales. Nevertheless, Global Betting and Gaming Consultants estimates China's unregulated market for online gambling to have been worth $562.4 million in gross gaming yield last year.[17] The popularity of such illicit online gambling platforms also contributed to the aforementioned crackdown by Chinese regulatory authorities in recent months. For example, on April 1, 2015, Chinese authorities announced the bust of a massive online gaming network, resulting in the arrests of over 1,000

---

[14] Wang, P., & Antonopoulos, G. A. (2015). 'Organized crime and illegal gambling: How do illegal gambling enterprises respond to the challenges posed by their illegality in China?' *Australian & New Zealand Journal of Criminology*, doi: 0004865815573874.

[15] *Id.*

[16] Simon Liddle, *Illegal Chinese Gaming Worth Billions*, INTERGAME (Mar. 9, 2012), at http://www.intergameonline.com/casino/news/6967/illegal-chinese-gaming-worth-billions

[17] *Id.*

people. According to news reports, the operation involved around 200 online gambling sites hosted on Thailand-based servers.

58. As a result of the tight regulation, valid licensed Sports Lottery websites are still highly uncommon in China.

**III. 500.com's Operations are Suspended in 2012 for Failure to Obtain Regulatory Approval**

59. From 2001 until March 2012, 500.com operated an online lottery and gaming website without regulatory approval, in clear violation of Article 303 of the Criminal Law of the PRC. 500.com's illicit online operations initially spurred a government suspension in March 2012, after eleven years of operating without the requisite regulatory approval. The Company's operations remained suspended from March 2012 until November 2012, at which time the Company reported almost zero revenue.

60. In its Initial Offering Prospectus, the Company chalked its suspension up to the passing of a "newly promulgated regulation which mandates, among other things, that online lottery sales services can only be provided by entities approved by the MOF":

> From March to November 2012, we voluntarily suspended our online lottery sales services to substantially all of our customers, in response to a newly promulgated regulation which mandates, among other things, that online lottery sales services can only be provided by entities approved by the MOF. During this period, we continued to provide lottery sales services via our mobile applications to mobile users and via our online platform to a limited number of loyal customers as a means of customer maintenance. Approximately 78.5% of our service fees during the voluntary suspension period were generated from our mobile applications. We resumed online lottery sales services for sports lottery products in November 2012 after we obtained the relevant approval for such lottery products from the MOF. Simultaneously, we ceased to provide sales services for welfare lottery products.
>
> Historically, we have one of the largest and fastest-growing user bases among online lottery service providers in China. We had 8.8 million,

> 13.8 million, 16.6 million and 18.4 million registered user accounts as of December 31, 2010, 2011 and 2012 and September 30, 2013, respectively. The activity level of our users was adversely affected by the voluntary suspension.

61. 500.com conceded in a separate section of the Initial Offering Registration Statement and Prospectus that it received notice from the Ministry of Finance on September 26, 2010, ***two years before*** the 2012 suspension, that the MOF had issued the Interim Measures for the Administration of Online Sales of Lottery, allowing qualified service providers to provide online lottery sales services *only after obtaining the approval by and the operating permit from the MOF.* Accordingly, the Company's purported disclosure that a "newly promulgated regulation" required a government license and led to their temporary shutdown in 2012, is false.

## IV. Defendant Law Obtains Temporary Lottery License in Exchange for Bribing Chinese Governmental Officials With Illegal Kickbacks

62. After having its operations suspended in March 2012, the Company sought regulatory approval for the sale of Sports Lottery products online from the Ministry of Finance, which the Company claimed in its Initial Offering Prospectus was obtained in October 2012:

> ***In October 2012, we were notified by China Sports Lottery Administration Center that we were one of the two entities that had been approved by the MOF to conduct online sales of sports lottery products in China on behalf of China Sports Lottery Administration Center***. However, since the operation of online sports lottery sales services by China Sports Lottery Administration Center itself is in a pilot phase and is subject to further approval by the MOF, our operation of online sales of sports lottery products ***may be subject to suspension*** if China Sports Lottery Administration Center fails to obtain such further approval from the MOF. We are currently awaiting approval from the MOF to provide sales services for welfare lottery products.

(Emphasis Added).

63. According to 500.com, such approvals were the first ever granted by the Ministry of Finance. As such, the scarcity of companies approved by the

Ministry of Finance to conduct online lottery sales to date serves as a significant entry barrier to the market.

64. Since October 2012, 500.com has repeatedly and falsely marketed itself in public filings, including its Initial Offering Prospectus, as "one of only two entities that have been approved by the Ministry of Finance to provide online lottery sales services on behalf of the China Sports Lottery Administration Center."

65. Unbeknownst to investors, however, 500.com's licenses were granted pursuant to the pilot program and were only "temporary".[18] According to a November 13, 2013 Chinese-language *Times Weekly* article entitled, *500.com IPOs in the U.S.; Policy Remains the Risk*, although 500.com claims it is one of two companies that received a license from the Ministry of Finance, people in the industry believed the Company's license is just temporary and, based on other comments from researchers in the industry, there was no public information available indicating that the Ministry of Finance or any other Chinese regulatory authority had issued licenses to operate an online lottery.

66. On May 7, 2014, the Chinese-language *Jinghua Times* similarly reported in an article, entitled *All Internet Lotteries are Illegal*, that the China Welfare Lottery Administration Center and CSLAC both said that they have never authorized any website or agency to conduct online lottery sales to date and all online lottery sales are illegal. The news article further stated that, based on the "*Implementing Rules of Regulation on Administration of Lottery,*" online lottery sales are illegal without prior authorization.

67. On May 8, 2014, People.com published an article entitled *Ministry of Finance Gave Two Internet Lottery Companies "Tentative Permits," Official Licenses Might Be Issued In June*,[19] reporting that the China Welfare Lottery

---

[18] *500.com IPOs in the U.S.; Policy Instability Remains the Risk*, TIMES WEEKLY (Nov. 13, 2013) at http://tech.gmw.cn/2013-11/13/content_9480383.htm.

[19] *Ministry of Finance Gave Two Internet Lottery Companies "Tentative Permits," Official License Might Be Issued In June*, PEOPLE.COM (May 8, 2014) at http://politics.people.com.cn/n/2014/0508/c1001-24990301.html.

Issuances and Administration Center and the China Sports Lottery Administration Center had issued a statement that "all online lottery sales activities are illegal and against the law." The article also reported that, although 500.com had reportedly received a tentative license, no formal licenses had been issued.

68. Defendant Pan admitted in a June 23, 2014 *Tencent Tech* article that no official word from government agencies had been received by 500.com regarding a formal license.[20] In explicit terms, Defendant Pan pointed out in the article that, despite various rumors regarding license issuance, nothing official had come from the Ministry of Finance, Ministry of Civil Affairs, and/or the General Administration of Sports.

69. 500.com obtained its status of one of only two companies authorized to sell Sports Lottery products online by bribing government officials. According to confidential sources in China who operate within the Chinese lottery industry interviewed by Lead Plaintiff's counsel, beginning by at least late 2012 and continuing throughout the Class Period, Defendant Law perpetrated an illicit kickback scheme in which Law obtained from Tian Xiao ("Xiao"), the Vice Secretary of the General Administration of Sports of China, a temporary license from the Ministry of Finance's pilot online lottery program in exchange for paying Xiao illegal kickbacks from fees earned from the Company's online lottery sales. Specifically, according to these sources, as a result of this arrangement, Law paid Xiao an agreed upon amount of money as a percentage of online Sports Lottery sales in exchange for Xiao turning a blind eye to 500.com conducting unauthorized online lottery sales outside of the authorized province.

70. Moreover, in September 2014, famed short-seller Carson Block of Muddy Waters Research revealed at the 2014 Value Investing Congress in New York several "major red flags" regarding 500.com's business practices and operating license. Specifically, Block stated that the Company had not actually

[20] *500.com CFO: No Official News Regarding Internet Lottery Licenses Issuance*, TENCENT TECH (Jun. 23, 2014) at http://tech.qq.com/a/20140623/016798.htm.

achieved the requisite regulatory approval from the Ministry of Finance and further alleged that: (1) the Company competes in, and has won its own lottery; and (2) it collects and stores such prize money in 500.com's employees' personal bank accounts. 500.com confirmed both assertions by Block in a September 10, 2015 press release entitled *500.com Limited Reiterates that It Has Obtained Proper and Necessary Approvals to Legally Provide Online Sports Lottery Services in China and It Is Committed to Full and Accurate Disclosures of Its Business Operations*:

> 500.com Limited (NYSE: WBAI) ("500.com" or the "Company"), a leading online sports lottery service provider in China, today announced that it came to the Company's attention that there was a recent online article which made several unsubstantiated speculations on various aspects of the Company's business operations. The Company hereby refutes each of such unsubstantiated speculations and reiterates that (i) it has obtained all relevant and necessary licenses and approvals to legally provide online sports lottery services in China; and (ii) it has made accurate and full disclosures on its business operations.
>
> ***Legality of providing online sports lottery services in China***
> The online article stated that the status of the authorization for the Company to operate its business is "not clear". The Company wished to reiterate that, as disclosed in the Company's Form 20-F annual report for year 2013 and Form F-1 Registration Statements previously filed with the SEC, the Company has obtained the approval from the Ministry of Finance of the People's Republic of China, or the MoF, to provide online sports lottery services on behalf of China Sports Lottery Administration Center, the government authority in charge of the issuance and sale of sports lottery products in China. The MoF is the ultimate regulator of China's lottery industry and oversees the operation of China Sports Lottery Administration Center.
>
> ***
>
> ***Collection of prize money by using employees' bank account***
> The online article pointed out that the Company collects prize money by using the employees' bank accounts. As disclosed in the Company's Form 20-F annual report for year 2013 and Form F-1 Registration Statements previously filed with the SEC, such arrangement was made due to the fact that under the current regulations and implementation procedures of national and provincial lottery products in China, prizes can only be claimed by natural persons who present the winning lottery tickets at the time of collection and the Company. Since the Company

> does not distribute physical tickets to individual users, it needs to collect prizes on behalf of such winning users. As disclosed on page 36 in the Form 20-F annual report for year 2013, the Company has adopted several measures to ensure that such individual employee accounts are under the strict control, such as strict record keeping, immediate transfer of prize money to the Company's corporate account upon collection, and real-time monitoring of the employee bank accounts by accounting managers. Such measures are specifically designed to prevent any potential fraud and the Company has never had an incident where prize money deposited in an employee's account was misappropriated in its 13 years of operating history.

71. As a result of the Management Defendants' illegal activity, the Company has been able to continually report that it has the largest market share among online lottery service providers in terms of the total purchase amount of Sports Lottery products. The Management Defendants illegally sold lottery products outside of the authorized provinces in order to become the top online lottery product provider and skim profits for the Management Defendants' own personal financial gain.

72. Corruption and bribery are notorious cultural phenomena in China, which has seen a strict crackdown of such activities following the election of current PRC President, Xi Jinping ("President Xi"). Notwithstanding, Chinese politics today exhibits a pervasive culture of patronage, factionalism, and cronyism. Or, as President Xi put it in a speech in 2013, excessive bureaucratization, hedonism, and use of public funds and position for personal advancement and pleasure.[21]

73. As discussed below, 500.com's illegal practices came to an abrupt halt as a result of the National Audit Office ("NAO") investigation starting in November 2014 into how lottery administration centers were using the funds raised by the Welfare and Sports Lotteries. The NAO investigation uncovered extensive unauthorized online lottery sales and resulting embezzlement, fraud, illegal subsidies for staff and procurement of "fancy" offices, among other illicit activities.

---

[21] Macabe Keliher and Hsinchao Wu, *How to Discipline 90 Million People*, THE ATLANTIC (Apr. 7, 2015) at http://www.theatlantic.com/international/archive/2015/04/xi-jinping-china-corruption-political-culture/389787/.

## V. 500.com Launches a Strategically Timed Initial Public Offering to Raise Capital Before Imminent Government Crackdown

74. In late 2013, the Company decided to target United States investors in a strategically timed Initial Public Offering on the New York Stock Exchange. The IPO was timed to target U.S. investors before a widely speculated and long anticipated government crackdown on corruption in online lottery sales and illicit online gaming, and the resulting dissolution of the Company's already tenuous supporting regulatory framework.

75. On November 22, 2013, 500.com announced the pricing of its initial public offering of 5,786,000 American Depositary Shares, or ADSs, each representing ten Class A ordinary shares of the Company, at $13.00 per ADS for a total offering size of USD $75.2 million. The Underwriter Defendants were granted an additional option, exercisable within 30 days from the date of the Initial Offering Prospectus, to purchase up to 867,900 additional ADSs at $13.00 per ADS.

76. 500.com filed its Initial Offering Prospectus with the SEC on August 22, 2013. According to the Initial Offering Prospectus, 500.com planned to use the proceeds from the offering for: (1) continued investment in the Company's technology platform; (2) research and development; (3) sales and marketing initiatives including advertising; (4) other general corporate purposes, including working capital needs, incremental costs associated with being a public company, and potential acquisitions; and (5) the retention of employees by providing them with equity incentives.

77. The Initial Offering Prospectus identified Deutsche as the lead underwriter for the IPO. Deutsche went to work quickly in its efforts to peddle the soon-to-be listed shares by conducting a roadshow. As stated in the IPO roadshow presentation, 500.com presented a unique opportunity to invest in a Chinese online gambling company, as the Company was "one of only two licensed in the country by the Chinese regulatory authorities." The IPO presentation further emphasized

that the Company had the "largest market share in chain," and was a "MOF approved online lottery service provider." Indeed, the IPO Presentation went on to describe 500.com as "the only MOF-approved privately owned online lottery sales service provider with an operational track record" and "the only government approved private online lottery service provider":







78. The Initial Offering Prospectus reiterated the Company's market share and that 500.com was purportedly "the only MOF-approved online lottery sales service provider with an operational track record and expertise" with an "experienced and dedicated management team." In addition, the Initial Offering

Prospectus flaunted the Company's position as "among the first companies to provide online lottery services in China, and [] one of the two entities that are authorized by the Ministry of Finance, or the MOF, to provide online lottery sales services on behalf of China Sports Lottery Administration Center, the government authority in charge of the issuance and sale of sports lottery products in China."

79. Based on the Initial Offering Prospectus and related documents, the Company's ADSs were approved for listing and registration on November 18, 2013, and the Company received from the SEC its Notice of Effectiveness on November 21, 2013. On October 22, 2013, 500.com filed its Initial Offering Registration Statement on Form F-1 with SEC. The Initial Offering Registration Statement identified Deutsche, Piper Jaffray, and Oppenheimer as the three underwriters in the offering.

80. The offering was a firm commitment underwriting in which each of the underwriters had agreed to purchase all of the securities being offered. Pursuant to the underwriting agreement, Deutsche was obligated to purchase 4,628,800 shares, Piper Jaffray was obligated to purchase 867,900 shares, and Oppenheimer was obligated to purchase 289,300 shares. The underwriters were paid by deduction from the net proceeds of the offering, in an amount ranging from $5,265,260 to $6,055,049 depending on either no exercise or full exercise by the Underwriting Defendants of their over-allotment option. The over-allotment option allowed the Underwriting Defendants to purchase up to an additional 867,900 ADSs at the public offering price, less the underwriting discounts and commissions, option exercisable for 30 days from the date of the Initial Offering Prospectus. The Company further agreed to payment for all expenses related to the offering in an aggregate amount not to exceed USD $500,000.

81. Ultimately, 500.com raised proceeds of approximately $75 million from the sale of 5.8 million ADSs at $13.00 per ADS in the November 2013 IPO, after applying the underwriter discount and commissions, and with shares debuting

on the New York Stock Exchange at trading levels of approximately $20.00 per ADS.

82. The success of the IPO, as facilitated by the false and misleading Initial Offering Registration Statement and Prospectus (discussed below), also garnered positive press coverage. In an article by 24/7 Wall Street entitled *The Hot 500.com IPO: Chinese Lottery Opens With a Bang*, published on November 22, 2013, the Company's IPO was positively reported on as follows:

> This online sports lottery service provider in China is represented as having the largest market share in the six months ended June 30, 2013, and the second largest market share in 2012 in terms of purchase amount of sports lottery products. The company aggregates and processes lottery purchase orders from its registered user accounts and currently derives substantially all of its revenues from service fees paid by provincial sports lottery administration centers for the purchase orders of sports lottery products. 500.com offers a suite of online lottery services, information, user tools and virtual community venues.
>
> The company does appear to be profitable. After pricing at $13.00, the shares opened at $20.00 and were at $21.05 at 9:57 a.m.

83. Cabot Investing's Paul Goodwin also wrote a highly positive report following the IPO, and recommended 500.com to investors. The report stated in relevant part:

> Just like my top auto, entertainment, Internet, and social networking picks that doubled our readers' money four times in 2013, my No. 1 China stock now matches the same profit profile.
>
> Here's why:
>
> 1. The stock is a fast-rising star in a global $204 billion industry.
> 2. It's a new stock that's already up 98% in three months.
> 3. It registered 198% earnings growth for its first quarter.
> 4. Analysts expect it to register another 203% next year, clobbering the S&P 500 by more than $20 to $1.
>
> What I like most about this company is that:

> 1. It doesn't have a single U.S. competitor and never will,
> 2. China only licenses two companies to profit in this fast-growing sector, and
> 3. It's outperforming its No. 1 competitor nearly 100 to 1.
>
> My No. 1 recommendation is one of only two companies authorized by the Ministry of Finance to provide online lottery and sports gaming to the nation's 3 billion people.
>
> Talk about a wide moat! When you consider that it's outperforming its No. 1 competitor by nearly 100 to 1, you can see why we are placing our bet here and why I want you in on the action.

84. Lastly, picking up on Goodwin's report, StockGumShoe.com reported on the Company in a June 23, 2014 article and similarly encouraged investors to buy 500.com:

> 500.com is comparatively small, quite focused, and it's one of the market share leaders in a country where gambling is well entrenched culturally — it's also been an IBD favorite at times, which isn't a surprise (Cabot and IBD are both largely growth/momentum focused). You can see their 2013 earnings numbers in this press release, which does include all those mouthwatering growth numbers (they've nearly doubled earnings year over year, and analysts think they'll keep growing at better than 50% for at least this year).

85. However, contrary to the positive press coverage, 500.com has failed to meet analyst projections and remain profitable, largely as a result of the Company's misrepresentations regarding its licensing and regulatory compliance. These pervasive misrepresentations and omissions led to the suspension of 500.com's operations. Since announcing this suspension, the Company has reported zero revenue for the two most recent financial quarters, the first quarter 2015 and the second quarter 2015.

## VI. The Chinese Government Cracks Down on Illegal Online Gambling

86. Since coming to power in March 2013, Chinese President Xi Jinping has launched a massive anti-corruption campaign within his own government. To this end, President Xi has passed new party rules regulating promotion and

corruption, including a multitude of anti-graft and anti-extravagance regulations in recent years. These regulations against decadence banned the use of luxury cars, eliminated lavish gifts for government officials, and limited the scope of galas, official dinners, and other special privileges that party officials had long enjoyed, amongst other things. In essence, these regulations aimed to tackle the culture of corruption and bribery amongst and between Chinese government officials that is nearly as a ubiquitous and notorious as the culture of illegal gambling.

87. This anti-corruption campaign began to specifically target the state lottery system in which 500.com was operating in late 2014. Specifically, on November 2014, the NAO announced that it had sent inspection teams to 18 Chinese provinces, including several in which 500.com was illegally operating, to determine how lottery administration centers were using the funds raised by the Welfare and Sports Lotteries.

88. On January 15, 2015, the Ministry of Finance, together with the Ministry of Civil Affairs and the General Administration of Sports of the People's Republic of China, jointly promulgated the Notice Related to Self-Inspection and Self-Remedy of Unauthorized Online Lottery Sales, or the Self-Inspection Notice. The Company did not immediately respond to the Self-Inspection Notice or disclose its existence to United States investors. The Self-Inspection Notice was not immediately reported on by English-language media outlets. In essence, as revealed by subsequent belated 500.com press releases and media reports, the Self-Inspection Notice directed:

> [P]rovincial and municipal government branches, including financial, civil affairs and sports bureaus, to conduct inspection and take remedial measures for unauthorized online lottery sales within their respective jurisdictions. The scope of inspection includes, among other things, commercial contract arrangements, online lottery products, lottery sales data exchange, online lottery sales channels, and sales commission fees in connection with unauthorized engagements of online sales agents by lottery administration centers. The Notice further requires a formal report on the result of the self-inspection and

self-remedy be submitted by each provincial or municipal government to the Ministry of Finance, the Ministry of Civil Affairs and the General Administration of Sports of the People's Republic of China by March 1, 2015

89. This news broke on January 20, 2015, when multiple Chinese blogs reported that the Ministries of Finance, Civil Affairs, and the State Sports General Administration, had issued letters to provincial lottery administrators directing them to shut down all unlicensed online operators by March 1, 2015. The direction warned that any operators who flouted the new restriction would face severe penalties.

90. On February 25, 2015, the State Sports General Administration, again, warned that the authority would "firmly correct the unregulated online selling of sports lotteries" and "crash illegal business in cooperation with the police and other administrative departments."[22] Thus, in February 2015, several provincial sports lottery administration centers suspended accepting online purchase orders for lottery products from 500.com in response to the above detailed letter from governmental authorities.

91. According to confidential sources within the lottery industry in China, in connection with the National Audit findings, Defendant Law was brought to Beijing and detained in February 2015 where he was interrogated regarding the National Audit investigation results and allegations of corruption and bribery in the state lottery system.

92. A February 23, 2015 e-mail to an investor purportedly from the Company's investor relations team denied the rumor that Defendant Law had been detained and stated that the Company's business "continues to operate normally."

---

[22] 体育总局关于切实落实彩票资金专项审计意见, GENERAL ADMINISTRATION OF SPORT OF CHINA (Feb. 25, 2015), at http://www.sport.gov.cn/n16/n33193/n33208/n33448/n33793/6197184.html.

A screenshot of that e-mail is below:

zhengdn(郑丹妮) <zhengdn@500wan.com>

[redacted]

Thanks for reaching out and your continued support of 500.com.

The rumors that you have heard regarding the Chinese government's revocation of 500.com's license and that Mr. Man San Law has been detained by authorities are false and have conveniently being spread during China's seven-day new year's holiday. Mr. Law has not been detained and the Company's business continues to operate normally. As mandated by the government, lottery sales are suspended during Chinese New Year holidays nationwide. Sales will resume after the Chinese New Year holiday ends on Wednesday, February 25, 2015

Please let us know if there is anything else we can help you with.

Thank you.

Regards
Danni
Investor Relations

93. As the Company would soon admit in a February 25, 2015 press release, however, it was not business as usual and, in fact, certain provincial Sports lottery administration centers had informed 500.com that, as part of their respective self-inspection processes, such provincial Sports lottery administration centers planned to temporarily suspend accepting online purchase orders for lottery products starting February 25, 2015:

> The Company was informed by certain provincial sports lottery administration centers that as part of their respective self-inspection processes, such provincial sports lottery administration centers plan to temporarily suspend accepting online purchase orders for lottery products starting from February 25, 2015. Four high frequency lottery products for which the Company currently provides online services are affected as a result and the Company will not be able to accept online purchase orders for such suspended lottery products. Aggregate revenue generated from the four suspended lottery products accounted for approximately 10.6% and 9.6% of the Company's total revenue in 2013 and 2014, respectively. The

> Company is closely monitoring the development of the matter and will disclose relevant information in a timely manner once available.
>
> ***
>
> In addition, ***the Company wishes to reiterate that the Company has obtained the approval from the Ministry of Finance to provide online sports lottery services on behalf of China Sports Lottery Administration Center***.

(Emphasis Added).

94. At least one confidential authority speculated that the "certain provincial Sports lottery administration centers" which suspended operations at this time, did so to avoid being implicated in the government audit, and 500.com's illicit operations.

95. Soon after, on March 2, 2015, the Company reported in a press release entitled *500.com Limited Provides Additional Information on Temporary Suspension of Sales by Provincial Sports Lottery Administration Centers*, that it had been informed, on February 28th, by the remaining provincial Sports lottery administration centers to which it provides sports lottery sales services that such provincial Sports lottery administration centers also planned to temporarily suspend accepting online purchase orders for lottery products, in response to the Self-Inspection Notice. In the same press release, the Company articulated its expectations for 500.com during this "temporary" suspension, while also reiterating the status of its purported license:

> [T]he Company expects transaction volume to decrease significantly and in turn the Company's financial results will likely be materially and adversely impacted during the temporary suspension period. The Company plans to actively engage in conversation with the competent government authorities with regard to such temporary suspension and will make announcements with updates on the situation once available.
>
> ***
>
> [500.com] is one of two entities that have been approved by the Ministry of Finance to provide online lottery sales services on behalf of the China Sports Lottery Administration Center, which is the

government authority that is in charge of the issuance and sale of sports lottery products in China.

96. An April 1, 2015 article issued by GeoInvesting, entitled *500.com- All Bets Are Off With This Online Lottery Provider*, confirmed that on February 26, 2015, during the abbreviated trading week due to President's Day, rumors started to spread across the internet that the "government plans to revoke the company's online sports lottery license" and that CEO Man San Law had been detained by Chinese authorities.

97. On April 3, 2015, eight government ministries and agencies, including the Ministry of Finance, issued a joint public statement demanding that "all institutions, online entities or individuals which provide unauthorized online lottery sales services, either directly or through agents, shall immediately cease such services." The April 3, 2015 announcement also instructed provincial authorities to "investigate and sanction unauthorized online lottery sales in their respective jurisdictions according to relevant laws and regulations." The announcement further warned that any lottery issuance authority planning to engage in online sales needed to first "obtain a consent from the Ministry of Civil Affairs or the General Administration of Sports of China," while individual operators wishing to provide technical services to enable online sales "must be pre-approved by the Ministry of Finance." Upon this announcement, most lottery operations, including 500.com, were forced to suspend their operations indefinitely.

98. The Company issued a press release also on April 3, 2015 stating that it would indefinitely suspend all operations and the suspension was the result of recent Chinese regulatory decrees regarding online lottery sales and detailed the specifics of the decrees:

> [T]he Public Announcement, with regard to online lottery sales in China was jointly released by eight competent government authorities, namely, the Ministry of Finance, the Ministry of Public Security, the State Administration for Industry & Commerce, the Ministry of Industry and Information Technology, Ministry of Civil

Affairs, People's Bank of China, the General Administration of Sports of China and China Banking Regulatory Commission. The Public Announcement mandates, among other things, that:

(i) all institutions, online entities, or individuals which provide unauthorized online lottery sales services, either directly or through agents, shall immediately cease such services and all provincial governmental authorities of finance, civil affairs and sports shall investigate and sanction unauthorized online lottery sales in their respective jurisdictions according to relevant laws and regulations;

(ii) local government authorities of public security and industry & commerce shall investigate any sales of illegal lottery products within their respective jurisdictions, with necessary assistance from local government authorities of finance, communication, banking regulatory commission, civil affairs and sports and local branches of the People's Bank of China, and report any criminal activities to law enforcement for prosecution; and

(iii) lottery issuance authorities that plan to sell lottery products online shall obtain a consent from the Ministry of Civil Affairs or the General Administration of Sports of China in order to submit an application for written approval by the Ministry of Finance, and any entity that provides online lottery sales services must be pre-approved by the Ministry of Finance.

99. In June 2015, the NAO released the results of its internal audit, reporting that 18% of the government's share of lottery revenue generated between January 2012 and October 2014 had been improperly allocated. The NAO further reported that more than one-quarter of the RMB 65.8 billion in lottery funds it reviewed were "problematic" because, as the State news agency Xinhua reported, those funds were the product of embezzlement, fraud, illegal subsidies for staff, procurement of "fancy" offices and ***unauthorized online lottery sales***.

100. Moreover, according to the NAO, 17 of the 18 provinces audited were found to have engaged in online lottery sales without the Ministry of Finance's approval. Given that 500.com was one of only two companies with temporary authority to sell lottery products online and that the other company did not conduct online sales, 500.com is likely the main culprit of unauthorized online sales in these

17 provinces. At this time, the Ministry of Finance reiterated that it had never explicitly licensed ***any*** online operators.

101. Notably, all audit deficiencies relating to 500.com would have been directly communicated to the Management Defendants and, thus, they were certainly aware of 500.com's improper and illegal online gambling activities and illicit kickback and skimming schemes.

102. In response to the audit, Chinese law enforcement announced it was actively investigating 90 cases of suspected illegality and anyone found guilty would face harsh punishment. Civil Affairs Minister Li Liguo said the misuse of lottery funds had "damaged the image of the Party and the government" and thus the government would ramp up supervision of lottery fund management and the drawing of lottery numbers. Li strongly suggested that lottery administrators "introspect and correct every wrongdoing uncovered by the audit."

103. According to Lead Plaintiff's confidential sources in China identified above, a lawsuit is to be filed soon against Xiao, the Vice Secretary of the General Administration of Sports of China, in China, on bribery charges, and this lawsuit will likely implicate Defendant Law and 500.com.

104. Indeed, a June 25, 2015 *China Economic Weekly* article entitled *Is the Detainment of Tian Xiao of General Administration of Sport Relevant to Sports Lottery Corruption?,* speculated that the Vice Secretary of the General Administration of Sports was involved in the corruption uncovered by the NAO. The article specifically referenced the curious timing of Xiao's arrest. The Central Commission for Discipline Inspection Department website released news that Xiao had been detained regarding serious violations of the law and was under investigation- the same day, the National Audit Office issued "lottery funds audit results" involving the Welfare and Sports lotteries. As previously described, the audit identified rampant misappropriations of lottery funds, including illegal purchases, acquisitions, and other issues.

105. In addition, a June 24, 2015 Chinese-language article reporting on the audit specifically reported that lottery agency staff, lottery vendors, and other public officials are suspected of having operated illegal online vendors to further their own illegitimate interests.[23] Officials quoted in the article also reported that the audit uncovered: (1) lottery administrators and/or staff members had obtained illegal profits during the regulatory approval process of certain lottery vendors; (2) some lottery administrators and/or staff members had misappropriated lottery funds through fraud or fabrication; (3) certain lottery vendors had embezzled lottery sales revenue directly by underreporting the number of ticket sales; and (4) certain public officials were complicit in the foregoing.

## VII. With Knowledge of Imminent Government Crackdown, 500.com Insiders Make Self-Serving Stock Sales Before Suspension Announcement

106. Between February 18 and 23, 2015, while rumors of suspension circulated but before the Company issued its February 25, 2015 Press Release, an alarming series of stock sales took place by a company called "Blue Ivy Investment Ltd." According to Blue Ivy Investment's Form F-1, the company's majority shareholder is another company, called "Vision Knight Capital." Zhe Wei, who sits on the Board of 500.com, is the Chairman of Vision Knight Capital.

---

[23] 审计署抽查18省彩票资金 两成半使用违法违规, *National Audit Office Selectively Inspected Lottery Funds in 18 Provinces, 25% of Lottery Funds Were Illegally or Unprofessionally Used* (Jun. 24, 2015).

107. Also according to Blue Ivy Investment's Form F-1, the company can be controlled entirely by Vision Knight Capital:

> Vision Knight Capital General Partners Ltd., acting as the general partner of Vision Knight Capital (China) Fund I, L.P., has the power to direct Blue Ivy Investment Limited as to the voting and disposition of shares directly and indirectly held by Blue Ivy Investment Limited. Mr. Zhe Wei and Mr. Daming Zhu are the directors of Vision Knight Capital General Partners Ltd. and have the power to, through unanimous resolutions, direct Blue Ivy Investment Limite as to the voting and disposition of shares directly and indirectly held by Blue Iv Investment Limited. Each of Mr. Zhe Wei and Mr. Daming Zhu disclaims beneficial ownership of any of the shares held by Blue Ivy Investment Limited except to the extent of his pecuniar interest therein. The registered office of Blue Ivy Investment Limited is at Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands.

108. On February 23, 2015, Blue Ivy Investment filed a Form 144 with the SEC, detailing its intention to sell 553,000 500.com ADSs. The approximate date of sale was listed as February 19, 2015.

109. On February 19 and 20, 2015, Blue Ivy Investment actually sold 312,900 shares at an artificially inflated price of $17.36 and $15.66 per ADS, respectively.

110. Only a few days later, on February 25, 2015, the Company announced a partial suspension of its operations, sending the 500.com ADS price into a tailspin. Specifically, 500.com's ADS price fell 22% on this date, from a closing price of $12.83 per ADS on February 24, 2015, to close at $9.96 per share on February 25, 2015. In total by February 25, 2015, 500.com's ADS price had fallen 45% over the previous two weeks, and 81% since the beginning of February 2015.

111. Thus, at a time when the Company and its ADS holders should have been the sole focus, 500.com insiders sought to capitalize on their asymmetry of information to profit personally, by exposing the Company's inadequate internal controls.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

112. As alleged herein, prior to and throughout the Class Period, 500.com

operated an online Sports lottery business pursuant to a "tentative" license that defendant Law obtained by bribing government officials who agreed to look the other way while the Company sold lottery products outside of the authorized provinces in exchange for illegal kickbacks. At all relevant times, the Management Defendants knew that the Ministry of Finance had granted the Company merely an exploratory or provisionary permit in a pilot online lottery program for a certain limited number of provinces and that the Company was operating largely outside of the authorized provinces. As a result of the Company's failure to comply with regulatory requirements and licensing procedures, the Company exposed both 500.com and its investors to significant risk that the Company's entire operations would likely be suspended for non-compliance as had occurred in 2012.

113. In order to conceal from investors that 500.com was only able to report strong financial results as a result of its regulatory violations and illegal activities, the 500.com Defendants issued a series of pervasive and material misstatements and omitted material facts in the Company's public filings and press releases throughout the Class Period that falsely represented 500.com had "obtained all relevant and necessary licenses and approvals to legally provide online sports lottery services in China" and "has made accurate and full disclosures on its business operations."

114. These material misstatements and omissions created the false impression that 500.com was thriving financially and its operations were in compliance with regulations and, thus, protected from a potential government crackdown. This false impression, in turn, caused the Company's ADS price to be artificially inflated throughout the Class Period and, among other things, maximize proceeds from the Company's Initial Public Offering in November 2013.

## I. Materially False and Misleading Statements in 500.com's Initial Offering Prospectus

115. On November 22, 2013, 500.com filed its Initial Offering Prospectus on Form 424B4 with the SEC, which was signed by Defendants Law and Pan. The

Initial Offering Prospectus incorporated by reference the Initial Offering Registration Statement and its exhibits.

116. The Initial Offering Prospectus contained several categories of materially false and misleading statements concerning 500.com's: (i) license to operate an online lottery and gaming website; (ii) market risk related to China's changing regulatory environment; (iii) compliance with Chinese laws and regulations; and (iv) financial and operational performance.

### A. Materially False and Misleading Statements Concerning 500.com's License to Operate an Online Lottery and Gaming Website

117. In the Initial Offering Prospectus, the 500.com Defendants falsely represented that 500.com was "approved by the MOF to provide online sales services for sports lottery products" and was "the only MOF-approved online lottery sales service provider with an operational track record and expertise among the online lottery sales service providers that currently operate in China."

118. Defendants also falsely assured investors that the Company "will continue our reputation as a reliable and trustworthy source for online lottery purchases in the future."

119. In addition, Defendants falsely represented that the Company had undertaken all reasonable measures to comply with licensing regulations and that it was one of two entities approved to conduct online sales:

> On September 26, 2010, the MOF issued the Interim Measures for the Administration of Online Sales of Lottery, or the Interim Measures, which allows qualified service providers to provide online lottery sales services after obtaining the approval by and the operating permit from the MOF. On January 18, 2012, the MOF, the Ministry of Civil Affairs and the General Administration of Sports of China jointly promulgated the Implementing Rules of Regulation on Administration of Lottery, or the Implementing Rules, which set forth, among other things, detailed requirements and qualifications for the approvals to conduct online lottery sales. Applications were submitted to the MOF in

> connection with the qualifications and approvals of our online lottery sales services for both sports and welfare lottery products provided on our websites, in accordance with the new measures. In October 2012, we were notified by China Sports Lottery Administration Center that we were one of the two entities that had been approved by the MOF to conduct online sales of sports lottery products in China on behalf of China Sports Lottery Administration Center.

120. The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions, 500.com: (i) did not have a formal license granted by the Ministry of Finance as represented, and rather, had, at most, a provisionary or exploratory permit; (ii) only had the temporary license as a result of illegal bribes and kickback arrangements with government officials; (iii) was using its temporary license to operate illegally outside of the permitted province; (iv) as a result of (i) – (iii), was not in compliance with applicable regulations; (v) would be subjected to stiff fines, penalties and a likely shutdown of the Company's operations (as in 2012) once the MOF caught wind of its non-compliance and illegal activity; (vi) would likely be the subject of costly litigation as a result of regulatory violations and illegal kickback schemes; (vii) could not sustain the reported levels of revenue and profit from illegal lottery sales; (viii) as a result of the above, was not a "reliable and trustworthy source for online lottery purchases"; and (ix) financial performance and operations were much worse than represented.

121. Moreover, the 500.com Defendants' purportedly warned against the risk of suspension as a result of regulatory noncompliance and licensing violations:

> There are uncertainties relating to the regulation of the Internet business in China, including evolving licensing practices. This means that permits, licenses or operations at some of our companies may be subject to challenge, or we may fail to obtain permits or licenses that may be deemed necessary for our operations or we may not be able to obtain or renew certain permits or licenses.
>
> If we fail to maintain any of these required licenses or approvals, we may be subject to various penalties, including fines and the discontinuation of or restriction on our operations. Any such

> disruption in our operations may have a material and adverse effect on our results of operation.

122. These purported warnings were materially false and misleading because, at the time the 500.com Defendants made the statements, 500.com: (i) lacked a definitive license to operate an online lottery operation; (ii) was violating the terms of the Company's "temporary" licenses by, among other ways, operating outside of the allowed province and paying government officials illegal kickbacks; and, thus, contrary to the 500.com Defendants' representations, the purported risk of which they warned had already occurred.

123. Indeed, 500.com ultimately disclosed that it had merely received a permit from the Ministry of Finance to be part of a pilot program for online lottery sales in China. Comparatively, an actual and definitive license from the Ministry of Finance to operate an online lottery service in China was subject to several contingencies, none of which had been realized, including that (1) the Ministry of Finance use its best efforts to develop an online lottery sales management system; (2) 500.com then reapply to the Ministry of Finance to provide online lottery sales following the development of an online lottery sales management system; and (3) the Ministry of Finance approve 500.com's application at that time.

**B. Materially False and Misleading Statements Concerning Market Risk**

124. In the Initial Offering Prospectus, the 500.com Defendants falsely represented that 500.com's market risk was limited and manageable. For example, the Initial Offering Prospectus asserted that 500.com was provided with a license to operate an online lottery website, at least in part, so that it could serve as a model for the developing online market in China:

> [W]e believe the MOF acknowledged our reliable and secured operations and excellent customer services, as evidenced by our large customer base and good market reputation, and issued its approval for us to be one of the two authorized entities to provide online lottery sales services under the new regulations so that we can act as an

example for the developing the online lottery market in China.

125. Defendants also falsely assured investors that, as one of the only two companies approved by the Ministry of Finance to operate an online lottery market, 500.com was shielded from both competition and penalties imposed by the Ministry of Finance:

> Although the MOF approval process is relatively new and there is uncertainty as to when and how many approvals the MOF would issue going forward, ***the scarcity of companies approved by the MOF to conduct online lottery sales to date serves as a significant entry barrier to the market and puts us in a unique and advantageous position in the current online lottery market in China.*** In addition, according to the iResearch Report, the recent implementation of the Urgent Notice and the subsequent investigations and penalties on certain online lottery sales service provider who does not have the relevant approvals could have a significant impact on the competitive landscape of the online lottery market. Although there are online lottery sales service providers who currently operate without relevant approvals, the Urgent Notice and the subsequent government actions have brought significant risks and uncertainties to such service providers.

(Emphasis Added).

126. The above statements were materially false and misleading at the time they were made because the 500.com Defendants knew that the Ministry of Finance had granted the Company merely an exploratory permit in a pilot online lottery program and not a definitive license to operate an online lottery market. Moreover, 500.com was selling lottery products outside of the permitted provinces, in violation of the temporary license agreement. Thus, the 500.com Defendants knew that it was only a matter of time before this temporary license would be revoked and the Company would be subjected to penalties, fines and litigation. As a result, 500.com was not in a "unique and advantageous position." In fact, 500.com's market risk was substantially more than represented.

**C. Materially False and Misleading Statements Concerning 500.com's Compliance with Chinese Laws and Regulations**

127. In the Initial Offering Prospectus and throughout the Class Period, Defendants also falsely stated that 500.com was in material compliance with applicable laws and regulations. In reality however, the 500.com Defendants had maintained the highly illicit practice of bribing certain government officials within the National Sports Authority in exchange for 500.com's position in the pilot program and the government's agreement to look the other way while the Company sold its lottery products outside of the permitted province.

**1. Bribery and Illegal Kickbacks**

128. The Initial Offering Prospectus is laden with warnings regarding the Company's inability to comply with changing Chinese laws and regulations, including the Company's prospective inability to detect the fraud or corruption of its own employees. Notably however, these warnings are false and misleading because the Company's own IPO was directly facilitated by the fraud and corruption of Defendant Law and certain officials in the National Sports Authority.

129. Specifically, in the Initial Offering Prospectus, Defendants falsely warned investors:

> **Negative publicity about our operations, or problems such as underage and compulsive lottery activities, fraud and corruption in sports matches may adversely affect our reputation and business.**
>
> Social responsibility policies are a key consideration in lottery laws and regulations…***Negative publicity about potential fraud (including money laundering) and corruption in sports matches (including collusion and match-fixing), even if not directly or indirectly connected with us or our services, may adversely impact our reputation*** and the willingness of the public to participate in the purchase of sports lotteries. As a result, the number of potential users available to us could be adversely affected.
>
> **We may fail to detect fraudulent activities of our users or employees.**

> Online transactions may be subject to sophisticated schemes or collusion to defraud or other illegal activities, and there is a risk that our platform may be used for those purposes either by our users or our employees. While we make continuing efforts to protect our business and our users from such illegal activities, including a user identity verifying system and pre-payment procedures to protect against fictitious transactions, the controls and procedures we have implemented may not be effective in all cases. Failure to protect our operations and our users from fraudulent activity either by other users or our employees could result in reputational damage to us and could materially and adversely affect our results of operations.

(Emphasis Added).

130. These purported warnings were materially false and misleading at the time they were made because: (i) Defendant Law had bribed the Vice Governor of the National Sports Authority in exchange for a provisionary permit to operate an online lottery service and his agreement to ignore 500.com's sales of lottery products outside of the approved province; (ii) this fraud directly facilitated the Company's ability to conduct an IPO in the United States; (iii) the Company's results of operation were the product of fraud and illegal activity and would be negatively impacted once the scheme was uncovered; and (iv) as Defendant Law's fraudulent practices were well known to industry participants in China throughout the Class Period, 500.com's reputation had already been damaged. Thus, the purported risks that the 500.com Defendants warned about had already occurred.

### 2. Cross-Border Ticket Sales

131. In the Initial Offering Prospectus, the 500.com Defendants purported to warn that 500.com may not be able to maintain its current license, thereby potentially subjecting the Company to fines, penalties and the discontinuation or restriction of lottery operations:

> Pursuant to the VAS license issued to E-Sun Sky Network by Telecommunication Management Bureau of Guangdong Province in February 2013, ***E-Sun Sky Network is permitted to provide internet information services within Guangdong Province***. The license is effective until September 2017. We need to renew each of the licenses upon its expiration, and apply for permits and alteration of the license in advance of any change to the license holder regarding its shareholding structure, controlling shareholders, merger and

> acquisition, business scope and etc. and apply for alteration of the license for any change to the name, legal representative of the license holder. However, we cannot assure you that each of the licenses will be successfully and timely renewed, or that the license will continue to cover all aspects of our online lottery service business upon its renewal. If we fail to maintain any of these required licenses or approvals, we may be subject to various penalties, including fines and the discontinuation of or restriction on our operations. Any such disruption in our operations may have a material and adverse effect on our results of operations. (Emphasis Added).
>
> ***
>
> The fact that our websites and mobile applications are accessible from a foreign jurisdiction could render our business operations subject to the laws and regulations of such jurisdiction, even though we do not have a physical presence in that jurisdiction. As a result, we could be required to obtain the requisite approval or license for lottery services in such jurisdiction, or could be deemed to have violated the prohibition against lottery services in that jurisdiction.
>
> ***
>
> The PRC regulations on lottery sales services via mobile applications and their interpretations are subject to uncertainty. Our PRC legal counsel has advised us, given that the MOF has approved us as an authorized entity to conduct online lottery sales on behalf of China Sports Lottery Administration Center, our operation of lottery sales services prior to November 2012, including sales through our mobile applications and online platform, did not and will not likely to have a material adverse effect on us. However, under the rules and regulations on online lottery sales, the relevant PRC authorities have broad discretion on the lottery sales that are conducted without the approval by the MOF, and have the authority to impose sanctions thereon, including without limitation, levying fines, confiscating illegal income or suspending the operations and other sanctions. We have not received any legal sanctions, but there is no assurance that the competent authorities would not impose any legal sanction. Any legal sanctions imposed on us by the competent authorities could have a material adverse effect on our business, financial condition, results of operations and prospects.

132. The foregoing statements were materially false and misleading when made because, at the time they were made, the 500.com Defendants: (i) knew the 500.com's provisional permit from the Ministry of Finance limited its lottery sales

to within the Guangdong Province; (ii) yet notwithstanding (i), the Company was selling and distributing lottery tickets to users outside of this province, in violation of the express limits of its permit; (iii) as a result of 500.com's violations of regulatory and licensing requirements, the Company would inevitably be subjected to stiff fines, penalties and a likely shutdown of its operations (as in 2012) once the MOF caught wind of its non-compliance and illegal activity.

### D. Materially False & Misleading Statements Concerning 500.com's Financial Performance

133. In the Initial Offering Prospectus, the 500.com Defendants reported:

- Total Purchase Amount of RMB 1.7 billion, a 32% decrease over 2011, as a result of the 2012 suspension;
- Revenue of RMB 171.5 million, a 26.2% decrease over 2011, as a result of the 2012 suspension; and
- Number of Active Users of 0.9 million, a 53.2% decrease over 2011, and is expected growth of active users to 58.9 million by 2015.

134. The financial performance of the Company in 2012 had been adversely affected by the 2012 suspension. Notwithstanding, the 500.com Defendants reiterated the financial posterity of the Company. Following resumed online lottery sales in November 2012, for the nine months ended September 30, 2013, the 500.com Defendants reported:

- Total Purchase Amount of RMB 329.7 million, 540.0 million, 699.9 million, 735.6 million in the three months ended December 31, 2012, March 31, 2013, June 30, 2013, and September 30, 2013, respectively, representing a 33.4%, 63.8%, 29.6% and 5.1% increase from their respective preceding quarters;
- Revenue of RMB 163.4 million, an increase of 25% over the nine months ended September 30, 2012; and
- Number of Active Users of 282,000, 297,000, 389,000 and 374,000 in

the three months ended December 31, 2012, March 31, 2013, June 30, 2013 and September 30, 2013, respectively, representing a 6.0%, 5.3% and 31.0% increases and a 3.9% decrease from their respective preceding quarters.

135. The above statements were materially false and misleading when made because: (i) 500.com's revenue, purchase amount and active users were the product of 500.com's illegal kickback scheme and violations of regulatory and license requirements and, thus, were overstated; (ii) 500.com was not in compliance with applicable regulations; (iii) the 500.com Defendants knew that the Company's current financial performance was not sustainable and its operations would likely be suspended as they were in 2012 for non-compliance; and, thus, (iv) 500.com's financial position was much worse than represented.

136. The above material misstatements served to maintain the Company's inflated ADS price and facilitated a profitable IPO. Indeed, as a result of the above misstatements, 500.com's ADS price opened in the IPO at $20.00 per share on November 22, 2013, 54% above the IPO price of $13.00 per ADS, and within the ensuing month was trading as high as $31.06 per ADS on December 23, 2013.

## II. Materially False and Misleading Statements in 500.com's Initial Offering Registration Statement

137. On October 22, 2013, 500.com filed its Initial Offering Registration Statement on Form F-1 with the SEC, which was signed by Defendants Law and Pan.

138. The Initial Offering Registration Statement contained several categories of materially false and misleading statements concerning 500.com's: (i) license to operate an online lottery and gaming website; (ii) market risk related to China's changing regulatory environment; (iii) compliance with Chinese laws and regulations; and (iv) financial and operational performance.

### A. Materially False and Misleading Statements Concerning 500.com's License to Operate an Online Lottery and Gaming Website

139. In the Initial Offering Registration Statement, the 500.com Defendants falsely represented that 500.com was "approved by the MOF to provide online sales services for sports lottery products" and was "the only MOF-approved online lottery sales service provider with an operational track record and expertise among the online lottery sales service providers that currently operate in China."

140. Defendants also falsely assured investors that the Company "will continue our reputation as a reliable and trustworthy source for online lottery purchases in the future."

141. In addition, Defendants falsely represented that the Company had undertaken all reasonable measures to comply with licensing regulations and that it was one of two entities approved to conduct online sales:

> On September 26, 2010, the MOF issued the Interim Measures for the Administration of Online Sales of Lottery, or the Interim Measures, which allows qualified service providers to provide online lottery sales services after obtaining the approval by and the operating permit from the MOF. On January 18, 2012, the MOF, the Ministry of Civil Affairs and the General Administration of Sports of China jointly promulgated the Implementing Rules of Regulation on Administration of Lottery, or the Implementing Rules, which set forth, among other things, detailed requirements and qualifications for the approvals to conduct online lottery sales. Applications were submitted to the MOF in connection with the qualifications and approvals of our online lottery sales services for both sports and welfare lottery products provided on our websites, in accordance with the new measures. In October 2012, we were notified by China Sports Lottery Administration Center that we were one of the two entities that had been approved by the MOF to conduct online sales of sports lottery products in China on behalf of China Sports Lottery Administration Center.

142. The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions, 500.com: (i) did not have a formal license granted by the Ministry of Finance as represented, and rather,

had, at most, a provisionary or exploratory permit; (ii) only had the temporary license as a result of illegal bribes and kickback arrangements with government officials; (iii) was using its temporary license to operate illegally outside of the permitted province; (iv) as a result of (i) – (iii), was not in compliance with applicable regulations; (v) would be subjected to stiff fines, penalties and a likely shutdown of the Company's operations (as in 2012) once the MOF caught wind of its non-compliance and illegal activity; (vi) would likely be the subject of costly litigation as a result of regulatory violations and illegal kickback schemes; (vii) could not sustain the reported levels of revenue and profit from illegal lottery sales; (viii) as a result of the above, was not a "reliable and trustworthy source for online lottery purchases"; and (ix) financial performance and operations were much worse than represented.

143. Moreover, the 500.com Defendant's purportedly warned against the risk of suspension as a result of regulatory noncompliance and licensing violations:

> There are uncertainties relating to the regulation of the Internet business in China, including evolving licensing practices. This means that permits, licenses or operations at some of our companies may be subject to challenge, or we may fail to obtain permits or licenses that may be deemed necessary for our operations or we may not be able to obtain or renew certain permits or licenses.
>
> If we fail to maintain any of these required licenses or approvals, we may be subject to various penalties, including fines and the discontinuation of or restriction on our operations. Any such disruption in our operations may have a material and adverse effect on our results of operation.

144. These purported warnings were materially false and misleading because, at the time the 500.com Defendants made the statements, 500.com: (i) lacked a definitive license to operate an online lottery operation; (ii) was violating the terms of the Company's "temporary" licenses by, among other ways, operating outside of the allowed province and paying government officials illegal kickbacks;

and, thus, contrary to the 500.com Defendants' representations, the purported risk of which they warned had already occurred.

145. Indeed, 500.com ultimately disclosed in the April 6, 2015 Press Release and the 2014 Annual Report that it had merely received a permit from the Ministry of Finance to be part of a pilot program for online lottery sales in China. Comparatively, an actual and definitive license from the Ministry of Finance to operate an online lottery service in China was subject to several contingencies, none of which had been realized, including that (1) the Ministry of Finance use its best efforts to develop an online lottery sales management system; (2) 500.com then reapply to the Ministry of Finance to provide online lottery sales following the development of an online lottery sales management system; and (3) the Ministry of Finance approve 500.com's application at that time.

**B. Materially False and Misleading Statements Concerning Market Risk**

146. In the Initial Offering Registration Statement, the 500.com Defendants falsely represented that 500.com's market risk was limited and manageable. For example, the Initial Offering Registration Statement asserted that 500.com was provided with a license to operate an online lottery website, at least in part, so that it could serve as a model for the developing online market in China:

> [W]e believe the MOF acknowledged our reliable and secured operations and excellent customer services, as evidenced by our large customer base and good market reputation, and issued its approval for us to be one of the two authorized entities to provide online lottery sales services under the new regulations so that we can act as an example for the developing the online lottery market in China.

147. Defendants also falsely assured investors that, as one of the only two companies approved by the Ministry of Finance to operate an online lottery market, 500.com was shielded from both competition and penalties imposed by the Ministry of Finance:

> Although the MOF approval process is relatively new and there is uncertainty as to when and how many approvals the MOF would issue going forward, ***the scarcity of companies approved by the MOF to conduct online lottery sales to date serves as a significant entry barrier to the market and puts us in a unique and advantageous position in the current online lottery market in China.*** In addition, according to the iResearch Report, the recent implementation of the Urgent Notice and the subsequent investigations and penalties on certain online lottery sales service provider who does not have the relevant approvals could have a significant impact on the competitive landscape of the online lottery market. Although there are online lottery sales service providers who currently operate without relevant approvals, the Urgent Notice and the subsequent government actions have brought significant risks and uncertainties to such service providers.

(Emphasis Added).

148. The above statements were materially false and misleading at the time they were made because the 500.com Defendants knew that the Ministry of Finance had granted the Company merely an exploratory permit in a pilot online lottery program and not a definitive license to operate an online lottery market. Moreover, 500.com was selling lottery products outside of the permitted provinces, in violation of the temporary license agreement. Thus, the 500.com Defendants knew that it was only a matter of time before this temporary license would be revoked and the Company would be subjected to penalties, fines and litigation. As a result, 500.com was not in a "unique and advantageous position." In fact, 500.com's market risk was substantially more than represented.

**C. Materially False and Misleading Statements Concerning 500.com's Compliance with Chinese Laws and Regulations**

149. In the Initial Offering Registration Statement and throughout the Class Period, Defendants also falsely stated that 500.com was in material compliance with applicable laws and regulations. In reality however, the 500.com Defendants had maintained the highly illicit practice of bribing certain government officials within the National Sports Authority in exchange for 500.com's position in the pilot

program and the government's agreement to look the other way while the Company sold its lottery products outside of the permitted province.

**1. Bribery and Illegal Kickbacks**

150. The Initial Offering Registration Statement is laden with warnings regarding the Company's inability to comply with changing Chinese laws and regulations, including the Company's prospective inability to detect the fraud or corruption of its own employees. Notably however, these warnings are false and misleading because the Company's own IPO was directly facilitated by the fraud and corruption of Defendant Law and certain officials in the National Sports Authority.

151. Specifically, in the Initial Offering Registration Statement, Defendants falsely warned investors:

> **Negative publicity about our operations, or problems such as underage and compulsive lottery activities, fraud and corruption in sports matches may adversely affect our reputation and business.**
>
> Social responsibility policies are a key consideration in lottery laws and regulations…***Negative publicity about potential fraud (including money laundering) and corruption in sports matches (including collusion and match-fixing), even if not directly or indirectly connected with us or our services, may adversely impact our reputation*** and the willingness of the public to participate in the purchase of sports lotteries. As a result, the number of potential users available to us could be adversely affected.
>
> **We may fail to detect fraudulent activities of our users or employees.**
>
> Online transactions may be subject to sophisticated schemes or collusion to defraud or other illegal activities, and there is a risk that our platform may be used for those purposes either by our users or our employees. While we make continuing efforts to protect our business and our users from such illegal activities, including a user identity verifying system and pre-payment procedures to protect against fictitious transactions, the controls and procedures we have implemented may not be effective in all cases. Failure to protect our operations and our users from fraudulent activity either by other users

> or our employees could result in reputational damage to us and could materially and adversely affect our results of operations.

(Emphasis Added).

152. These purported warnings were materially false and misleading at the time they were made because: (i) Defendant Law had bribed the Vice Governor of the National Sports Authority in exchange for a provisionary permit to operate an online lottery service and his agreement to ignore 500.com's sales of lottery products outside of the approved province; (ii) this fraud directly facilitated the Company's ability to conduct an IPO in the United States; (iii) the Company's results of operation were the product of fraud and illegal activity and would be negatively impacted once the scheme was uncovered; and (iv) as Defendant Law's fraudulent practices were well known to industry participants in China throughout the Class Period, 500.com's reputation had already been damaged. Thus, the purported risks that the 500.com Defendants warned about had already occurred.

**2. Cross-Border Ticket Sales**

153. In the Initial Offering Registration Statement, the 500.com Defendants purported to warn that 500.com may not be able to maintain its current license, thereby potentially subjecting the Company to fines, penalties and the discontinuation or restriction of lottery operations:

> Pursuant to the VAS license issued to E-Sun Sky Network by Telecommunication Management Bureau of Guangdong Province in February 2013, ***E-Sun Sky Network is permitted to provide internet information services within Guangdong Province***. The license is effective until September 2017. We need to renew each of the licenses upon its expiration, and apply for permits and alteration of the license in advance of any change to the license holder regarding its shareholding structure, controlling shareholders, merger and acquisition, business scope and etc, and apply for alteration of the license for any change to the name, legal representative of the license holder. However, we cannot assure you that each of the licenses will be successfully and timely renewed, or that the license will continue to cover all aspects of our online lottery service business upon its renewal. If we fail to maintain any of these required licenses or approvals, we may be subject to various penalties, including fines and the discontinuation of or restriction on our operations. Any such

> disruption in our operations may have a material and adverse effect on our results of operations. (Emphasis Added).
>
> ***
>
> The fact that our websites and mobile applications are accessible from a foreign jurisdiction could render our business operations subject to the laws and regulations of such jurisdiction, even though we do not have a physical presence in that jurisdiction. As a result, we could be required to obtain the requisite approval or license for lottery services in such jurisdiction, or could be deemed to have violated the prohibition against lottery services in that jurisdiction.
>
> ***
>
> The PRC regulations on lottery sales services via mobile applications and their interpretations are subject to uncertainty. Our PRC legal counsel has advised us, given that the MOF has approved us as an authorized entity to conduct online lottery sales on behalf of China Sports Lottery Administration Center, our operation of lottery sales services prior to November 2012, including sales through our mobile applications and online platform, did not and will not likely to have a material adverse effect on us. However, under the rules and regulations on online lottery sales, the relevant PRC authorities have broad discretion on the lottery sales that are conducted without the approval by the MOF, and have the authority to impose sanctions thereon, including without limitation, levying fines, confiscating illegal income or suspending the operations and other sanctions. We have not received any legal sanctions, but there is no assurance that the competent authorities would not impose any legal sanction. Any legal sanctions imposed on us by the competent authorities could have a material adverse effect on our business, financial condition, results of operations and prospects.

154. The foregoing statements were materially false and misleading when made because, at the time they were made, the 500.com Defendants: (i) knew the 500.com's provisional permit from the Ministry of Finance limited its lottery sales to within the Guangdong Province; (ii) yet notwithstanding (i), the Company was selling and distributing lottery tickets to users outside of this province, in violation of the express limits of its permit from the MOF and its VAS license to operate over the internet; (iii) as a result of 500.com's violations of regulatory and licensing

requirements, the Company would inevitably be subjected to stiff fines, penalties and a likely shutdown of its operations (as in 2012) once the MOF caught wind of its non-compliance and illegal activity.

### D. Materially False & Misleading Statements Concerning 500.com's Financial Performance

155. In the Initial Offering Registration Statement, the 500.com Defendants reported the same false and misleading statements concerning 500.com's financial and operation performance as those contained in the Initial Offering Prospectus.

156. Those statements were materially false and misleading when made because: (i) 500.com's revenue, purchase amount and active users were the product of 500.com's illegal kickback scheme and violations of regulatory and license requirements and, thus, were overstated; (ii) 500.com was not in compliance with applicable regulations; (iii) the 500.com Defendants knew that the Company's current financial performance was not sustainable and its operations would likely be suspended as they were in 2012 for non-compliance; and, thus, (iv) 500.com's financial position was much worse than represented.

157. The above material misstatements served to maintain the Company's inflated ADS price and facilitated a profitable IPO. Indeed, as a result of the above misstatements, 500.com's ADS price opened in the IPO at $20.00 per share on November 22, 2013, 54% above the IPO price of $13.00 per ADS, and within the ensuing month was trading as high as $31.06 per ADS on December 23, 2013.

## III. Materially False and Misleading Statements In 500.com's February 21, 2014 Press Release

158. On February 21, 2014, the Company issued a press release announcing its fourth quarter and full year 2013 financial results:

- Total Purchase Amount of RMB 1.1 billion during the fourth quarter, representing a 45.6% increase from the third quarter of 2013;
- Net Revenue of RMB 96.1 million (US$15.9 million) during the fourth

quarter, representing a 38.9% increase from the third quarter of 2013 and a 135.5% increase from the fourth quarter of 2012;

- Number of Active Users of approximately 894,000 during the fourth quarter, representing a 140.5% increase from the third quarter of 2013; and
- Net Revenue of RMB 259.5 million (US$42.9 million) for the full year 2013, representing a year-over-year increase of 51.3%.

159. Touting the Company's financial results, Defendant Law was quoted as stating:

> I am happy to announce strong quarterly results in our first quarter as a public company. Our business continued to pick up momentum as we set new records for total active users, active mobile users and total purchase amount during the quarter. Our comprehensive and innovative mobile services form a key part of our overall strategy. Mobile-registered users increased significantly, accounting for approximately 67% of active users during the quarter. Mobile purchases now represent approximately 18% of our total purchase amount. Results like these demonstrate the enormous potential that our mobile services offer and are indicative of the direction we are headed. We recently signed an agreement with China Mobile E-Commerce that will greatly expand the reach of our mobile lottery products by providing convenient, safe and reliable payment services. We are also eager to take advantage of any opportunities that arise to invest in our mobile strategy as we work to prepare for this summer's FIFA World Cup ***and build upon the solid foundation we have created as China's leading online sports lottery service***.

(Emphasis added).

160. The above statements were materially false and misleading when made because: (i) 500.com's revenue, purchase amount and active users were the product of 500.com's illegal kickback scheme and violations of regulatory and license requirements and, thus, were overstated; (ii) 500.com was not in compliance with applicable regulations; (iii) the 500.com Defendants knew that the Company's current financial performance was not sustainable and its operations would likely be suspended as they were in 2012 for non-compliance; and, thus, (iv) 500.com's

financial position was much worse than represented.

161. The above material misstatements served to maintain the Company's inflated ADS price. Indeed, as a result of the above misstatements, 500.com's ADS price increased from $47.00 per ADS on February 20, 2014 to $48.00 per share on the day of the announcement, representing an increase of approximately 2.14%

## IV. Materially False and Misleading Statements in 500.com's 2013 Annual Report

162. On March 26, 2014, 500.com filed its 2013 Annual Report on Form 20-F for the period ended December 31, 2013 ("2013 Annual Report") with the SEC. Defendants Law and Pan signed the 2013 Annual Report.

163. The 2013 Annual Report contained several categories of materially false and misleading statements concerning 500.com's: (1) license to operate an online lottery and gaming website; (2) market risk; (3) compliance with Chinese laws and regulations; (4) internal controls; and (5) financial results.

### A. Materially False and Misleading Statements Concerning 500.com's License to Operate an Online Lottery and Gaming Website and Market Risk

164. In the 2013 Annual Report, the 500.com Defendants falsely represented that 500.com was "one of the first two entities that have been approved by the MOF to conduct online sales of sports lottery products in China."

165. Defendants also falsely represented that the Company had taken all reasonable measures to comply with licensing regulations:

> On September 26, 2010, the MOF issued the Interim Measures for the Administration of Online Sales of Lottery, or the Interim Measures, which allows qualified service providers to provide online lottery sales services after obtaining the approval by and the operating permit from the MOF. On January 18, 2012, the MOF, the Ministry of Civil Affairs and the General Administration of Sports of China jointly promulgated the Implementing Rules of Regulation on Administration of Lottery, or the Implementing Rules, which set forth, among other things, detailed requirements and qualifications for the approvals to conduct

> online lottery sales. Applications were submitted to the MOF in connection with the qualifications and approvals of our online lottery sales services for both sports and welfare lottery products provided on our websites, in accordance with the new measures. In October 2012, we were notified by China Sports Lottery Administration Center that we were one of the two entities that had been approved by the MOF to conduct online sales of sports lottery products in China on behalf of China Sports Lottery Administration Center.

166. The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions, 500.com: (i) did not have a formal license granted by the Ministry of Finance as represented, and rather, had, at most, a provisionary or exploratory permit; (ii) only had the temporary license as a result of illegal bribes and kickback arrangements with government officials; (iii) was using its temporary license to operate illegally outside of the permitted province; (iv) as a result of (i) – (iii), was not in compliance with applicable regulations; (v) would be subjected to stiff fines, penalties and a likely shutdown of the Company's operations (as in 2012) once the MOF caught wind of its non-compliance and illegal activity; (vi) would likely be the subject of costly litigation as a result of regulatory violations and illegal kickback schemes; (vii) could not sustain the reported levels of revenue and profit from illegal lottery sales; (viii) as a result of the above, was not a "reliable and trustworthy source for online lottery purchases"; and (ix) financial performance and operations were much worse than represented.

167. Moreover, the 500.com Defendants purportedly warned against the risk of suspension as a result of regulatory noncompliance and licensing violations:

> There are uncertainties relating to the regulation of the Internet business in China, including evolving licensing practices. This means that permits, licenses or operations at some of our companies may be subject to challenge, or we may fail to obtain permits or licenses that may be deemed necessary for our operations or we may not be able to obtain or renew certain permits or licenses.

***

> If we fail to maintain any of these required licenses or approvals, we may be subject to various penalties, including fines and the discontinuation of or restriction on our operations. Any such disruption in our operations may have a material and adverse effect on our results of operation.
>
> New laws and regulations that regulate Internet activities, including online lottery services, may be promulgated. If these new laws and regulations are promulgated, additional licenses may be required for our operations. If our operations do not comply with these new regulations after they become effective, or if we fail to obtain any licenses required under these new laws and regulations, we could be subject to penalties.

168. These purported warnings were materially false and misleading because, at the time the 500.com Defendants made the statements, 500.com: (i) lacked a definitive license to operate an online lottery operation; (ii) was violating the terms of the Company's "temporary" licenses by, among other ways, operating outside of the allowed province and paying government officials illegal kickbacks; and, thus, contrary to the 500.com Defendants' representations, the purported risk of which they warned had already occurred.

**B. Materially False and Misleading Statements Concerning 500.com's Market Risk**

169. The 500.com Defendants also misrepresented that 500.com's market risk was limited and manageable:

> Our PRC legal counsel has advised us, given that the MOF has approved us as an authorized entity to conduct online lottery sales on behalf of China Sports Lottery Administration Center, our operation of lottery sales services prior to November 2012, including sales through our mobile applications and online platform, did not and will not likely to have a material adverse effect on us.
>
> ***
>
> Through continued and significant investments in the past 13 years, we have built a prominent brand, 500wan, which means "five million" in Chinese and is the typical amount of top prizes of most lottery products in China. We believe our brand is known in the industry and by our users for its credibility and reliability

170. Defendants also falsely assured investors that, as purportedly one of the only two companies approved by the Ministry of Finance to operate an online lottery market, 500.com was secure from both competition and penalties imposed by the Ministry of Finance:

> In October 2012, we became one of the two entities that are approved by the MOF to provide online lottery sales services on behalf of China Sports Lottery Administration Center. Such approvals were the first ever granted by the MOF. Although the MOF approval process is relatively new and there is uncertainty as to when and how many approvals the MOF would issue going forward, the scarcity of companies approved by the MOF to conduct online lottery sales to date serves as a significant entry barrier to the market and puts us in a unique and advantageous position in the current online lottery market in China.

171. The above statements were materially false and misleading at the time they were made because the 500.com Defendants knew that the Ministry of Finance had granted the Company merely an exploratory permit in a pilot online lottery program and not a definitive license to operate an online lottery market. Moreover, 500.com was selling lottery products outside of the permitted provinces, in violation of the temporary license agreement. Thus, the 500.com Defendants knew that it was only a matter of time before this temporary license would be revoked and the Company would be subjected to penalties, fines and litigation. As a result, 500.com was not in a "unique and advantageous position." In fact, 500.com's market risk was substantially more than represented.

**C. Materially False and Misleading Statements Concerning 500.com's Compliance with Chinese Laws and Regulations**

**1. Bribery and Illegal Kickbacks**

172. The 2013 Annual Report is laden with warnings regarding the Company's inability to comply with changing Chinese laws and regulations, including the Company's prospective inability to detect the fraud or corruption of its own employees. Notably however, even these warnings are false and misleading

because the Company's own IPO was directly facilitated by the fraud and corruption of Defendant Law and certain officials in the National Sports Authority.

173. Thus, in the 2013 Annual Report, the 500.com Defendants falsely warned investors:

> **Negative publicity about our operations, or problems such as underage and compulsive lottery activities, fraud and corruption in sports matches may adversely affect our reputation and business.**
>
> Social responsibility policies are a key consideration in lottery laws and regulations…***Negative publicity about potential fraud (including money laundering) and corruption in sports matches (including collusion and match-fixing), even if not directly or indirectly connected with us or our services, may adversely impact our reputation*** and the willingness of the public to participate in the purchase of sports lotteries. As a result, the number of potential users available to us could be adversely affected.
>
> **We may fail to detect fraudulent activities of our users or employees.**
>
> Online transactions may be subject to sophisticated schemes or collusion to defraud or other illegal activities, and there is a risk that our platform may be used for those purposes either by our users or our employees. While we make continuing efforts to protect our business and our users from such illegal activities, including a user identity verifying system and pre-payment procedures to protect against fictitious transactions, the controls and procedures we have implemented may not be effective in all cases. Failure to protect our operations and our users from fraudulent activity either by other users or our employees could result in reputational damage to us and could materially and adversely affect our results of operations.

(Emphasis Added).

174. These purported warnings were materially false and misleading at the time they were made because: (i) Defendant Law had bribed the Vice Governor of the National Sports Authority in exchange for a provisionary permit to operate an online lottery service and his agreement to ignore 500.com's sales of lottery products outside of the approved province; (ii) this fraud directly facilitated the Company's ability to conduct an IPO in the United States; (iii) the Company's

results of operation were the product of fraud and illegal activity and would be negatively impacted once the scheme was uncovered; and (iv) as Defendant Law's fraudulent practices were well known to industry participants in China throughout the Class Period, 500.com's reputation had already been damaged. Thus, the purported risks that the 500.com Defendants warned about had already occurred.

### 2. Cross-Border Ticket Sales

175. In the 2013 Annual Report, the 500.com Defendants purported to warn that 500.com may not be able to maintain its current license, thereby potentially subjecting the Company to fines, penalties and the discontinuation or restriction of its lottery business:

> Pursuant to the VAS license issued to E-Sun Sky Network by Telecommunication Management Bureau of Guangdong Province in February 2013, ***E-Sun Sky Network is permitted to provide internet information services within Guangdong Province***. The license is effective until September 2017. We need to renew each of the licenses upon its expiration, and apply for permits and alteration of the license in advance of any change to the license holder regarding its shareholding structure, controlling shareholders, merger and acquisition, business scope and etc, and apply for alteration of the license for any change to the name, legal representative of the license holder. However, we cannot assure you that each of the licenses will be successfully and timely renewed, or that the license will continue to cover all aspects of our online lottery service business upon its renewal. If we fail to maintain any of these required licenses or approvals, we may be subject to various penalties, including fines and the discontinuation of or restriction on our operations. Any such disruption in our operations may have a material and adverse effect on our results of operations. (Emphasis Added).
>
> ***
>
> The fact that our websites and mobile applications are accessible from a foreign jurisdiction could render our business operations subject to the laws and regulations of such jurisdiction, even though we do not have a physical presence in that jurisdiction. As a result, we could be required to obtain the requisite approval or license for lottery services in such jurisdiction, or could be deemed to have violated the prohibition against lottery services in that jurisdiction.

***

> The PRC regulations on lottery sales services via mobile applications and their interpretations are subject to uncertainty. Our PRC legal counsel has advised us, given that the MOF has approved us as an authorized entity to conduct online lottery sales on behalf of China Sports Lottery Administration Center, our operation of lottery sales services prior to November 2012, including sales through our mobile applications and online platform, did not and will not likely to have a material adverse effect on us. However, under the rules and regulations on online lottery sales, the relevant PRC authorities have broad discretion on the lottery sales that are conducted without the approval by the MOF, and have the authority to impose sanctions thereon, including without limitation, levying fines, confiscating illegal income or suspending the operations and other sanctions. We have not received any legal sanctions, but there is no assurance that the competent authorities would not impose any legal sanction. Any legal sanctions imposed on us by the competent authorities could have a material adverse effect on our business, financial condition, results of operations and prospects.

176. The foregoing statements were materially false and misleading when made because, at the time they were made, the 500.com Defendants: (i) knew the 500.com's provisional permit from the Ministry of Finance limited its lottery sales to within the Guangdong Province; (ii) yet notwithstanding (i), the Company was selling and distributing lottery tickets to users outside of this province, in violation of the express limits of its permit and its VAS license to operate over the internet; (iii) as a result of 500.com's violations of regulatory and licensing requirements, the Company would inevitably be subjected to stiff fines, penalties and a likely shutdown of its operations (as in 2012) once the MOF caught wind of its non-compliance and illegal activity.

### D. Material False and Misleading Statements Concerning 500.com's Internal Controls

177. Each of 500.com's annual and semi-annual filings with the SEC included certifications signed by Defendants Law and Pan, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that 500.com's financial

statements did not contain material misstatements or omissions, and that the Company employed internal disclosure controls over financial reporting and related disclosures.

178. In this regard, the 2013 Annual Report contained a certification signed by defendant Law, which stated:

**Chief Executive Officer Certification**
**Pursuant to Section 302 of the Sarbanes Oxley Act of 2002**

I, Man San Law, Chief Executive Officer of 500.com Limited (the "Company"), certify that:

1. I have reviewed this annual report of the Company;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this annual report;

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a 15(e) and 15d 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a 15 (f) and 15d 15(f)) for the Company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability

of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

(d) Disclosed in this annual report any change in the Company's internal control over financial reporting that occurred during the period covered by this annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of Company's board of directors (or persons performing the equivalent function):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: March 26, 2014

By: /s/ Man San Law___________

Name: Man San Law
Title: Chairman and Chief Executive Officer

179. The 2013 Annual Report contained a separate certification signed by Defendant Pan, which contained a verbatim reproduction of Law's certification statement above.

180. Moreover, the 2013 Annual Report contained certifications pursuant

to 18 U.S.C. Section 1350, as adopted by Section 906 of the Sarbanes-Oxley Act of 2002, signed by defendant Law, which stated:

**Chief Executive Officer Certification**
**Pursuant to Section 906 of the Sarbanes Oxley Act of 2002**

In connection with the Annual Report on Form 20-F of 500.com Limited (the "Company") for the year ended December 31, 2014 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Man San Law, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 26, 2014

By: /s/ Man San Law
Name: Man San Law
Title: Chairman and Chief Executive Officer

181. The 2014 Annual Report contained an identical certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, signed by Defendant Pan.

182. The above certifications were materially false and misleading at the time they were made because 500.com's internal controls were deficient and, thus, allowed the Company to: (i) violate regulatory and licensing requirements; (ii) sell lottery products outside of the permitted province; (iii) engage in and perpetuate the illegal bribery and kickback scheme which facilitated the IPO; (iv) continually misrepresent the Company's licensing status and operations to investors; (v) violate the Company's own internal policies; and (vi) violate GAAP.

183. The 500.com Defendants knew at the time of these statements that the Company lacked the necessary internal controls to ensure accurate financial

reporting and regulatory compliance, yet issued materially false and misleading financial statements to the investing public. Indeed, by the 500.com Defendants' own admission, the Company's internal controls were inadequate at the time of the IPO and during the Class Period (*see* ¶¶ 230-245, *infra*). Even after the IPO, 500.com did not maintain a system of adequate controls, or take adequate measures to redress its material deficiencies in internal controls, as represented.

184. Compelling evidence of the Company's inadequate internal controls and failure to address or rectify these deficiencies include the fact that, between March 2012 and November 2012, 500.com suspended operations for noncompliance with licensing regulations during which time the Company generated virtually no revenue; that on February 25, 2015, the Company announced a second, albeit limited, suspension of online lottery sales by certain provincial Sports lottery administration centers; that on April 4, 2015, the Company announced a third suspension, this time of all its online lottery sales, in response to an announcement by Chinese government authorities that all unauthorized online lottery sales must cease operations; and lastly, that on April 6, 2014, the SEC ordered the Company's shares be temporarily halted from trading in response to the announcement of the Company's full suspension, before being reinstated on April 7, 2015. Had the Company instituted appropriate internal controls, as represented, 500.com would not have been forced to suspend operations on several occasions in response to an imminent government crackdown on illicit online gambling operations. Moreover, confidential sources within the lottery industry have attested that Defendant Law bribed certain government officials within the National Sports Authority to gain licensing around the time of the IPO. To date, the Company has not resumed operations.

### E. Materially False & Misleading Statements Concerning 500.com's Financial Performance

185. In the 2013 Annual Report, the 500.com Defendants reported:

- Total Purchase Amount of RMB 3.0 billion, a 76.5% increase over 2012;
- Revenue of RMB 259.5 million a 51.3% increase over 2012; and
- Number of Active Users of 1.5 million, a 67% increase over 2012.

186. The above statements were materially false and misleading when made because: (i) 500.com's revenue, purchase amount and active users were the product of 500.com's illegal kickback scheme and violations of regulatory and license requirements and, thus, were overstated; (ii) 500.com was not in compliance with applicable regulations; (iii) the 500.com Defendants knew that the Company's current financial performance was not sustainable and its operations would likely be suspended as they were in 2012 for non-compliance; and, thus, (iv) 500.com's financial position was much worse than represented.

187. The above material misstatements served to maintain the Company's inflated ADS price. Indeed, as a result of the above misstatements, 500.com's ADS price increased from $34.68 per ADS on March 27, 2014 to $40.01 per ADS by April 2, 2014, representing an increase of 15%.

## V. Materially False and Misleading Statements In 500.com's May 7, 2014 Press Release

188. On May 7, 2014, the Company issued a press release announcing its first quarter 2014 financial results:

- Total Purchase Amount of RMB 1,054.9 million (US$169.7 million), representing a 1.5% decrease from the fourth quarter of 2013, but a 95.4% increase from the first quarter of 2013;
- Net Revenue of RMB RMB89.8 million (US$14.4 million), representing a 6.6% decrease from the fourth quarter of 2013, but a 127.3% increase from the first quarter of 2013; and
- Number of Active Users of approximately 1,144,000 during the first quarter of 2014, representing a 28.0% increase from the fourth quarter

of 2013.

189. Touting the Company's financial results, Defendant Law was quoted as stating:

> I am pleased to report another strong quarter as we begin 2014 on a solid footing. We continued to gain momentum as we handedly beat guidance with total purchase amount surpassing US$169.7 million, a 95.4% year-over-year increase. Traffic continued to grow during the quarter, particularly through our mobile channel where 26.4% of total purchases are now made. With mobile purchases now approaching one third of total purchases, we will continue to invest in R&D, marketing and our innovative mobile services as we reach out to a new user base to reinforce our leadership position. Revenues continued to increase as our active user base increased to approximately 1,144,000 users during the first quarter of 2014, a 28.0% increase sequentially. Our operating margin remained steady at 35.3% during the quarter, which further demonstrating the effectiveness of our overall strategy.

190. The above statements were materially false and misleading when made because: (i) 500.com's revenue, purchase amount and active users were the product of 500.com's illegal kickback scheme and violations of regulatory and license requirements and, thus, were overstated; (ii) 500.com was not in compliance with applicable regulations; (iii) the 500.com Defendants knew that the Company's current financial performance was not sustainable and its operations would likely be suspended as they were in 2012 for non-compliance; and, thus, (iv) 500.com's financial position was much worse than represented.

191. The above material misstatements served to maintain the Company's inflated ADS price. Indeed, as a result of the above misstatements, 500.com's ADS price increased from $28.61 per ADS on May 7, 2014 to $33.77 per share by May 12, 2014, representing an increase of 18%

## VI. Materially False and Misleading Statements in 500.com's May 8, 2014 Press Release

192. On May 8, 2014, the Company issued a press release, entitled *500.com Limited Reiterates that it Has Obtained Proper Approvals to Operate an Online*

*Sports Lottery Service in China*,[24] falsely claiming that 500.com had obtained all necessary regulatory approval to operate and online sports lottery:

> The Company reiterates that it ***has obtained all relevant approvals to legitimately operate an online sports lottery service in China***. In particular, the Company has obtained approval from the Ministry of Finance of the People's Republic of China ("Ministry of Finance"), which is the ultimate regulator of China's lottery industry and oversees the operation of China Sports Lottery Administration Center.
>
> ***
>
> The legality of the Company's business is endorsed by its legal counsel, whose opinion was filed with the SEC on April 2, 2014 in 500.com's most recent F-1 registration statement. The Company ***confirms that the information regarding the Company's approvals and other aspects of operations is accurately and fairly described*** in the Company's Form 20-F filed on March 26, 2014.

(Emphasis Added).

193. The above statements were materially false and misleading at the time they were made because, contrary to the 500.com's Defendants' assertions: (i) defendant Law had bribed the Vice Governor of the National Sports Authority in exchange for a provisionary permit to operate an online lottery service and his agreement to ignore 500.com's sales of lottery products outside of the approved province; (ii) the Company had not obtained the appropriate approval to receive a license for online gambling; (iii) the Company's results of operation were the product of fraud and illegal activity and, thus, were not "fairly described" in 500.com's SEC filings; and (iv) 500.com was not in compliance with regulatory and licensing requirements.

194. The above material misstatements served to maintain the Company's inflated ADS price. Indeed, as a result of the above misstatements, 500.com's ADS price increased from $28.61 per share on May 7, 2014 to $33.77 per share by May 12, 2014, representing an increase of 18%.

---

[24] Press Release, *500.com Limited Reiterates that it Has Obtained Proper Approvals to Operate an Online Sports Lottery Service in China*, 500.COM INVESTOR ROOM (May 8, 2014), *available at* http://500.investorroom.com/2014-05-08-500-com-Limited-Reiterates-that-it-Has-Obtained-Proper-Approvals-to-Operate-an-Online-Sports-Lottery-Service-in-China.

195. In addition, as a result of these inflated financial results, analysts provided positive coverage of the Company beginning on May 8, 2014. For example, on May 8, 2014, Deutsche Bank upgraded 500.com from Sell to Hold, with Deutsche analyst Alan Hellawell III adding: "as the World Cup approaches, we expect sentiment toward 500.com to improve continuously…we expect the event to drive outperformance relative to the co's conservative 1Q guide."

## VII. Materially False and Misleading Statements In 500.com's August 11, 2014 Press Release

196. On August 11, 2014, the Company issued a press release announcing its second quarter 2014 financial results:

- Total Purchase Amount of RMB 2,093.2 million (US$337.4 million), representing a 98.4% increase from the first quarter of 2014 and a 199.1% increase from the second quarter of 2013.
- Net Revenue of RMB 156.1 million (US$25.2 million), representing a 73.8% increase from the first quarter of 2014 and a 185.4% increase from the second quarter of 2013.
- Number of Active Users of approximately 2,530,000 during the second quarter of 2014, representing a 121.2% increase from the first quarter of 2014.

197. Touting the Company's financial results, Defendant Law was quoted as stating:

> I am pleased to report a record quarter of solid growth across the board. Our growth momentum continued with revenue increasing significantly during the quarter as a result of the 2014 FIFA World Cup. Total purchase amount increased 199.1% year-over-year to US$337.4 million; a new record for the Company. Traffic continued to grow during the quarter, particularly through our mobile channels which now account for 34.3% of total purchases made. With mobile purchases exceeding one third of total purchases made for the first time, we will continue to invest in R&D and marketing as we look for new ways to innovate our mobile services and expand our use base to solidify our leading position. Revenues continued to increase as a

> result of our growing active user base which increased 121.2% sequentially to 2,530,000 users during the quarter. We are confident that the strategy we have in place will continue to increase shareholder value as we work to strengthen the sustainable foundation we have created as China's leading online sports lottery service.

198. The above statements were materially false and misleading when made because: (i) 500.com's revenue, purchase amount and active users were the product of 500.com's illegal kickback scheme and violations of regulatory and license requirements and, thus, were overstated; (ii) 500.com was not in compliance with applicable regulations; (iii) the 500.com Defendants knew that the Company's current financial performance was not sustainable and its operations would likely be suspended as they were in 2012 for non-compliance; and, thus, (iv) 500.com's financial position was much worse than represented.

199. The above material misstatements served to maintain the Company's inflated ADS price. Indeed, as a result of the above misstatements, 500.com's ADS price increased from $37.68 per ADS on August 11, 2014 to $37.88 per ADS by August 12, 2014.

## VIII. Materially False and Misleading Statements in 500.com's September 10, 2014 Press Release

200. On September 10, 2014, the Company issued a press release, entitled *500.com Limited Reiterates that it Has Obtained Proper and Necessary Approvals to Legally Provide Online Sports Lottery Services in China and It Is Committed to Full and Accurate Disclosures of Its Business Operations*,[25] again, falsely representing that 500.com had obtained all relevant regulatory and licenses to operate an online sports lottery:

> 500.com Limited (NYSE: WBAI) ("500.com" or the "Company"), a leading online sports lottery service provider in China, today

---

[25] Press Release, *500.com Limited Reiterates that it Has Obtained Proper and Necessary Approvals to Legally Provide Online Sports Lottery Services in China and It Is Committed to Full and Accurate Disclosures of Its Business Operations*, 500.COM INVESTOR RELATIONS (Sep., 10, 2014), *available at* http://500.investorroom.com/2014-09-10-500-com-Limited-Reiterates-that-It-Has-Obtained-Proper-and-Necessary-Approvals-to-Legally-Provide-Online-Sports-Lottery-Services-in-China-and-It-Is-Committed-to-Full-and-Accurate-Disclosures-of-Its-Business-Operations.

> announced that it came to the Company's attention that there was a recent online article which made several unsubstantiated speculations on various aspects of the Company's business operations. ***The Company hereby refutes each of such unsubstantiated speculations and reiterates that (i) it has obtained all relevant and necessary licenses and approvals to legally provide online sports lottery services in China; and (ii) it has made accurate and full disclosures on its business operations.*** (Emphasis Added).
>
> ***Legality of providing online sports lottery services in China***
> The online article stated that the status of the authorization for the Company to operate its business is "not clear". The Company wished to reiterate that, ***as disclosed in the Company's Form 20-F annual report for year 2013 and Form F-1 Registration Statements previously filed with the SEC, the Company has obtained the approval from the Ministry of Finance of the People's Republic of China, or the MoF, to provide online sports lottery services on behalf of China Sports Lottery Administration Center, the government authority in charge of the issuance and sale of sports lottery products in China. The MoF is the ultimate regulator of China's lottery industry and oversees the operation of China Sports Lottery Administration Center.***

201. The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions, 500.com: (i) defendant Law had bribed the Vice Governor of the National Sports Authority in exchange for a provisionary permit to operate an online lottery service and his agreement to ignore 500.com's sales of lottery products outside of the approved province; (ii) the Company had not obtained the appropriate approval to receive a license for online gambling; (iii) the Company's results of operation were the product of fraud and illegal activity and, thus, were not "fairly described" in 500.com's SEC filings; and (iv) 500.com was not in compliance with regulatory and licensing requirements.

202. As a result of these inflated financial results, analysts provided positive coverage of the Company beginning on September 10, 2014. For example, on September 16, 2014, Deutsche Bank again upgraded 500.com from Hold to Buy, with a price target of $40.00 per share. Again, Deutsche analyst Alan Hellawell III

added:

> Discussion with 500.com mgmt reveals an intense focus on preserving GMV momentum post the Jun/Jul "World Cup bump." New game-play formats and a pipeline of new games should prevent GMV QoQ erosion in 3Q, also driven by a govt-mandated increase in industry lottery payout ratio. Single-match game launches, new SNS overlays to WBAI's games and a major mobile app overhaul are likely 3Q/4Q catalysts. We upgrade 500.com from Hold to Buy on solid post-World Cup momentum and the recent unduly severe sell-off.

## IX. Materially False and Misleading Statements In 500.com's November 20, 2014 Press Release

203. On November 20, 2014, the Company issued a press release announcing its third quarter 2014 financial results:

- Total Purchase Amount of RMB 2,244.6 (US$365.7 million), representing a 7.2% increase from the second quarter of 2014 and a 205.1% increase from the third quarter of 2013;
- Net Revenue of RMB187.6 million (US$30.6 million), representing a 20.2% increase from the second quarter of 2014 and a 171.1% increase from the third quarter of 2013; and
- Number of Active Users of approximately 3,500,000 during the third quarter of 2014, representing a 38.3% increase from the second quarter of 2014.

204. Touting the Company's financial results, Defendant Law was quoted as stating:

> I am pleased to report another solid quarter of growth as our business continues to gain momentum. Total purchase amount reached a new record high of US$365.7 million, a 205.1% increase from the same period last year. . . We are confident that our mobile strategy and its enhanced services will strengthen our position as China's leading online sports lottery service and generate sustainable, long-term revenue.

205. The above statements were materially false and misleading when made because: (i) 500.com's revenue, purchase amount and active users were the product

of 500.com's illegal kickback scheme and violations of regulatory and license requirements and, thus, were overstated; (ii) 500.com was not in compliance with applicable regulations; (iii) the 500.com Defendants knew that the Company's current financial performance was not sustainable and its operations would likely be suspended as they were in 2012 for non-compliance; and, thus, (iv) 500.com's financial position was much worse than represented.

206. The above material misstatements served to maintain the Company's inflated ADS price. Indeed, as a result of the above misstatements, 500.com's ADS price increased from $23.89 per share on November 20, 2014 to $24.20 per share by November 21, 2014.

## X. Materially False and Misleading Statements In 500.com's February 11, 2015 Press Release

207. On February 11, 2015, the Company issued a press release announcing its fourth quarter and full year 2014 financial results:

- Total Purchase Amount of RMB1,757.9 million (US$283.3 million) for the fourth quarter, representing a 21.7% decrease from the third quarter of 2014 and a 63.7% increase from the fourth quarter of 2013;
- Net Revenue of RMB146.2 million (US$23.6 million) for the fourth quarter, representing a 22.1% decrease from the third quarter of 2014 and a 52.1% increase from the fourth quarter of 2013;
- Number of Active Users of decreased by 71.9% to approximately 984,000 during the fourth quarter of 2014 from 3,500,000 in the third quarter of 2014, primarily due to increased user activity in connection with the FIFA World Cup which was held during the third quarter of 2014; and
- Net Revenue of RMB579.7 million (US$93.4 million), for the full year 2014, representing a year-over-year increase of 123.4%.

208. Touting the Company's financial results, Defendant Law was quoted

as stating:

> We finished the year on a strong note with net revenues increasing 52.1% year-over-year. Total purchase amount during the quarter increased 63.7% from the same period last year to US$283.3 million as non-GAAP net income grew significantly, increasing 98.5% to US$8.3 million. We continue to invest in the marketing of our mobile app as purchases made through mobile channels rapidly approaches half of all purchases. We expect to see this trend continue as we roll out new functions and games to enhance the overall user experience.

209. The above statements were materially false and misleading when made because: (i) 500.com's revenue, purchase amount and active users were the product of 500.com's illegal kickback scheme and violations of regulatory and license requirements and, thus, were overstated; (ii) 500.com was not in compliance with applicable regulations; (iii) the 500.com Defendants knew that the Company's current financial performance was not sustainable and its operations would likely be suspended as they were in 2012 for non-compliance; and, thus, (iv) 500.com's financial position was much worse than represented.

210. The above material misstatements served to combat the potentially adverse effect on 500.com's ADS price of rumors beginning to circulate in Chinese-language media outlets regarding a potential suspension of 500.com's online lottery services.

211. Between February 18 and 23, 2015, while rumors of suspension circulated but before the Company issued its February 25, 2015 Press Release, an alarming series of stock sales took place by a company called "Blue Ivy Investment Ltd," which is ultimately controlled by Zhe Wei, who sits on the 500.com Board. Specifically, on February 19 and 20, 2015, Blue Ivy Investment sold 312,900 shares at an artificially inflated price. Only a few days later, on February 25, 2015, the Company announced a partial suspension of its operations, sending the 500.com ADS price into a tailspin. Specifically, 500.com's stock price fell 22% on this date, from a closing price of $12.83 per ADS on February 24, 2015, to close at $9.96 per ADS on February 25, 2015. In total by February 25, 2015, 500.com's ADS price

had fallen 45% over the previous two weeks, and 81% since the beginning of February 2015.

## THE TRUTH BEGINS TO EMERGE

### I. The 500.com Defendants Reveal in the February 25, 2015 Press Release that the Sale of Certain Lottery Products Have Been Suspended Pursuant to a National Audit Investigation

212. The Company issued a press release on February 25, 2015, entitled *500.com Limited Announces Suspension of Sales by Certain Provincial Sports Lottery Administration Centers*,[26] announcing the temporary suspension of online purchase orders for lottery products at certain provincial Sports lottery administration centers in response to the Self-Inspection Notice. The February 25, 2015 Press Release stated in relevant part:

> 500.com Limited (NYSE: WBAI) ("500.com" or the "Company"), a leading online sports lottery service provider in China, today announced that it had recently come to the Company's attention that certain provincial sports lottery administration centers to which the Company provides sport lottery sales services plan to temporarily suspend accepting online purchase orders for lottery products, in response to the Notice on Issues Related to Self-Inspection and Self-Remedy of Unauthorized Online Lottery Sales (the "Notice"), which was jointly promulgated by the Ministry of Finance, the Ministry of Civil Affairs and the General Administration of Sports of the People's Republic of China on January 15, 2015.
>
> The Notice requires provincial and municipal government branches, including financial, civil affairs and sports bureaus, to conduct inspection and take remedial measures for unauthorized online lottery sales within their respective jurisdictions. The scope of inspection includes, among other things, commercial contract arrangements, online lottery products, lottery sales data exchange, online lottery sales channels, and sales commission fees in connection with unauthorized engagements of online sales agents by lottery administration centers.

---

[26] Press Release, *500.com Announces Suspension of Sales by Certain Provincial Sports Lottery Administration Centers*, 500.COM INVESTOR ROOM (Feb. 25, 2015), *available at* http://500.investorroom.com/2015-02-25-500-com-Limited-Announces-Suspension-of-Sales-by-Certain-Provincial-Sports-Lottery-Administration-Centers.

> The Notice further requires a formal report on the result of the self-inspection and self-remedy be submitted by each provincial or municipal government to the Ministry of Finance, the Ministry of Civil Affairs and the General Administration of Sports of the People's Republic of China by March 1, 2015.
>
> The Company was informed by certain provincial sports lottery administration centers that as part of their respective self-inspection processes, such provincial sports lottery administration centers plan to temporarily suspend accepting online purchase orders for lottery products starting from February 25, 2015. Four high frequency lottery products for which the Company currently provides online services are affected as a result and the Company will not be able to accept online purchase orders for such suspended lottery products. Aggregate revenue generated from the four suspended lottery products accounted for approximately 10.6% and 9.6% of the Company's total revenue in 2013 and 2014, respectively. The Company is closely monitoring the development of the matter and will disclose relevant information in a timely manner once available.

213. On the news of the partial suspension, 500.com's ADS price fell to a 52-week low of $9.55 per ADS on February 25, 2015. This decline marked a 22% decline from a closing price of $12.83 per ADS on February 24, 2015, a 67.71% decline from early November 2014, and a precipitous 79.25% decline from February 2014.

## II. Continuing Materially False and Misleading Statements in the February 25, 2015 Press Release

214. The 500.com Defendants, however, continued to falsely represent in the February 25, 2015 Press Release that 500.com had received all necessary approvals from the Ministry of Finance to operate online lottery services and assure investors that 500.com will not be affected in the long-term:

> The Company notes that, as stated in the preamble of the Notice, the promulgation of the Notice is an important step by the competent government authorities to sanction unauthorized online lottery sales and to ensure healthy development of the lottery market in China. Although there is uncertainty involved in the implementation of the

> Notice, the Company believes such measures would have long-term beneficial effects on the lottery market in China. In addition, ***the Company wishes to reiterate that the Company has obtained the approval from the Ministry of Finance to provide online sports lottery services on behalf of China Sports Lottery Administration Center.***

(Emphasis Added).

215. The above statements were materially false and misleading at the time they were made because, contrary to Defendants' assertions, 500.com: (i) did not have a formal license granted by the Ministry of Finance as represented, and rather, had, at most, a provisionary or exploratory permit; (ii) only had the temporary license as a result of illegal bribes and kickback arrangements with government officials; (iii) was using its temporary license to operate illegally outside of the permitted province; (iv) as a result of (i) – (iii), was not in compliance with applicable regulations; (v) would be subjected to stiff fines, penalties and a likely shutdown of the Company's operations (as in 2012) once regulators caught wind of its non-compliance and illegal activity; and (vi) would likely be the subject of costly litigation as a result of regulatory violations and illegal kickback schemes. Furthermore, the Company had not "recently" been informed of the Self-Inspection Notice, as represented. The Self-Inspection Notice was issued to the Company on January 15, 2015 and widely reported on by Chinese-language media beginning on January 17, 2015. Notwithstanding, the Company failed to disclose the Self-Inspection Notice to investors until over one month later, in the February 25, 2015 Press Release.

### III. The March 2, 2015 Press Release Discloses Further Suspensions by the Remaining Provincial Sports Lottery Administration Centers

216. On March 2, 2015, the Company issued a press release, entitled *500.com Limited Provides Additional Information on Temporary Suspension of Sales by Provincial Sports Lottery Administration Centers*,[27] announcing additional

[27] Press Release, *500.com Limited Provides Additional Information on Temporary Suspension of*

temporary suspensions of online purchase orders for lottery products at certain provincial Sports lottery administration centers in response to the Self-Inspection Notice.

217. The March 2, 2015 Press Release stated in relevant part:

> 500.com Limited (NYSE: WBAI) ("500.com" or the "Company"), a leading online sports lottery service provider in China, today made an announcement in furtherance to the Company's announcement on February 25, 2015 with regard to the suspension of sales by certain provincial sports lottery administration centers. On February 28, 2015 the Company was ***further informed by the remaining provincial sports lottery administration centers to which the Company provides sport lottery sales services that such provincial sports lottery administration centers also plan to temporarily suspend accepting online purchase orders for lottery products***, in response to the Notice on Issues Related to Self-Inspection and Self-Remedy of Unauthorized Online Lottery Sales. The Company notes that during the temporary suspension period the Company plans to continue processing online orders for lottery products that are distributed by local lottery stations and represented by paper lottery tickets. As a result, the Company ***expects transaction volume to decrease significantly and in turn the Company's financial results will likely be materially and adversely impacted during the temporary suspension period.*** The Company plans to actively engage in conversation with the competent government authorities with regard to such temporary suspension and will make announcements with updates on the situation once available.

(Emphasis added).

218. On news of the full suspension, 500.com's ADS price remained depressed from its pre-February 25, 2015 Press Release trading levels, to close at $10.02 per ADS on March 2, 2015, representing a decline of 21.78% from February 24, 2015, a 67.52% decline from early November 2014, and a precipitous 77.38% decline from March 2014.

---

*Sales by Provincial Sports Lottery Administration Centers*, 500.COM INVESTOR ROOM (Mar. 2, 2015), *available at* http://500.investorroom.com/2015-03-02-500-com-Limited-Provides-Additional-Information-on-Temporary-Suspension-of-Sales-by-Provincial-Sports-Lottery-Administration-Centers.

## IV. POST-CLASS PERIOD EVENTS

219. On April 3 2015, the Company issued a press release, entitled *Public Announcement Regarding Online Lottery Sales in China*,[28] announcing its plans to "voluntarily and temporarily" suspend all of its online lottery sales services starting from April 4, 2015, in response to the Self-Inspection Notice and a subsequent notice issued by eight Chinese regulatory authorities. The April 3, 2015 Press Release stated in relevant part:

> 500.com Limited (NYSE: WBAI) ("500.com" or the "Company"), a leading online sports lottery service provider in China, announced that today a public announcement, or the Public Announcement, with regard to online lottery sales in China was jointly released by eight competent government authorities, namely, the Ministry of Finance, the Ministry of Public Security, the State Administration for Industry & Commerce, the Ministry of Industry and Information Technology, Ministry of Civil Affairs, People's Bank of China, the General Administration of Sports of China and China Banking Regulatory Commission. The Public Announcement mandates, among other things, that (i) all institutions, online entities, or individuals which provide unauthorized online lottery sales services, either directly or through agents, shall immediately cease such services and all provincial governmental authorities of finance, civil affairs and sports shall investigate and sanction unauthorized online lottery sales in their respective jurisdictions according to relevant laws and regulations; (ii) local government authorities of public security and industry & commerce shall investigate any sales of illegal lottery products within their respective jurisdictions, with necessary assistance from local government authorities of finance, communication, banking regulatory commission, civil affairs and sports and local branches of the People's Bank of China, and report any criminal activities to law enforcement for prosecution; and (iii) lottery issuance authorities that plan to sell lottery products online shall obtain a consent from the Ministry of Civil Affairs or the General Administration of Sports of China in order to submit an application for written approval by the Ministry of Finance, and any entity that provides online lottery sales services must be pre-approved by the Ministry of Finance.

---

[28] Press Release, *Public Announcement Regarding Online Lottery Sales in China*, 500.COM INVESTOR ROOM (Apr. 3, 2014), *available at* http://500.investorroom.com/2015-04-03-Public-announcement-regarding-online-lottery-sales-in-China.

> To assist the competent government authorities to implement the Public Announcement, ***the Company plans to voluntarily and temporarily suspend all of its online lottery sales services starting from April 4, 2015. During this temporary suspension period the Company expects that it will not generate any revenue.*** The Company will continue to work with China Sports Lottery Administration Center for the development of the pilot program for online sales of sports lottery. ***The pilot program was mandated by the Notice on the Commencement of the Pilot Program of Online Sales of Sport Lottery issued by the Ministry of Finance in 2012, which approved Shenzhen E-Sun Sky Network Technology Co., Ltd., a consolidated affiliated entity of the Company, to be one of the two entities to provide online lottery sales services on behalf of China Sports Lottery Administration Center.*** The Company is also in active communication with the competent government authorities and will make announcements with updates on the situation once available.

(Emphasis Added).

220. Importantly, in the April 3, 2015 Press Release, the Company, again, reiterated that 500.com had received all necessary approvals from the Ministry of Finance to operate an online lottery service. The Press Release specifically assured investors that it was "one of the two entities [approved] to provide online lottery sales services on behalf of China Sports Lottery Administration Center" and "[t]he Company is in active communication with the competent government authorities."

221. On April 6, 2015, the Company issued a press release, entitled *Clarification on Announcement Regarding Online Lottery Sales in China*,[29] disclosing that 500.com did not have a license from the Ministry of Finance to operate an online lottery service and that, in the event the China Sports Lottery Administrative Center did develop a lottery sales management system, the Company would have to reapply for a license from the Ministry of Finance before commencing operations. In other words, the Company does not and never had an explicit license to operate online lottery games. Rather, at best, 500.com had a

[29] Press Release, *Clarification on Announcement Regarding Online Lottery Sales in China*, 500.COM INVESTOR ROOM (Apr. 6, 2015), *available at* http://500.investorroom.com/2015-04-06-Clarification-on-Announcement-Regarding-Online-Lottery-Sales-in-China.

provisionary or exploratory permit, or just the mere permission, of the Ministry of Finance to run a trial website selling online lottery tickets.

222. The April 6, 2015 Press Release stated in relevant part:

> In particular, such approval mandated that the China Sports Lottery Administration Center use its best effort to develop an online lottery sales management system as part of a ***pilot program*** for online lottery sales in China, and once such a management system is finished, the China Sports Lottery Administration Center should apply again for approval from the Ministry of Finance for official commencement of online lottery sales in China. The Company notes it has been working and will continue to work with the China Sports Lottery Administration Center to develop such a management system. ***To the best of the Company's knowledge, the approval by the Ministry of Finance for the Company to provide online lottery sales services on behalf of the China Sports Lottery Administration Center is valid and has not been revoked or amended as of the date of this announcement.***
>
> The Company believes the public announcement jointly released by eight competent government authorities on April 3, 2015 is a further step by the competent government authorities to sanction unauthorized online lottery sales and to ensure the healthy development of the lottery market in China. In particular, the Company believes the close proximity of the release of such public announcement and the promulgation of the Notice on Issues Related to Self-Inspection and Self-Remedy of Unauthorized Online Lottery Sales on January 15, 2015 ***signals a potential significant change of regime in the online lottery market in China***. ***In light of such potential change of regime, the Company decided to voluntarily and temporarily suspend all of its online lottery sales services***. To the best of the Company's knowledge, as of the date of this announcement, all online lottery sales service providers in China have temporarily suspended their operations.

(Emphasis Added).

223. The 500.com Defendants, however, continued to falsely represent that the Company was "one of the two entities approved by the Ministry of Finance in 2012 to provide online lottery sales services on behalf of the China Sports Lottery

Administration Center."

224. The above material misstatements served to combat the adverse news of the Company's suspension on its ADS price. Indeed, as a result of the above misstatements, 500.com's ADS price increased from $12.29 per share on April 6, 2015, to $14.47 per ADS on April 7, 2015, representing an increase of 17.74%, despite that the Company was generated zero revenue. In addition to the Company's material misstatements, the jump in ADS price is attributable to rumors circulating in both Chinese and English-language media that lottery sales were poised to resume. For example, on April 2, 2015 Bloomberg reported in an article entitled *500.com Jumps on Report China May Restart Legal Lottery Sales,* that "Chinese officials have reached an agreement on the operation of the web-based lottery industry, signaling sales will restart "soon."

225. On April 27, 2015, 500.com filed its 2014 Annual Report on Form 20-F for the period ended December 31, 2014 (the "2014 Annual Report") with the SEC, which was signed by Defendants Law and Pan. In the 2014 Annual Report, the 500.com Defendants assured investors that, despite the suspension of the Company's lottery operations, 500.com had sufficient cash to meet its current obligations for the foreseeable future:

> On the basis of the current level of cash and cash equivalents, time deposits and management forecasts, management believes that ***the risk of the current obligations not being met is low and therefore the Group will continue its operations for the foreseeable future.***

(Emphasis Added).

226. Not surprisingly, as a result of Law's unlawful bribery scheme and resulting detention, on May 15, 2015, Defendant Law resigned as CEO and defendant Pan replaced Law as the new CEO. In addition, Qi Li resigned as a director of the Company for purported "personal reasons" and defendant Pan replaced Li as a director of 500.com.

227. On May 19, 2015, the Company released its unaudited financial results for the first quarter of 2015, reporting Total Purchase Amount of RMB1,305 million, representing a 25.7% decrease from the prior quarter; revenues of RMB98.8 million (US$15.9 million), representing a 32.4% decrease from the prior quarter; and 857,000 active users, representing a 12.9% decrease from the fourth quarter of 2014. Despite the Company's declining financial results stemming from its indefinitely suspended operations, defendant Law falsely reiterated that the Company was one of only two approved entities to authorized to provide online lotter services and claimed 500.com's license was "valid":

> We voluntarily and temporarily suspended our online lottery sales operations in response to the promulgation of the Self-Inspection Notice. Such temporary and voluntary suspension materially and adversely impacted our results of operations and financial conditions of the first quarter of 2015. ***We want to restate that the Company was one of the two entities approved by the Ministry of Finance in 2012 to provide online lottery sales services on behalf of the China Sports Lottery Administration Center***. . . To the best of the Company's knowledge, the approval by the Ministry of Finance for the Company to provide online lottery sales services on behalf of the China Sports Lottery Administration Center ***is valid and has not been revoked*** or amended as of the date of this earnings release."

(Emphasis added).

228. On May 21, 2015, Deutsche Bank, the same investment bank which served as 500.com's lead underwriter in the IPO, downgraded the Company to "sell" from "hold" in a note to investors. According to Deutsche Bank analysts Alan Hellawell III and Vivian Hao said "[the] timing of a resumption of online sales remains anyone's guess."

229. On June 9, 2015, the Company announced that Tsinghua Holdings, a state owned LLC with very close ties to the government, agreed to invest $123.8 million (or a 15.2% stake) in 500.com.[30] Tsinghua Holdings is an investment firm

---

[30] http://calvinayre.com/2015/06/10/business/tsinghua-university-takes-124m-stake-in-500-com/

affiliated with Tsinghua University, a state owned enterprise. Tsinghua University is considered a top tier university for engineering and a significant amount of government officials have graduated from Tsinghua.

**500.COM'S INTERNAL CONTROL VIOLATIONS**

230. During the Class Period, the 500.com Defendants falsely represented that 500.com maintained internal controls over financial reporting to ensure the reliability of the Company's financial reporting in compliance with Generally Accepted Accounting Principles ("GAAP").

231. In addition, during the Class Period, the 500.com Defendants concealed a chronic and systematic breakdown of the Company's internal accounting controls, thereby allowing the Company to, among other things, illegally operate the Company's online lottery business without proper licensing and in violation of regulatory requirements, engage in an illegal kickback scheme with government officials, pocket proceeds from playing the Company's own lottery and engage in insider selling. These illicit activities ultimately resulted in 500.com's entire lottery operations being suspended indefinitely.

232. As a result of the 500.com Defendants' failure to maintain effective internal control over financial reporting, they were able to mask the illegal kickback schemes the Management Defendants were engaged in and the fact that 500.com was operating largely without any valid lottery license. 500.com's inadequate internal financial controls caused the Company to issue the False and Misleading Financial Statements, in violation of GAAP.

233. As the SEC has explained, internal controls are fundamental and critical for summarizing and reporting financial data . . . ." 15 U.S.C. § 78m(b)(2).[31] Indeed, a lack of fundamental internal controls, as here, under GAAP constitutes a "material weakness" that should be immediately disclosed to investors under

---

[31] Specifically, the SEC requires a public company to: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer; and (b) devise and maintain a system of internal accounting controls . . . . " 15 U.S.C. § 78m(b)(2).

GAAP.

234. Generally accepted auditing standards ("GAAS") set forth the role of a Company's management in an audit of an entity's financial statements. Specifically, and as excerpted above:

> management and, when appropriate, those charged with governance, have responsibility
>
> a. for the preparation and fair presentation of the financial statements in accordance with the applicable financial reporting framework;
>
> b. for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error…[32]

235. The Management Defendants were further required under Rule 302 of the Sarbanes-Oxley Act of 2002 to provide certifications relating to the company's internal control over financial reporting in the False and Misleading Financial Statements.

236. Additionally, Section 302 of the Sarbanes-Oxley Act of 2002 required the 500.com Defendants to maintain, assess and report on the effectiveness of the Company's internal control over financial reporting. The language provides the following, in relevant part:

> (a) REGULATIONS REQUIRED.—The Commission shall, by rule, require, for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m, 78o(d)), that the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that—
>
> (1) the signing officer has reviewed the report;

[32] AU-C Preface – *Principles Underlying an Audit Conducted in Accordance with Generally Accepted Auditing Standards*.

> (2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;
>
> (3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;
>
> (4) ***the signing officers—***
>
> ***(A) are responsible for establishing and maintaining internal controls;***
>
> ***(B) have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;***
>
> ***(C) have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and***
>
> ***(D) have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date…***

(Emphasis added.)

237. Auditing standards established and adopted by the Public Company Accounting Oversight Board (the "PCAOB"), specifically Auditing Standard ("AS") No. 5, *An Audit of Internal Control over Financial Reporting that is Integrated with an Audit of Financial Statements and Related Independence Rules and Conforming Amendments* ("AS 5"), defines internal controls over financial reporting as follows:

> Internal control over financial reporting is a process designed by , or under *the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of* directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes those policies and procedures that –

> (1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.[33]

238. Professional accounting standards recognize that a company's control environment sets the tone of an organization, and is the foundation for all other components of internal control, providing discipline and structure. The Committee of Sponsoring Organizations of the Treadway Commission framework also discusses a Company's control environment as being one of five interrelated components of internal control, stating:

> Control environment. Senior management must set an appropriate "***tone at the top***" that positively influences the control consciousness of entity personnel. The control environment is the foundation for all other components of internal control and provides discipline and structure.

239. The Company's most senior executive management, comprised in substantial part of the Management Defendants herein, embraced a "tone at the top" of operating a lottery business without valid licenses, in violation of regulations governing the industry and other illicit activities in order to line the pockets of insiders. The purported control environment created by the Management Defendants focused on lottery sales, rather than regulatory compliance, resulting in the ineffective internal controls described in detail herein. The Management

[33] AS 5, Appendix A, A-5.

Defendants' failure to meet basic regulatory requirements for conducting online lottery sales rather and, instead circumvent regulations by engaging in illegal kickback and other schemes created a control environment contributing to the ultimate suspension of the Company's entire lottery business.

240. Moreover, the 500.com Defendants' failure to identify such control deficiencies (e.g., material weaknesses) within the Company rendered the Management Defendants' Sarbanes Oxley reports in the False and Misleading Statements section materially false and misleading in turn, and contributed to the Company's issuance of materially false and misleading financial statements in violation of GAAP.

241. The 500.com Defendants admitted in the Initial Offering Prospectus that 500.com's outside auditors had identified material weaknesses in the Company's internal controls:

> In preparing our consolidated financial statements as of December 31, 2013 a material weakness in our internal control over financial reporting was identified, as defined in the standards established by the U.S. Public Company Accounting Oversight Board.
>
> ***
>
> We and our independent registered public accounting firm, in connection with the preparation and external audit of our consolidated financial statements as of and for the fiscal year ended December 31, 2012, have identified certain material weaknesses and a control deficiency, each as defined in the U.S. Public Company Accounting Oversight Board Standard AU Section 325, Communications About Control Deficiencies in an Audit of Financial Statements, or AU325, in our internal control over financial reporting. As defined in AU325, a "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

242. The Initial Offering Prospectus further disclosed that the material deficiencies identified related to the Company's ability to comply with U.S. GAAP

and detect misstatements in financial statements, the exact deficiencies raised in this Amended Complaint.

243. According to the Initial Offering Prospectus, however, the Company and its auditors admittedly did not perform a "formal assessment" of 500.com's internal controls and believe that had the performed such a formal assessment, additional material weaknesses may have been identified:

> The material weaknesses identified related to (i) insufficient personnel with U.S. GAAP expertise in the preparation of the financial statements and related disclosures in accordance with U.S. GAAP and SEC reporting requirements; and (ii) lack of an effective independent oversight function to prevent and detect misstatements in financial statements. Neither we nor our independent registered public accounting firm undertook a comprehensive assessment of our internal control for purposes of identifying and reporting material weaknesses and other control deficiencies in our internal control over financial reporting as we and they may be required to do after we become a public company. In light of the number of material weaknesses and other control deficiencies that were identified as a result of the limited procedures performed, we believe it is possible that, had we performed a formal assessment of our internal control over financial reporting or had our independent registered public accounting firm performed an audit of our internal control over financial reporting, additional control deficiencies may have been identified.

244. Notwithstanding the 500.com Defendants' failure to perform a competent and full internal control analysis, 500.com assured investors that the Company was committed to rectifying such deficiencies, despite not fully informing themselves of what they were:

> Following the identification of these material weaknesses and other control deficiencies, we have begun taking measures and plan to continue to take measures to remedy these weaknesses and deficiencies.

245. The 500.com Defendants subsequently continued to issue materially false and misleading statements to investors claiming the Company had adequate controls over financial reporting and that measures had been taken to fix known

control deficiencies, despite that little or no action had actually been taken and 500.com's internal controls were still inadequate.

**ADDITIONAL SCIENTER ALLEGATIONS**

246. As alleged herein, each of the Management Defendants acted with scienter in that the they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

247. The Management Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of 500.com and thus controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

248. Throughout the Class Period, each of the Management Defendants acted intentionally and/or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature of the Company's license purportedly granted by the Ministry of Finance and compliance with Chinese laws and regulations. Such actions allowed 500.com to inflate the Company's ADS price and profit from the Initial Public Offering to profit off United States investors before an imminent government crackdown on illicit online gambling. The Management Defendants' scienter may be imputed to 500.com as the Management Defendants were among 500.com's most senior management and were acting within the scope of their employment.

**I. The 500.com Defendants' Knowledge Of, And/Or Reckless Disregard**

**for 500.com's Failure to Obtain a Valid Lottery License and Comply with Lottery Regulations**

249. The Management Defendants knew that 500.com did not have a definite license granted by the Ministry of Finance as represented, and rather, had at most a provisionary or exploratory permit, and that a complete suspension of its operations was imminent, as a result of: (A) Defendant Law's unlawful scheme to bribe government officials to obtain a temporary online lottery license and sell lottery products outside of the permitted province in exchange for illegal kickbacks; (B) the Company's failure to satisfy the specific regulatory requirements for obtaining a valid online lottery license; (C) 500.com's pattern of failing to comply with regulatory and licensing requirements, resulting in prior suspension of operations; (D) defendant Law's control over 500.com's business; (E) the fact that online lottery sales was 500.com's "core" business; (F) the Management Defendants' significant industry and financial experience; and (F) the Management Defendants' hands on experience and close monitoring of 500.com's lottery business pursuant to their duties as members of various Board committees.

**A. Defendant Law Bribed Government Officials to Sell Lottery Products Without a Valid License in Exchange for Illegal Kickbacks**

250. As early as November 2012, each of the Management Defendants knew, or recklessly disregarded that 500.com did not have a definite license granted by the Ministry of Finance to operate an online lottery service as represented, and rather, had at most a provisionary or exploratory permit limited to the designated province.

251. Indeed, according to confidential sources in China who operate within the Chinese lottery industry interviewed by Lead Plaintiff's counsel, 500.com only had the temporary license as a result of Defendant Law perpetrating an illicit kickback scheme in which Law obtained from Tian Xiao, the Vice Secretary of the

General Administration of Sports of China, a temporary license from the Ministry of Finance's pilot online lottery program in exchange for paying Xiao illegal kickbacks from fees earned from the Company's online lottery sales. Specifically, according to these sources, as a result of this arrangement, Law paid Xiao an agreed amount of money upon percentage of online Sports Lottery sales in exchange for Xiao turning a blind eye to 500.com conducting illegal online lottery sales outside of the authorized province.

252. As a direct result of Law's ongoing bribery scheme and corruption that was uncovered in connection with the National Audit, Defendant Law was detained and interrogated in February 2015. According to Lead Plaintiff's confidential sources, a lawsuit is soon to be filed against Xiao in China asserting bribery charges, and this lawsuit will implicate Defendant Law.

253. A *China Economic Weekly* article entitled *Is the Detainment of Tian Xiao of General Administration of Sport Relevant to Sports Lottery Corruption?,* speculated that the Vice Secretary of the General Administration of Sports was involved in the corruption uncovered by the NAO. The article specifically referenced the curious timing of Xiao's arrest. The Central Commission for Discipline Inspection Department website released news that Xiao had been detained regarding serious violations of the law and was under investigation- the same day, the National Audit Office issued "lottery funds audit results" involving the Welfare and Sports lotteries. As previously described, the audit identified rampant misappropriations of lottery funds, including illegal purchases, acquisitions, and other issues.

254. As demonstrated above, Defendant Law, being directly involved in, and having orchestrated the bribery scheme alleged herein, unquestionably had actual knowledge that 500.com's license was only temporary and that the Company was engaging in the unauthorized sale of its lottery products online outside of the province approved in the pilot program.

**B. Defendant Pan Admits that the Management Defendants Were Aware that 500.com Had Not Satisfied the Requirements for Obtaining a Valid Online License**

255. Each of the Management Defendants knew that the Company did not have a valid license to sell lottery products online and, instead, had merely received a permit from the Ministry of Finance to be part of a pilot program for online lottery sales in China because 500.com had not met the requirements for receiving a valid license. Specifically, an actual and definitive license from the Ministry of Finance to operate an online lottery service in China is subject to several contingencies, none of which had been realized, including that (1) the Ministry of Finance use its best efforts to develop an online lottery sales management system; (2) 500.com then reapply to the Ministry of Finance to provide online lottery sales following the development of an online lottery sales management system; and (3) the Ministry of Finance approve 500.com's application at that time. Defendant Pan specifically acknowledged this in a June 2015 *Tencent Tech* article and the Management Defendants admitted such in the Company's 2014 Annual Report.

256. Moreover, the China Welfare Lottery Issuances and Administration Center and the China Sports Lottery Administration Center issued a statement in May 2014 that "all online lottery sales activities are illegal and against the law" and no formal licenses to operate an online lottery service had not been issued.

257. As such, the Management Defendants, as top executives of the Company (founder, CEO, President and CFO) in charge of its financial and business operations, were each aware that the Company had not satisfied the requirements for obtaining a valid license to sell online lottery products. Further, 500.com's prior 2012 suspension for operating an online lottery service without a license should have been a sufficient warning to the Management Defendant's that a suspension was substantially certain to occur. Yet in the face of this imminent probability, and the persistent media and industry speculation concerning the Company's license,

the Management Defendants opted to neither do nor say anything to prevent a suspension – allowing the Company to operate in the shadow of Chinese laws and regulations until April 4, 2015, when Chinese regulators ordered a complete shutdown of 500.com's online lottery operations, to the detriment of Lead Plaintiff and 500.com's minority public ADS holders.

### C. The Management Defendants, Through Their Control of the 500.com Entities, Were Aware that 500.com Lacked a License to Operate an Online Lottery Service and a Government Crackdown was Imminent

258. The Management Defendants had primary control over 500.com's business and were directly involved in the day-to-day decisions concerning the Company's finances and operations.

259. According to the Initial Offering Prospectus and the 2013 Annual Report, Law was at the "forefront" with respect to 500.com's business and online practices, including 500.com's compliance with Chinese laws and regulations. Thus, Law had direct knowledge of the Company's license to operate an online lottery service (or lack thereof) and likelihood of a suspension in the future:

> Our founder, Chairman and Chief Executive Officer, Mr. Man San Law, has 12 years of experience in the lottery service industry. Mr. Law is a pioneer of the online lottery service market who has been at the forefront of developing innovative online products and solutions and has established relations with market participants in China. Most of our senior management team members have 12 years of experience in information technology or Internet related industries. They are crucial to our smooth operation and continued innovation.

260. Furthermore, Defendant Law, as the Chairman of the Nominating and Corporate Governance Committee, was responsible for "monitoring [500.com's] compliance with the code of business conduct and ethics, including reviewing the adequacy and effectiveness of our internal rules and procedures to ensure compliance with applicable laws and regulations."

261. Similarly, as stated in the 2013 Annual Report, Defendant Law, as the

Chairman and Chief Executive of 500.com, oversaw "the strategic direction" of the Company and all facets of the management of 500.com:

> *Mr. Man San Law* is our founder, chairman of our board of directors and chief executive officer. Mr. Law founded E-Sun Network Co., Ltd. in 1999 and has been a pioneer in the online lottery service industry having focused on this field since 2001. Mr. Law oversees the strategic direction of our company and has transformed our company from a small start-up to an established and leading online lottery service provider in China.

262. Similarly, defendant Pan was the Company's President and CEO with direct control over the Company's business and operations and, prior to that, served as 500.com's Chief Financial Officer.

263. Thus, the Management Defendants knew 500.com did not have a definite license granted by the Ministry of Finance as represented, and also knew how this information was being reported in the financial statements that 500.com filed with the SEC and Company earnings releases. The Management Defendants knew that a government shutdown of 500.com's business operations was likely, particularly given the prior 2012 shutdown, and would have received the numerous government warnings and the results of the National Audit indicating that a crackdown on illicit gambling operations was imminent. Yet the Management Defendants failed to properly comply with Chinese licensing regulations and did not disclose this reality to investors until months later, after Law was detained by Chinese authorities on bribery and corruption charges and forced to resign as CEO.

### D. The Management Defendants' History of Non-Compliance with License and Regulatory Requirements

264. The Management Defendants are no strangers to non-compliance with regulatory and licensing requirements. Indeed, as alleged herein, the 500.com Defendants have a history and pattern of non-compliance. As uncovered through Lead Plaintiff's investigation of Chinese records, from 2001 until March 2012, the Company operated an online lottery and gaming website without regulatory approval, in clear violation of Article 303 of the Criminal Law of the PRC.

500.com's illicit online operations initially spurred a government suspension in March 2012, after eleven years of operating without the requisite regulatory approval. The Company's operations remained suspended from March 2012 until November 2012, at which time the Company reported almost zero revenue.

265. The Company also disclosed in the Initial Offering Prospectus that it received notice from the Ministry of Finance on September 26, 2010, two years before the Company's first suspension, that the MOF had issued the Interim Measures for the Administration of Online Sales of Lottery, allowing qualified service providers to provide online lottery sales services *only after obtaining the approval by and the operating permit from the MOF*.

266. Thus, the Management Defendants were clearly aware that they were not in compliance with licensing and regulatory requirements, yet, as in the past and as alleged herein, chose to ignore them.

### E. The Management Defendants Were Aware that 500.com Lacked a License to Operate an Online Lottery Service and a Government Crackdown Was Imminent Because it was 500.com's "Core" Business

267. Online lottery sales are 500.com's "core" business. As alleged herein, 500.com's online lottery services generated nearly one hundred percent of the Company's profits and earnings during the Class Period. For example, the 2014 Annual Report states: "[500.com] currently derive[s] substantially all of our revenues from service fees paid to us by provincial sports lottery administration centers for the purchase orders of sports lottery products that we direct to such centers." In addition, as a result of the most recent suspension of the Company's operations, 500.com did not generate any revenue from sports lottery sales in the second quarter of 2015.

268. Thus, each of the Management Defendants, by virtue of the fact that 500.com's online lottery service was the Company's "core" business, knew or were

reckless in not knowing that the Company was operating in the shadow of Chinese laws and regulations by operating without a formal license from the Ministry of Finance, outside of the authorized province. The facts of 500.com's ultimate suspension obviously involve the majority of 500.com's business and fall within its "core business operations" and "vital corporate function" that 500.com's most senior executives are rightly presumed to have knowledge of as a matter of law. Accordingly, knowledge of the falsity of the Company's public statements as related to these facts are properly ascribed to the Management Defendants, who should have known of problems relating to the core operations of the Company that would have led them to the realization that the Company's public filings included false statements when issued.

### F. The Management Defendants Were Aware that 500.com Lacked a License to Operate an Online Lottery Service and a Government Crackdown Was Imminent as a Result of Their Significant Industry Knowledge and Experience

269. The Management Defendants are well-educated and experienced in the fields of Chinese internet operations and online lotteries. Thus, they had the ability to, and did, understand and analyze 500.com's business practices and compliance with Chinese laws and regulations, particular licensing requirements, the risk associated with operating an online lottery service without the proper license, and how the defaults impacted the Company's business and financial statements.

270. Specifically:

- As derived from the Initial Offering Prospectus, Defendant Law founded E-Sun Network Co., Ltd. in 1999 and has been a pioneer in the online lottery service industry having focused on this field since 2001. He oversees the strategic direction of 500.com's company and has transformed it from a small start-up to an established and leading online lottery service provider in China. He serves as the Chairman of 500.com Limited. From 1990 to 1999, he served in various positions at Shenzhen Yangguang Co., Ltd. Law received a bachelor's degree from Wuhan University in 1990, and an Executive Master of Business Administration degree from Cheung Kong Graduate School of

Business in 2009.

- Defendant Pan has been the President of 500.com since September 1, 2014 and its Chief Executive Officer since May 15, 2015. Pan served as the Chief Financial Officer of 500.com since April 2011 until August 2014 and served as its Principal Accounting Officer. He served as Vice president at Deutsche Bank AG, Hong Kong Branch from 2007 to April 2011 and an attorney at Simpson Thacher & Bartlett LLP from 2003 to 2007. He has been Director of 500.com since May 15, 2015. Mr. Pan received a Master of Law degree and a Juris Doctor degree from Columbia University Law School in 2001 and 2003, respectively, a Master of Law degree from the University of Edinburgh in 2000 and a bachelor's degree in law from Fudan University in 1999.

271. Thus, the Management Defendants knew 500.com was operating without the proper license from the Ministry of Finance, and was otherwise in violation of stated Company compliance practices. This is not just to say that the Management Defendants must have known; it is to show that they did know.

### G. The Individual Defendants Closely Monitored 500.com's Online Lottery Business During the Class Period

272. Throughout the Class Period, the Management Defendants continually flaunted their team's industry experience:

> Most of our senior management team members have 13 years of experience in information technology or Internet related industries. They are crucial to our smooth operation and continued innovation. In addition, we rely on a limited number of specialized staff members in certain areas of our IT operations where we do not receive support from external service providers. Furthermore, our ability to expand our operations to accommodate our anticipated growth will also depend on our ability to attract and retain additional personnel such as qualified risk managers, finance, management, marketing, technical and other personnel.
>
> ***
>
> The members of the core development team all have previous experience in major Chinese Internet enterprises, some of whom are the first generation Internet professionals in China. We are dedicated to expanding our product development team and to attracting highly experienced professionals. We provide our team members with

> frequent and up-to-date training to ensure that they are fully updated on industry trends and developments, and are capable of and efficient in handling any technical challenges we might face in our operations. Our current focus is on the development of new functions and improvement of existing technologies in a number of crucial areas, such as sever capacity, user interface, client-side software, mobile site and mobile client side software, infrastructure optimization and user data mining.

273. The Management Defendants also monitored and managed the Company's compliance with Chinese laws and regulations through their duties on the Nominating and Corporate Governance Committee, which is directly responsible for overseeing 500.com's effectiveness of internal rules and compliance with applicable laws and regulations. The Nominating and Corporate Governance Committee, in turn, was required to (and presumably would have) reported its findings to the full Board.

274. Throughout the Class Period, Defendant Law was (and remains) the Chairman of the Nominating and Corporate Governance Committee and required to comply with all aspects of the Nominating and Corporate Governance Committee Charter. The Nominating and Corporate Governance Committee Charter states in relevant part:

> The purpose of the Nominating and Corporate Governance Committee (the "Committee") is to assist the Board with fulfilling its responsibilities regarding:
>
> a) identifying qualified candidates as consistent with the criteria approved by the Board for director nominees and recommending such candidates to the Board for selection for all directorships to be filled by the Board or by the shareholders;
> b) identifying qualified candidates as consistent with the criteria approved by the Board for executive officer nominees and recommending such candidates to the Board for selection;
> c) conducting annual reviews of the Board's independence, qualifications and experiences in light of the availability of potential Board members; and
> d) monitoring compliance with the Company's Code of Business Conduct and Ethics, including reviewing the adequacy and

effectiveness of the Company's internal rules and procedures to ensure compliance with applicable laws and regulations.

275. Thus, Defendant Law was aware of 500.com's non-compliance with licensing regulations throughout the Class Period through his duties and obligations as Chairman of the Nominating and Corporate Governance Committee and would have reported his findings to other Management Defendants, particularly Defendant Pan, who was President of 500.com throughout the Class Period and became a fellow Board member on May 15, 2015.

## II. THE 500.COM DEFENDANTS HAD MOTIVE TO MAKE FRAUDULENT REPRESENTATIONS

### A. The Management Defendants Had Motive to Commit the Alleged Fraud in Order to Reap Significant Profits From Lucrative Bonuses

276. The 500.com Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate 500.com's ADS price and maximize their individual profits through equity-based bonuses and insider trading.

277. First, in the Initial Offering Prospectus, the 500.com Defendant's clearly state that Initial Public Offering proceeds will be used to for "the retention of employees by providing them with equity incentives." Following the Initial Public Offering, Defendants Law and Pan awarded themselves 54,603,854 and 2,400,000 ADSs, respectively. At the $13.00 per share IPO price, these holdings equated to $709,850,102 and $31,200,000 USD for Defendant Law and Pan, respectively. On the day of the IPO and at most times throughout the Class Period before the truth was revealed, the 500.com ADS price exceeded $20.00 per share. This inflated the value Defendant Laws holdings into the ***billions***.

278. Accordingly, Defendants Law and Pan had every incentive to issue false and misleading statements regarding the Company's business prospects, to artificially inflate the Company's ADS price, and therefore the value of their large

equity holdings.

**B. Insider Selling**

279. Between February 18 and 23, 2015, while rumors of suspension circulated but before the Company issued its February 25, 2015 Press Release, an alarming series of stock sales took place by a company called "Blue Ivy Investment Ltd." According to Blue Ivy Investment's Form F-1, the company's majority shareholder is another company, called "Vision Knight Capital." Zhe Wei, who sits on the Board of 500.com, is the Chairman of Vision Knight Capital. Also according to Blue Ivy Investment's Form F-1, the company can be controlled entirely by Vision Knight Capital. On February 19 and 20, 2015, Blue Ivy Investment sold 312,900 shares at an artificially inflated price. Only a few days later, on February 25, 2015, the Company announced a partial suspension of its operations, sending the 500.com ADS price into a tailspin. Specifically, 500.com's ADS price fell 22% on this date, from a closing price of $12.83 per ADS on February 24, 2015, to close at $9.96 per share on February 25, 2015. In total by February 25, 2015, 500.com's ADS price had fallen 45% over the previous two weeks, and 81% since the beginning of February 2015.

280. These ADS sales were strategically timed to capitalize on the small window of time during the Chinese New Year when the Company was not operating and thus, did not have to respond to rumors widely circulating that a suspension was imminent. The Chinese New Year took place on February 19, 2015 and Blue Ivy Investment's stock sales occurred on the same day. As a result, Zhe Wei was able to cash out his holdings in the Company at the artificially inflated price before the Company announced the suspension.

281. Thus, at a time when the Company and its ADS holders should have been the sole focus, 500.com insiders sought to capitalize on their asymmetry of information to profit personally, by exposing the Company's inadequate internal controls.

### C. The Management Defendants Had Motive to Commit the Alleged Fraud in Order to Complete the IPO

282. The 500.com Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate 500.com's ADS price and maximize the proceeds from the Initial Public Offering.

283. By artificially inflating the ADS price in anticipation of the Initial Public Offering, 500.com was able to generate approximately $75 million in net proceeds to fund Law's illicit online lottery services and perpetuate Law's illicit kickback scheme with the Vice Governor of the National Sports Authority. The Ministry of Finance was in the process of an ongoing national audit, and thus, an IPO needed to occur, if at all, before Defendant Law's fraud was exposed and the government yet again suspended 500.com's operations. Thus, it was critical for the Company to obtain a substantial amount of proceeds from the Initial Public Offering before it was shutdown.

284. The IPO, in turn, provided 500.com more money to expand online operations, thereby resulting in inflated fees paid by provincial lottery administration centers. As the 2013 Annual Report discloses, "[s]ubstantially all of [500.com's] revenues were generated from service fees paid to [500.com] by a few provincial lottery administration centers." Before the IPO, for the 2012 fiscal year, the Company reported service fees paid to the Company by provincial lottery administration centers of RMB $169.4 million. Following the IPO, 500.com reported service fees paid to the Company by provincial lottery administration centers of RMB 316.8 million (USD 52.3 million) and RMB 635.2 million (USD 105.3 million) for the 2013 and 2014 fiscal years, respectively.

285. The foregoing creates an inference of scienter and motive on behalf of the 500.com Defendants relating to the Initial Public Offering.

## LOSS CAUSATION

286. The market for 500.com ADSs was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, 500.com ADSs traded at artificially inflated prices during the Class period. Lead Plaintiff and other members of the Class purchased or otherwise acquired 500.com ADSs relying upon the integrity of the market of 500.com ADSs and market information related to the Company, and have been damaged thereby.

287. During the Class Period, the 500.com Defendants named in this Action materially misled the investing public, thereby inflating the price of 500.com ADSs, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about 500.com's business, operations, and prospects as alleged herein.

288. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, the 500.com Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about 500.com's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's ADSs to be overvalued and artificially inflated at all relevant times. The materially false and/or misleading statements made by the 500.com Defendants named in this Action during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the

Company's ADSs at artificially inflated prices, thus causing the damages complained of herein. For example:

- In response to the Initial Offering Prospectus and the Initial Offering Registration Statement, filed on November 22, 2013 and October 22, 2013, respectively, the Company's ADSs opened in the IPO at $20.00 per ADS on November 22, 2013, 54% above the IPO price.

- In response to the May 7, 2014 Press Release, the Company's ADS price increased a substantial 18%, from a closing price of $28.61 per ADS on May 7, 2014 to a closing price of $33.77 per ADS by May 12, 2014.

- In response to the May 8, 2014 Press Release, the Company's ADS price increased a substantial 18%, from a closing price of $28.61 per ADS on May 7, 2014 to a closing price of $33.77 per ADS by May 12, 2014.

- In response to the August 11, 2014 Press Release, the Company's ADS price increased from a closing price of $37.68 per ADS on August 11, 2014 to a closing price of $37.88 per ADS on August 12, 2014.

- In response to the November 20, 2014 Press Release, the Company's ADS price increased from a closing price of $23.89 per share on November 20, 2014 to a closing price of $24.20 per share by November 21, 2014.

289. During the Class Period, as detailed herein, the 500.com Defendants engaged in a scheme to deceive the market and a course of conduct that caused the price of 500.com ADSs to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the 500.com Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of 500.com ADSs was removed, and the price of 500.com ADSs fell. Indeed, in response to the February 25, 2015 Press Release, the Company's ADS price decreased a substantial 22% from a closing price of $12.83 per ADS on February 24, 2015 to a closing price of $9.55 per ADS on February 25, 2015.

290. As a result of their purchases of 500.com ADSs during the Class Period at artificially inflated prices, Lead Plaintiff, and the other Class members suffered

economic loss, i.e., damages, under the federal securities laws.

291. The timing and magnitude of the price decline in 500.com ADSs negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the 500.com Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

292. Lead Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired 500.com ADSs during the Class Period, seeking to pursue remedies under the Securities Act and the Exchange Act (the "Class").

293. Excluded from the Class are 500.com and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

294. Because 500.com had millions of ADSs outstanding during the Class Period, and because its ADSs were actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Lead Plaintiff believes that there are, at a minimum, thousands of Class members. Members of the Class may be identified from records maintained by 500.com or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

295. Lead Plaintiff's claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

296. Lead Plaintiff will fairly and adequately protect the interests of the

Class and have retained counsel competent and experienced in class action and securities litigation.

297. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a. Whether Defendants violated the federal securities laws as alleged herein;
b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about 500.com's business and operations;
c. Whether the price of 500.com ADSs were artificially inflated during the Class Period; and
d. The extent to which members of the Class have sustained damages and the proper measure of damages.

298. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO STATUTORY SAFE HARBOR

299. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Class Action Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward- looking statements

pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of 500.com who knew that the statement was false when made.

**APPLICABILITY OF FRAUD ON THE MARKET DOCTRINE**

300. The market for 500.com ADSs was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, 500.com ADSs traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's ADSs relying upon the integrity of the market price of 500.com and market information relating to the Company, and have been damaged thereby.

301. During the Class Period, the artificial inflation of 500.com's ADSs was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about 500.com's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of 500.com and its business, operations, and prospects, thus causing the price of the Company's ADSs to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company ADSs. The Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's ADSs at such artificially inflated prices, and each of them has been damaged as a result.

302. At all relevant times, the market for 500.com ADSs was an efficient

market for the following reasons:

a. 500.com ADSs met the requirements for listing, and was listed and actively traded on the NYSE Stock Exchange, a highly efficient and automated market;

b. As a regulated issuer, 500.com filed periodic public reports with the SEC and the NYSE;

c. 500.com communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. During the class period, on average, over several hundreds of thousands of 500.com ADSs were traded on a weekly basis. On news days, the Company's trading volume increased into the millions, reflecting an active trading market for 500.com ADSs and investors' expectations being impounded into the ADS price; and

e. The proportion of statistically significant ADS price movement days for 500.com ADSs on news days is significantly over the proportion of non-news days and, thus, 500.com ADSs is more likely to have a statistically significant return on a day with news than no-news, consistent with an informationally efficient market.

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against 500.com and the Management Defendants**

303. Lead Plaintiff realleges each allegation as if fully set forth herein.

304. This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against 500.com, Law, and Pan (the "Count I Defendants").

305. The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts

necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

306. The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

307. The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

308. As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Lead Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

309. 500.com is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of respondeat superior, as those persons were acting as the officers, directors, and/or agents of 500.com in taking the actions alleged herein.

310. Lead Plaintiff and the Class purchased 500.com ADSs, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects. In so doing, Lead Plaintiff and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not

disclosed in the Count I Defendants' public statements. Lead Plaintiff and the Class were damaged as a result of their reliance on the Count I Defendants' false statements and misrepresentations and omissions of material facts.

311. At the time of the Count I Defendants' false statements, misrepresentations and omissions, Lead Plaintiff and the Class were unaware of their falsity and believed them to be true. Lead Plaintiff and the Class would not otherwise have purchased 500.com ADSs had they known the truth about the matters discussed above.

312. By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

313. As a direct and proximate result of the Count I Defendants' wrongful conduct, Lead Plaintiff and the Class have suffered damages in connection with their purchase of 500.com ADSs.

314. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchases of securities giving rise to the cause of action.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**

**Against 500.com and the Management Defendants**

315. Lead Plaintiff realleges each allegation as if fully set forth herein.

316. This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against 500.com, Law, and Pan (the "Count II Defendants").

317. Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of 500.com, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act. The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Lead Plaintiff's and the Class' investments in 500.com

ADSs within the meaning of §20(a) of the Exchange Act. Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

318. The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

319. The Count II Defendants knew or recklessly disregarded the fact that 500.com's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

320. By virtue of their high-level positions and their participation in and awareness of 500.com's operations and public statements, the Count II Defendants were able to and did influence and control 500.com's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiff and the Class contend contained materially false and misleading information and on which Lead Plaintiff and the Class relied.

321. The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

322. As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Management Defendants are also liable pursuant to §20(a) of the Exchange Act.

323. As a direct and proximate result of the Count II Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their

purchase of 500.com ADSs.

324. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchases of securities giving rise to the cause of action.

**COUNT III**

**For Violations of Section 11 of the Securities Act**

**Against Defendants 500.com, the Management Defendants, and the Underwriter Defendants**

325. This claim does not sound in fraud. For the purposes of this Section 11 claim, Lead Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act. This claim is based solely on strict liability.

326. Lead Plaintiff realleges each allegation as if fully set forth herein.

327. This claim is brought under §11 of the Securities Act, 15 U.S.C. § 77k, against 500.com, the Management Defendants, and the Underwriter Defendants (the "Count III Defendants").

328. The Initial Public Offering Documents were inaccurate and contained untrue statements of material fact, omitted to state facts necessary to make the statements made therein not inaccurate, and omitted to state material facts required to be stated therein.

329. 500.com was the registrant for the IPO. As the issuer of ADSs, 500.com is strictly liable to Lead Plaintiff and the Class for the materially inaccurate statements in the Initial Public Offering Documents and the failure of the Initial Public Offering Documents to be complete and disclose the material information required pursuant to the regulations governing its preparation.

330. Law and Pan signed the Initial Public Offering Documents and caused their issuance. The Management Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements

contained in the Offering Documents. Law and Pan had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Offering Documents inaccurate. By virtue of Law and Pan's failure to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Initial Public Offering Documents, the Initial Public Offering Documents contained inaccurate misrepresentations and/or omissions of material fact. As such, Law and Pan are strictly liable to Plaintiff and the Class.

331. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Offering Documents were prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Underwriter Defendants are strictly liable to Lead Plaintiff and the Class.

332. The Count III Defendants were collectively responsible for the contents and dissemination of the Initial Public Offering Documents. None of them made a reasonable investigation of possessed reasonable grounds for the belief that the statements contained in the Initial Public Offering Documents were true and without omissions of any material facts and were not inaccurate.

333. The Count III Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

334. At the time of the Count III Defendants' false statements, misrepresentations, and omissions in the Initial Public Offering Documents, Lead Plaintiff and the Class were unaware of their falsity and believed them to be true. Lead Plaintiff and the Class would not otherwise have purchased 500.com ADSs in

the IPO had they known the truth about the matters discussed above.

335. By virtue of the foregoing, the Count III Defendants have violated §11 of the Securities Act.

336. Lead Plaintiff and the Class acquired their 500.com ADSs pursuant to, traceable to, and in reliance upon the Initial Public Offering Documents, without knowledge concerning the misstatements alleged herein and could not have reasonably discovered these facts on their own. The value of 500.com ADSs sold in the IPO has declined substantially subsequent to and due to Defendants' violations of Section 11 of the Securities Act.

337. This claim was brought within one year after Lead Plaintiff discovered or reasonably could have discovered the untrue statements and omissions in the Initial Offering Prospectus and Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO registration statements.

**COUNT IV**

**For Violations of Section 15 of the Securities Act**

**Against the Management Defendants**

338. This claim does not sound in fraud. For the purposes of this Section 11 claim, Lead Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 15 of the Securities Act. This claim is based solely on strict liability.

339. Lead Plaintiff realleges each allegation as if fully set forth herein.

340. This claim is brought under §15 of the Securities Act, 15 U.S.C. § 77o, against the Management Defendants.

341. Each of the Management Defendants, by reason of their status as senior executive officers and/or directors of 500.com, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiff and the Class, within the meaning of §15 of the Securities Act. The Management

Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Lead Plaintiff's and the Class' investments in 500.com within the meaning of §15 of the Securities Act. Therefore, the Management Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

342. At all times relevant herein, Law and Pan were controlling persons of 500.com within the meaning of Section 15 of the Securities Act. Both before and after the IPO, the Management Defendants were executive officers of 500.com and participated in the day-to-day operations of 500.com's business affairs. The Management Defendants had the power to influence, and did so influence, 500.com's unlawful actions in connection with the IPO alleged herein.

343. During the time in which they served on the Board, the Director Defendants were controlling persons of 500.com:

> Our success is dependent upon the expertise and continued service of our senior management and other key personnel. Our founder, Chairman and Chief Executive Officer, Mr. Man San Law, has 12 years of experience in the lottery service industry. Mr. Law is a pioneer of the online lottery service market who has been at the forefront of developing innovative online products and solutions and has established relations with market participants in China.
>
> ***
>
> Our founder, chairman and CEO, Mr. Man San Law, was the key person behind the establishment of our company, which was among the earliest online lottery service providers in China. Mr. Law has been at the forefront of developing innovative online products and solutions and establishing strategic partnerships with market participants. Our long-term track record as a leader in the market under Mr. Law's leadership has strengthened our market position and enhanced our brand name.

344. For these reasons, each of the Management Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the

Management Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

345. The Management Defendants knew or recklessly disregarded the fact that 500.com's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Management Defendants did not act in good faith.

346. By virtue of their high-level positions and their participation in and awareness of 500.com's operations and public statements, the Management Defendants were able to and did influence and control 500.com's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

347. The Management Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

348. As set forth herein Defendants each violated §11 of the Securities Act by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Management Defendants are also liable pursuant to §15 of the Securities Act.

## COUNT V

## Violations of Section 12(a)(2) of the Securities Act

## Against the Underwriter Defendants

349. This claim does not sound in fraud. For the purposes of this Section 12(a)(2) claim, any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count. Lead Plaintiff does not allege that Underwriter Defendants had scienter or fraudulent intent, which are not elements of this Claim.

350. Lead Plaintiff realleges each allegation as if fully set forth herein.

351. This claim is brought under §12(a)(2) of the Securities Act, 15 U.S.C. § 77k, against Deutsche, Piper Jaffray, and Oppenheimer (the "Count V Defendants").

352. The Count V Defendants offered, sold and/or solicited a security, namely 500.com's ADSs, by means of the Public Offering Documents identified above, and sold, or solicited the sale, of 500.com's ADSs for their own financial benefit. The Public Offering Documents contained untrue and/or misleading statements of material fact that the Defendants in the exercise of reasonable care should have known were false.

353. The Count V Defendants actively solicited the sale of 500.com's ADSs to serve their own financial interests.

354. At the time of purchase of 500.com's shares, Lead Plaintiff and other members of the Class did not know that the representations made to them by 500.com and the Underwriter Defendants in connection with the distribution of ADSs and the matters described above were untrue, and did not know the above described omitted material facts, were not disclosed.

355. As a result, Lead Plaintiff and Class members are entitled to tender 500.com ADSs they purchased and receive from the Count V Defendants the consideration paid for those ADSs with interest thereon, less the amount of any income received thereon, or damages resulting from Defendants' conduct.

356. The Count V Defendants are liable to Lead Plaintiff and Class members pursuant to Section 12 (a)(2) of the Securities Act, as seller of 500.com ADSs in the IPO.

357. This Action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as representatives of the Class;

B. Awarding Lead Plaintiff and the members of the Class damages, including interest;

C. Awarding Lead Plaintiff reasonable costs and attorneys' fees; and

D. Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

Dated: September 15, 2015 Respectfully submitted,

**SHEPHERD FINKELMAN MILLER & SHAH LLP**

/s/ Valerie Chang .
Valerie L. Chang (SBN 295147)
11755 Wilshire Blvd.
Los Angeles, CA 90025
Tel: (323) 510-4060
Fax: (866) 300-7367
Email: vchang@sfmslaw.com

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins
Nancy A. Kulesa
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: nkulesa@zlk.com
*pro hac vice to be submitted*

*Attorneys for Lead Plaintiff Liu Shaolin*